ANTHONY L. FRANÇOIS, Cal. Bar No. 184100
Email: TFrancois@pacificlegal.org
TIMOTHY R. SNOWBALL, Cal. Bar No. 317379
Email: TSnowball@pacificlegal.org
Pacific Legal Foundation
930 G Street
Sacramento, California 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747

JAMES M. MANLEY, Ariz. Bar No. 031820* (*Pro Hac Vice*)
Email: JManley@pacificlegal.org
Pacific Legal Foundation
3217 E. Shea Blvd., # 108
Phoenix, Arizona 85028
Telephone: (916) 288-1405
Facsimile: (916) 419-7747

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| PETER STAVRIANOUDAKIS; KATHERINE STAVRIANOUDAKIS; SCOTT TIMMONS; ERIC ARIYOSHI; **and** AMERICAN FALCONRY CONSERVANCY**,**<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES FISH & WILDLIFE SERVICE; CHARLTON H. BONHAM, in his official capacity as Director of California Department of Fish and Wildlife; **and** MARGARET EVERSON, in her official capacity as Principal Deputy Director Exercising the Authority of the Director of United States Fish & Wildlife Service,<br><br>Defendants. | No. 1:18-cv-01505-LJO-BAM<br><br>**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

*Licensed to practice law in Arizona and Colorado. Not licensed to practice law in California.

Mem. in Supp. of Pl.s' Mot. for Prelim. Inj.
No. 1:18-cv-01505-LJO-BAM

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................................3

    I.    INTRODUCTION .................................................................................................8

    II.    THE REGULATIONS ..........................................................................................9

    III.    FACTUAL AND PROCEDURAL BACKGROUND...........................................10

    IV.    STANDARD OF DECISION ...............................................................................13

    V.    ANALYSIS............................................................................................................14

        A.    Likelihood of Success on the Merits....................................................14

            1.  Fourth Amendment challenge to the warrantless search rules.............14

                a.    Warrantless searches violate falconers' property rights
                      protected by the Fourth Amendment .............................................15

                b.    Warrantless searches violate falconers' privacy rights
                      protected by the Fourth Amendment .............................................16

            2.  First Amendment challenge to the speech regulations.........................18

                a.    Limiting images of falcons in all expression that is not about
                      falcons is unconstitutional .............................................................19

                 b.    Limiting commercials that feature falcons but are not about
                      falcons or falconry is unconstitutional..........................................21

                c.    Limiting compensation for falcon-related expression
                      is unconstitutional...........................................................................22

                d.    Dictating the content of conservation education programs
                      is unconstitutional...........................................................................24

        B.    Falconers Are Suffering Irreparable Harm from Continuous
            Constitutional Injuries ..........................................................................24

        C.    The Balance of Equities Weighs in Falconers' Favor............................25

        D.    A Preliminary Injunction Would Serve the Public Interest ...................26

        E.    Waiver of Bond Is Appropriate.............................................................26

    VI.    CONCLUSION ....................................................................................................27

**TABLE OF AUTHORITIES**

**CASES**

*Allen v. County of Lake*, 71 F. Supp. 3d 1044 (N.D. Cal. 2014)......................................26

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011)..................................13

*Animal Legal Def. Fund v. Herbert*, 263 F. Supp. 3d 1193 (D. Utah 2017)..............................19

*Baca v. Moreno Valley Unified Sch. Dist.*, 936 F. Supp. 719 (C.D. Cal. 1996) ........................27

*Barahona-Gomez v. Reno*, 167 F.3d 1228 (9th Cir. 1999) ..........................................................26

*Bartels v. Biernat*, 405 F. Supp. 1012 (E.D. Wis. 1975)............................................................27

*Boyd v. United States*, 116 U.S. 616 (1886)................................................................................27

*Brown v. Entm't Merchants Ass'n*, 564 U.S. 786 (2011)............................................................20

*Buehrle v. City of Key West*, 813 F.3d 973 (11th Cir. 2015) ......................................................19

*Byrd v. United States*, 138 S. Ct. 1518 (2018) ............................................................................16

*California v. Ciraolo*, 476 U.S. 207 (1986) ................................................................................17

*Carpenter v. United States*, 138 S. Ct. 2206 (2018) ...................................................................16

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*,
447 U.S. 557 (1980)..............................................................................................................21

*Cincinnati v. Discovery Network*, 507 U.S. 410 (1993)........................................................18, 22

*Citizens for Free Speech, LLC v. County of Alameda*,
62 F. Supp. 3d 1129 (N.D. Cal. 2014) ...........................................................................25–26

*Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010) ................................................20

*City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750 (1988)..........................................23

*Collins v. Virginia*, 138 S. Ct. 1663 (2018) ................................................................................15

*Consol. Edison Co. of N.Y. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 530 (1980)....................18

*Doe v. Pittsylvania County, Va.*, 842 F. Supp. 2d 927 (W.D. Va. 2012)....................................27

*Edwards v. District of Columbia*, 755 F.3d 996 (D.C. Cir. 2014) .............................................24

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ..............................................................26

*Florida v. Jardines*, 569 U.S. 1 (2013) ................................................................................14–15

*Fordyce v. City of Seattle*, 55 F.3d 436 (9th Cir. 1995)..................................................................19

*Goldie's Bookstore v. Superior Court*, 739 F.2d 466 (9th Cir. 1984)..........................................25

*Greater New Orleans Broadcasting Ass'n, Inc. v. United States*,
    527 U.S. 173 (1999)............................................................................................................21

*Groh v. Ramirez*, 540 U.S. 551 (2004) ........................................................................................14

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) .....................................................19–20

*Katz v. United States*, 389 U.S. 347 (1967) ..........................................................................15, 17

*Koontz v. St. Johns River Water Management Dist.*, 570 U.S. 595 (2013) ..........................14–15

*Kyllo v. United States*, 533 U.S. 27 (2001) ...........................................................................14, 17

*Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001)..................................................................21

*Los Angeles Memorial Coliseum Comm'n v. NFL*, 634 F.2d 1197 (9th Cir. 1980) ...................25

*Mapp v. Ohio*, 367 U.S. 643 (1961)..............................................................................................14

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012)...............................................................25–26

*Metro Lights, LLC v. City of Los Angeles*, 551 F.3d 898 (9th Cir. 2009)............................21–22

*Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*,
    460 U.S. 575 (1983)............................................................................................................20

*Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018)..............................23

*Ochoa v. Campbell*, 266 F. Supp. 3d 1237 (E.D. Wash. 2017), *appeal dismissed as
    moot sub nom. Sanchez Ochoa v. Campbell*, 716 F. App'x 741 (9th Cir. 2018)..................25

*Oliver v. United States*, 466 U.S. 170 (1984)..............................................................................15

*Payton v. New York*, 445 U.S. 573 (1980) ............................................................................14, 17

*People of State of Cal. ex rel. Van de Kamp v. Tahoe Regional Planning Agency*,
    766 F.2d 1319 (9th Cir. 1985), *amended on other grounds*,
    775 F.2d 998 (9th Cir. 1985)...............................................................................................27

*Preminger v. Principi*, 422 F.3d 815 (9th Cir. 2005)...................................................................26

*Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015)..................................................................18, 27

*Retail Digital Network, LLC v. Prieto*, 861 F.3d 839 (9th Cir. 2017) ......................................21

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781 (1988)........................................23

Mem. in Supp. of Pl.s' Mot. for Prelim. Inj.
No. 1:18-cv-01505-LJO-BAM                      4

*Sammartano v. First Judicial Dist. Court in & for County of Carson City*,
  303 F.3d 959 (9th Cir. 2002)...................................................................................24–26

*Sanders County Republican Cent. Comm. v. Bullock*, 698 F.3d 741 (9th Cir. 2012).................25

*Silverman v. United States*, 365 U.S. 505 (1961)...........................................................14

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*,
  502 U.S. 105 (1991)...........................................................................................23

*Stormans, Inc. v. Selecky*, 586 F.3d 1109 (9th Cir. 2009)...............................................25

*Thalheimer v. City of San Diego*, 645 F.3d 1109 (9th Cir. 2011)....................................25–26

*United States v. Alvarez*, 567 U.S. 709 (2012)..............................................................24

*United States v. Jones*, 565 U.S. 400 (2012)............................................................14–15

*United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803 (2000) ..............................18, 20, 24

*United States v. Scott*, 450 F.3d 863 (9th Cir. 2006) .......................................................15

*United States v. Stevens*, 559 U.S. 460 (2010)........................................................18–20, 24

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
  425 U.S. 748 (1976)...........................................................................................21

*Valle Del Sol Inc. v. Whiting*, 709 F.3d 808 (9th Cir. 2013)........................................21–22

*Warsoldier v. Woodford*, 418 F.3d 989 (9th Cir. 2005)..................................................25

*Welsh v. Wisconsin*, 466 U.S. 740 (1984)...................................................................14

*Western Watersheds Project v. Michael*, 869 F.3d 1189 (10th Cir. 2017) ..........................19–20

*Western Watersheds Project v. Michael*, No. 15-cv-169-SWS,
  2018 WL 5318261 (D. Wyo. Oct. 29, 2018) ...............................................................20

*Winter v. National Resources Defense Council*, 555 U.S. 7 (2008) ..............................13, 24–26

*World Wide Rush, LLC v. City of Los Angeles*, 606 F.3d 676 (9th Cir. 2010) .........................21

*Zemel v. Rusk*, 381 U.S. 1 (1965)............................................................................19

**CONSTITUTION**

U.S. Const. amend. IV ..............................................................................................14

**STATUTES**

16 U.S.C. § 668, *et seq.* ........................................................................................................... 13

16 U.S.C. § 703, *et seq.* ........................................................................................................... 13

**RULE**

Fed. R. Civ. P. 65 ....................................................................................................................... 8

**REGULATIONS**

14 C.C.R § 670 .......................................................................................................................... 8

14 C.C.R § 670(h)(13)(A) ......................................................................................... 8, 10, 13, 19–24

14 C.C.R. § 670(j)(1)–(2) ......................................................................................................... 10

14 C.C.R. § 670(j)(3)(A) ...................................................................................... 8–9, 13, 16

50 C.F.R. § 21.29 ....................................................................................................................... 8

50 C.F.R. § 21.29(b) .................................................................................................................. 8

50 C.F.R. § 21.29(b)(4)(i) ................................................................................... 8–9, 13, 16

50 C.F.R. § 21.29(c)(2)(i)(J) .................................................................................................. 10

50 C.F.R. § 21.29(d)(1)(ii)(A)–(B) ...................................................................................... 10

50 C.F.R. § 21.29(d)(2) ..................................................................................................... 8–9, 13

50 C.F.R. § 21.29(d)(9) ..................................................................................................... 8–9, 13

50 C.F.R. § 21.29(f)(8) ...................................................................................... 8, 10, 13, 22–23

50 C.F.R. § 21.29(f)(8)(iv) .............................................................................................. 10, 23

50 C.F.R. § 21.29(f)(8)(v) ............................................................................................... 10, 24

50 C.F.R. § 21.29(f)(9) ....................................................................................... 8, 10, 13

50 C.F.R. § 21.29(f)(9)(i) ............................................................................................ 10, 19–20

50 C.F.R. § 21.29(f)(9)(ii) ........................................................................................... 10, 21–22

50 C.F.R. § 21.29(f)(9)(ii)(A)–(B) ........................................................................... 10, 22–23

**OTHER AUTHORITIES**

11A Wright, Charles Alan & Miller, Arthur R.,
   *Federal Practice and Procedure* (3d ed. 2013) ....................................................................24

38 Fed. Reg. 20,264 (July 30, 1973) ............................................................................................8

*A History of Falconry*, International Association for Falconry & Conservation of
   Birds of Prey, *available at* https://iaf.org/a-history-of-falconry/ ...........................................8

Plaintiffs Peter Stavrianoudakis, Eric Ariyoshi, Scott Timmons, and American Falconry Conservancy (hereafter Falconers) and Katherine Stavrianoudakis (*in toto* Plaintiffs) respectfully move pursuant to Fed. R. Civ. P. 65 for a preliminary injunction enjoining California and federal regulations that continuously subject Plaintiffs to unreasonable warrantless searches of their homes and private property, *see* 50 C.F.R. § 21.29(b)(4)(i); 50 C.F.R. § 21.29(d)(2) and (d)(9); 14 C.C.R. § 670(j)(3)(A), infringe on their right to free speech, *see* 50 C.F.R. § 21.29(f)(8)–(9); 14 C.C.R § 670(h)(13)(A), and subject them to falconry licensure denial or suspension of previously issued licenses for noncompliance, 14 C.C.R. § 670(j)(3)(A).

## I. INTRODUCTION

Falconry is the time-honored practice of rearing, training, and flying birds of prey—such as falcons and hawks—to catch wild quarry. Falconry has been a sport and pastime for thousands of years. *See, generally*, *A History of Falconry*, International Association for Falconry & Conservation of Birds of Prey.[1] Since its introduction in the United States, the practice of falconry has drawn a passionate but relatively small group of enthusiasts. Amongst falconers, the bond of trust between bird and man takes on a special, almost familial significance.

Some 2,000 years after the first falconers flew birds, Defendant U.S. Fish and Wildlife Service promulgated, for the first time in American history, extensive regulations governing falconry. 50 C.F.R. § 21.29; 38 Fed. Reg. 20,264 (July 30, 1973). Under the guise of regulating the "taking, possessing, purchasing, bartering, [or] selling" of certain birds of prey pursuant to the Migratory Bird Treaty Act of 1918 and the Bald and Golden Eagle Protection Act of 1940, these regulations encourage states to create licensing and regulatory schemes consistent with the federal regulations, which California has done. The state regulations are enforced by defendant Bonham. 50 C.F.R. § 21.29(b); 14 C.C.R § 670. Plaintiffs challenge the portions of those state and federal regulations that subject Plaintiffs to unreasonable warrantless searches of their homes and property, and infringe on Falconers' right to free speech.

///

---

[1] https://iaf.org/a-history-of-falconry/.

As a condition of holding state-issued falconry licenses that conform to federal requirements, Plaintiffs are subject to unannounced warrantless searches of their homes at any time. In the case of Plaintiff Katherine Stavrianoudakis, her Fourth Amendment rights are forfeit simply for being married to a licensed falconer. Plaintiffs experience continuous anxiety and fear that armed government agents will appear on their private property and demand entry into their private homes. These fears are based on experience; two of the named Plaintiffs have been subjected to warrantless searches in in the past, as have dozens of California falconers in recent years. Such encounters are not merely brief inspections of hunting or fishing licenses that wildlife officials make in public places. Rather, state and federal regulations purport to give law enforcement officers the authority to demand access to Plaintiffs' homes and papers—backed by the threat of falconry license revocation, confiscation of personal property, and civil and criminal penalties.

These warrantless searches do not require probable cause, and can be carried out with no justification and for no discernable reason at all. Since they are carried out without advance warning by armed officials, such random, unrestrained encounters with law enforcement not only threaten Falconers' constitutional rights, but their health and safety. Additionally, the falconry regulations also impose a variety of content-based restrictions on falconers' speech. The falconry regulations significantly impair Falconers' First Amendment rights—both to create expression featuring their birds and to talk about their birds—based solely on the content of the expression.

## II. THE REGULATIONS

Nestled among the regulations governing the housing and care of falconry birds are regulations purportedly granting state and federal agents the power to conduct unreasonable warrantless searches of falconers' homes and private property. *See* 50 C.F.R. § 21.29(b)(4)(i); 50 C.F.R. § 21.29(d)(2) and (d)(9); 14 C.C.R. § 670(j)(3)(A). The warrantless search regulations grant state and federal law enforcement officers the power to inspect "facilities" to ensure that certain "facilities standards" are met. *See* 50 C.F.R. § 21.29(b)(4)(i); 14 C.C.R. § 670(j)(3)(A). In the vast majority of cases falconry "facilities" are actually the interior of falconers' homes, or mews located directly within their homes' curtilage. Peter Stavrianoudakis decl. ¶ 14; Ron Kearney decl. ¶¶ 12-14. The facility standards pertain to the basic physical features of falcons' housing, including

Mem. in Supp. of Pl.s' Mot. for Prelim. Inj.
No. 1:18-cv-01505-LJO-BAM                9

suitable perches, access to clean water, and room for the birds to fly or spread their wings (if tethered). 50 C.F.R. § 21.29(d)(1)(ii)(A)–(B); 14 C.C.R. § 670(j)(1)–(2). Compliance with these facilities standards has already been confirmed before a falconer obtains his or her first bird, in an initial licensing inspection (which Plaintiffs do not challenge). 50 C.F.R. § 21.29(c)(2)(i)(J).[2]

The regulations also place content-based restrictions on Falconers' speech. 50 C.F.R. § 21.29(f)(8)–(9); 14 C.C.R § 670(h)(13)(A). Falconers are prohibited from photographing or filming their birds—but only if the images will be used in a production that is not about falcons or falconry. 50 C.F.R. § 21.29(f)(9)(i); 14 C.C.R. § 670(h)(13)(A). The regulations also specifically ban Falconers from creating non-falcon-related commercial speech. 50 C.F.R. § 21.29(f)(9)(ii); 14 C.C.R. § 670(h)(13)(A). Only one sort of falcon-containing speech is allowed: that which is related to falcons or falconry. 50 C.F.R. § 21.29(f)(8); (f)(9)(ii)(A)–(B). But this outlet for speech comes with an important financial disincentive. Under the federal regulations Falconers' "presentation of a conservation education program" may only be compensated if the fee does "not exceed the amount required to recoup . . . costs." 50 C.F.R. § 21.29(f)(8)(iv).

The California regulations incorporate the same content-based restrictions as 50 C.F.R. § 21, but go further by entirely prohibiting compensation above costs for any falcon-containing expression. 14 C.C.R. § 670(h)(13)(A). Falconers who engage in conservation education programs despite the financial disincentives must also follow content-based guidelines about what can be discussed—including "information about the biology, ecological roles, and conservation needs of raptors and other migratory birds." 50 C.F.R. § 21.29(f)(8)(v). Graciously, the federal regulations do not require that "all of these topics must be addressed in every presentation." *Id.* But any "presentations that do not address falconry and conservation education" are expressly forbidden. *Id.*

### III. FACTUAL AND PROCEDURAL BACKGROUND

The overt abuse of Falconers' Fourth Amendment rights by California and U.S. Fish and Wildlife officers has been a pervasive problem for decades, and continues unabated. Peter

---

[2] Falconers do not challenge the substantive regulations governing the care of their birds.

Mem. in Supp. of Pl.s' Mot. for Prelim. Inj.
No. 1:18-cv-01505-LJO-BAM                    10

Stavrianoudakis decl. ¶¶ 13, 15, 23, 25-26; Ron Kearney decl. ¶¶ 6-11; Bridget Rocheford-Kearney decl. ¶¶ 2-3, 8-13; Scott Timmons decl. ¶¶ 8-9. These incidents include armed officers arriving on private property unannounced and without a warrant and demanding entry into private homes. Peter Stavrianoudakis decl. ¶¶ 6-10, 13; Ron Kearney decl. ¶¶ 6-11; Bridget Rocheford-Kearney decl. ¶¶ 8-12, 16. Even non-falconers are forced to allow warrantless searches of their homes and property by virtue of living with a licensed falconer. Katherine Stavrianoudakis decl. ¶ 4 ("I did not sign anything like a falconry license, and yet I am assumed to have given up my constitutional rights."); Peter Stavrianoudakis decl. ¶ 35 ("I hated to have to tell [my wife Katherine] that, just because she was married to me, it meant that armed government agents could come into our home anytime they wanted to."); Scott Timmons decl. ¶ 6 ("[A] prior conversation did not prepare [my mother] for the experience of armed law enforcement officers demanding access to our property . . . .").

Repeated pleas from falconers to conform these regulations to the Fourth Amendment have been met with additional injuries. Peter Stavrianoudakis decl. ¶¶ 24-25. In many cases, falconers who lobbied defendant Bonham (i.e. petitioned their government for a redress of grievances) were expressly threatened with the prohibition of falconry and a confiscation of their birds. Peter Stavrianoudakis decl. ¶ 21 ("Director Bonham told me 'We are not changing anything, so you'll just have to sue us. And if you want to fight us, we can just take falconry away completely.'"); Bridget Rocheford-Kearney decl. ¶¶ 3, 13-15. These types of threats are common and ongoing. Bridget Rocheford-Kearney decl. ¶¶ 13-14 ("[T]he common mentality of Fish and Wildlife agents is: 'Let us come into your home and answer all of our questions, or else.'").

According to defendant Bonham, "[F]ear of these surprise searches keeps falconers in line." Peter Stavrianoudakis decl. ¶ 20. Such abuses have effectively created pervasive fear among licensed falconers, Peter Stavrianoudakis decl. ¶¶ 15, 23 ("The understanding is that you do what Fish and Wildlife says, no matter the legality, or you will suffer the consequences."); Ron Kearney decl. ¶ 15 ("[The threat of unannounced warrantless searches] causes extreme stress, fear, and anxiety in many falconers."); Bridget Rocheford-Kearney decl. ¶¶ 3, 16. Even non-falconers, whose rights and security in their own home are threatened, understand that fear. Katherine

Mem. in Supp. of Pl.s' Mot. for Prelim. Inj.
No. 1:18-cv-01505-LJO-BAM                              11

Stavrianoudakis decl. ¶¶ 8-12 ("Will they knock down my door, pin me down, and put me in handcuffs because I do not want to cooperate in my rights being violated? All because I love and am married to a falconer?").

Even the effort to protect their constitutional rights through this lawsuit has caused Plaintiffs' increased fear and anxiety of retribution by Fish and Wildlife officials. Peter Stavrianoudakis decl. ¶¶ 21, 33-34 ("[B]eing a named plaintiff in this lawsuit, makes me feel like there is a target on my back. I live in constant anxiety of retribution . . . ."); Katherine Stavrianoudakis decl. ¶ 7 ("This fear has only increased since this lawsuit was filed. I am afraid of retaliation by California Fish and Wildlife officers."). For many dedicated falconers, the threat of having their birds taken away is akin to the loss of a family member. Bridget Rocheford-Kearney decl. ¶ 13 ("For falconers, their birds and practice is more than a passion: it is their entire life. Essentially they are being told to give up their Fourth Amendment rights or have their entire life taken away.").

This fear and anxiety also arises from the operation of the regulations prohibiting and regulating Falconers' speech. Scott Timmons decl. ¶ 25 ("I don't think I should have to function this way, unsure of what speech is prohibited or allowed, or afraid that Fish and Wildlife might interpret something a certain way and take my birds away."); Peter Stavrianoudakis decl. ¶¶ 38, 40; Ron Kearney decl. ¶ 19. Because of the operation of these speech prohibitions, the use of falconry birds in commercials, films, and for educational presentations has been extremely limited. Scott Timmons decl. ¶ 9; Peter Stavrianoudakis decl. ¶ 40; Ron Kearney decl. ¶ 16. As a result, the speech of licensed falconers across the country has been silenced. Scott Timmons decl. ¶¶ 10-24 ("It is legal for me to fly birds for abatement and make money, but if I want to give a paid presentation about my birds I cannot charge anything for it, and am told what I can or cannot say?"); Peter Stavrianoudakis decl. ¶¶ 36-38, 40; Ron Kearney decl. ¶¶ 17-19 ("The prohibitions on falconers' speech are well-known in the falconry community. The general impression is that we are simply not allowed to talk at will about falconry or else Fish and Wildlife will take our birds away."). This impression has been confirmed by Fish and Wildlife agents. Scott Timmons decl. ¶ 15 ("[Fish and Wildlife staff told me that] I was not allowed to [] talk to people about my birds at all. That I had

to be rude and ignore their questions, or else."). The only thing stopping Falconers from sharing the sport that they love is the speech regulations challenged herein. Scott Timmons decl. ¶ 22; Peter Stavrianoudakis decl. ¶¶ 36-40; Ron Kearney decl. ¶ 18; Bridget Rocheford-Kearney decl. ¶ 15.

On October 30, 2018, Plaintiffs filed this lawsuit seeking protection of their Fourth and First Amendment rights. Plaintiffs seek a declaratory judgment from the Court that (1) the warrantless search regulations[3] violate the Fourth Amendment both facially and as applied; (2) the speech regulations[4] violate the First Amendment both facially and as applied; and (3) the search and speech regulations are in excess of Defendants' statutory authority under the Migratory Bird Treaty Act, 16 U.S.C. § 703, *et seq.*, and the Bald and Golden Eagle Protection Act, 16 U.S.C. § 668, *et seq.*; Doc. 1 at 12–21. Plaintiffs currently seek a preliminary injunction on their constitutional claims, and ask the Court to enjoin Defendants from enforcing or applying the regulations against them during the pendency of their lawsuit.

## IV. STANDARD OF DECISION

A preliminary injunction to abate Defendants' warrantless search rules and speech restrictions is appropriate because: (1) Falconers are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter v. National Resources Defense Council*, 555 U.S. 7, 20 (2008). The Ninth Circuit has articulated a variation of the *Winter* test, under which "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011). Falconers are entitled to a preliminary injunction because each of the *Winter* factors is met.

///

///

///

---

[3] 50 C.F.R. § 21.29(b)(4)(i); 50 C.F.R. § 21.29(d)(2) and (d)(9); 14 C.C.R. § 670(j)(3)(A).

[4] 50 C.F.R. § 21.29(f)(8)–(9); 14 C.C.R § 670(h)(13)(A).

Mem. in Supp. of Pl.s' Mot. for Prelim. Inj.
No. 1:18-cv-01505-LJO-BAM              13

## V. ANALYSIS

**A.      Likelihood of Success on the Merits**

**1.   Fourth Amendment challenge to the warrantless search rules**

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, *houses*, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV (emphasis added).[5] "It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984) (citation omitted). Further, it is a "basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Groh v. Ramirez*, 540 U.S. 551, 559 (2004) (quoting *Payton v. New York*, 445 U.S. 573, 586 (1980)). "[W]hen it comes to the Fourth Amendment, the home is *first among equals*. At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (emphasis added) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)).

The warrantless searches of private homes and property at issue in this case is a regular and wide-spread practice. Peter Stavrianoudakis decl. ¶ 13 ("The abuse of falconers' Fourth Amendment rights by Fish and Wildlife officers is widespread, ongoing, and systemic."); Ron Kearney decl. ¶ 7 ("I am personally aware of many examples of this abuse of power over the years . . . . This abuse continues to this day."); Bridget Rocheford-Kearney decl. ¶¶ 8-12, 16 ("Every [licensed falconer] knows someone who has gotten a visit from Fish and Wildlife demanding entry into their home."). But even if Plaintiffs' homes or curtilage have not been recently searched, these warrantless search regulations still violate their Fourth Amendment property rights, *see United States v. Jones*, 565 U.S. 400 (2012), and privacy rights, *see Kyllo v. United States*, 533 U.S. 27, 34 (2001).

Being subjected to an unconstitutional exercise of government power as a condition of licensure is itself a sufficient constitutional injury for which relief can be granted. *See, e.g.*, *Koontz*

---

[5] Fully incorporated against the states via the Due Process Clause of the Fourteenth Amendment. *See Mapp v. Ohio*, 367 U.S. 643 (1961).

*v. St. Johns River Water Management Dist.*, 570 U.S. 595, 607 (2013) ("[When] someone refuses to cede a constitutional right in the face of coercive pressure, the impermissible denial of a governmental benefit is a constitutionally cognizable injury."). "The doctrine [of unconstitutional conditions] is especially important in the Fourth Amendment context." *United States v. Scott*, 450 F.3d 863, 867 (9th Cir. 2006). Since warrantless searches are a condition of issuing falconry licenses, the purported search authority violates the Fourth Amendment even if it is not being imminently exercised. The Fourth Amendment was intended to prevent precisely this type of arbitrary abuse of power claimed by Defendants in this case.

### a. Warrantless searches violate falconers' property rights protected by the Fourth Amendment

In *United States v. Jones*, 565 U.S. 400 (2012), and *Florida v. Jardines*, 569 U.S. 1 (2013), the Supreme Court reaffirmed that property rights provide a wholly independent and sufficient basis for protection from unreasonable warrantless searches by the government. Long before the Court articulated the privacy-based approach to unreasonable searches and seizures, *see Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring), it recognized the original grounding of the Fourth Amendment in property rights, *Jones*, 565 U.S. at 405. "[F]or most of our history the Fourth Amendment was understood to embody a particular concern for government trespass upon the areas ('persons, houses, papers, and effects') it enumerates." *Id.* at 406. The *Katz* reasonable-expectations test "has been added to, not *substituted for*," the traditional property-based understanding of the Fourth Amendment. *Jardines*, 569 U.S. at 11 (citing *Jones*, 565 U.S. at 409).

Specifically, the Court has held that warrantless physical trespass on a home's curtilage is as equally violative as trespass within the home itself. *Id.*[6] In the 2017–2018 term the Court further solidified the property rights approach to warrantless searches in three cases that either relied upon a property-based Fourth Amendment analysis, or discussed this approach by way of ancillary opinions. *See Collins v. Virginia*, 138 S. Ct. 1663, 1670 (2018) (citing *Jardines*, 569 U.S. at 11);

---

[6] A home's curtilage, the area "immediately surrounding and associated with the home," is "part of [the] home itself for Fourth Amendment purposes." *Oliver v. United States*, 466 U.S. 170, 180 (1984).

*Byrd v. United States*, 138 S. Ct. 1518, 1526 (2018); *Carpenter v. United States*, 138 S. Ct. 2206, 2235 (2018) (Thomas, J., dissenting); *id.* at 2267–68 (Gorsuch, J., dissenting).

Here, government officials have purported to grant themselves the power to effect warrantless searches on falconry "facilities" to ensure that the "facilities standards" are met. *See* 50 C.F.R. § 21.29(b)(4)(i); 14 C.C.R. § 670(j)(3)(A). But the "facilities" in question are actually falconers' *private homes* and structures located on *their private curtilage*. The common practice for the vast majority of falconers—including the named plaintiffs and other members of Plaintiff American Falconry Conservancy—is to house their birds almost exclusively inside their own homes. Peter Stavrianoudakis decl. ¶¶ 14, 32 ("The home is an integral part of the average falconers' craft and relationship with his bird."). It is equally common for falconers to build their falconry mews (stable-like structures for use when housing a bird temporarily outside) directly within the curtilage of their home. Ron Kearney decl. ¶¶ 12–14. Plaintiff Katherine Stavrianoudakis does not, and has never, held a falconry license or practiced falconry. Katherine Stavrianoudakis decl. ¶ 13. And yet her property rights protected by the Fourth Amendment are continually threatened, simply because her husband is a licensed falconer.

These regulations are unconstitutional on their face and as applied to Plaintiffs, because they violate their clearly protected property rights in their own homes and curtilage under the Fourth Amendment. For these reasons, Plaintiffs are likely to succeed on the merits of their facial and as-applied property-based Fourth Amendment claims.

**b. Warrantless searches violate falconers' privacy rights protected by the Fourth Amendment**

While the violation of Plaintiffs' property rights provides a sufficient basis to find a high likelihood of success on the merits of their Fourth Amendment claims, Plaintiffs' Fourth Amendment protected privacy interest in their homes and curtilage provides an equally strong alternative basis.

///

///

///

Mem. in Supp. of Pl.s' Mot. for Prelim. Inj.
No. 1:18-cv-01505-LJO-BAM                          16

Under the *Katz* test, individuals have a protected Fourth Amendment privacy interest in a given area where they, (1) Have exhibited a subjective expectation of privacy, and (2) Where the expectation is one that society is prepared to recognize as reasonable. *See Katz*, 389 U.S. at 361 (Harlan, J., concurring). Under this approach, private homes enjoy a high presumption of protected privacy. *See, e.g.*, *id.* ("[A] man's home is, for most purposes, a place where he expects privacy . . . ."). In cases involving homes, "there is a ready criterion, with roots deep in the common law, of the minimal expectation of privacy that *exists*, and that is acknowledged to be *reasonable*." *Kyllo*, 533 U.S. at 34.

Under the *Katz* test, Plaintiffs' homes and curtilage enjoy a strong presumption of protected privacy. The Fourth Amendment privacy-based approach, like the property approach, draws "a firm line at the entrance to the house." *Id.* at 40 (quoting *Payton v. New York*, 445 U.S. at 590). This line also extends to a home's curtilage, which is "intimately linked to the home, both physically and psychologically," and is where "privacy expectations are most heightened." *California v. Ciraolo*, 476 U.S. 207, 213 (1986). The "firm line at the entrance" of Plaintiffs' private homes and curtilage is continuously violated by the purported authority granted by the challenged regulations, and the threat of warrantless government searches conducted under them. As noted above, Plaintiff Katherine Stavrianoudakis does not, and has never, held a falconry license or practiced falconry. Katherine Stavrianoudakis decl. ¶ 13. And yet her privacy rights protected by the Fourth Amendment are continually threatened, simply because her husband is a licensed falconer. *Id.* ¶ 10 ("Privacy is extremely important to me. My home is my sanctuary. . . . Now I have to worry about armed government agents showing up unannounced and entering my home without permission.").

These regulations are unconstitutional on their face and as-applied to Falconers, because they authorize the violation of Falconers' privacy rights in their own homes and curtilage protected by the Fourth Amendment. For these reasons, Plaintiffs are likely to succeed on the merits of their facial and as-applied privacy-based Fourth Amendment claims.

///

///

///

Mem. in Supp. of Pl.s' Mot. for Prelim. Inj.
No. 1:18-cv-01505-LJO-BAM                    17

## 2. First Amendment challenge to the speech regulations

Falconers are also likely to succeed on the merits of their First Amendment claims. Plaintiff Falconers and the Conservancy's other members are being muzzled from communicating about the pastime that they love. Scott Timmons decl. ¶ 22; Peter Stavrianoudakis decl. ¶¶ 36-40; Ron Kearney decl. ¶ 18; Bridget Rocheford-Kearney decl. ¶ 15. The falconry regulations significantly impair their First Amendment rights to create expression featuring their birds and to talk about their birds, based solely on the content of the expression. They have declined opportunities to photograph their birds and otherwise refrained from speaking about their birds. But for these content-based restrictions, Plaintiff Falconers and many other Conservancy members would engage in the speech that is prohibited by the challenged regulations. *Id.* Regulations such as these that control expression based on its content are "'presumptively invalid,' and the Government bears the burden to rebut that presumption." *United States v. Stevens*, 559 U.S. 460, 468 (2010) (quoting *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 817 (2000)).

"'The First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic.' Thus, a speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2230 (2015) (quoting *Consol. Edison Co. of N.Y. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 530, 537 (1980)). Put simply, "[g]overnment regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* at 2227. "A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Id.* at 2228 (quoting *Cincinnati v. Discovery Network*, 507 U.S. 410, 429 (1993)).

Collectively, the state/federal regulations fall into four content-based categories: (1) generally banning images of falcons in all expression that is not about falcons; (2) specifically banning commercials that feature falcons but are not about falcons; (3) limiting compensation for falcon-related educational expression; and (4) dictating the content of conservation education

programs. Falconry itself may not be protected expression, but educational demonstrations, movies, commercials, photography, and filming are unequivocally protected speech—and the regulations at issue here unconstitutionally interfere with that expression.

### a. Limiting images of falcons in all expression that is not about falcons is unconstitutional

The regulations at issue prohibit falconers from photographing or filming their birds—but only if the images will be used in a production that is not about falcons or falconry. 50 C.F.R. § 21.29(f)(9)(i); 14 C.C.R. § 670(h)(13)(A). This impairs the creation of protected expression like movies, photos, and commercials based solely on their communicative content. *See Western Watersheds Project v. Michael*, 869 F.3d 1189, 1196 (10th Cir. 2017) ("An individual who photographs animals or takes notes about habitat conditions is creating speech in the same manner as an individual who records a police encounter.").

Rather than ban these images outright, the regulations prohibit taking certain photos and videos, in an attempt by "the government [to] bypass the Constitution by 'simply proceed[ing] upstream and dam[ming] the source' of speech." *Id.* at 1196 (quoting *Buehrle v. City of Key West*, 813 F.3d 973, 977 (11th Cir. 2015)). The First Amendment protects a falconer who creates an image of his soaring eagle—just the same as it protects filming the police on a public street, or filming wildlife on public lands. *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995); *Western Watersheds*, 869 F.3d at 1196; *Animal Legal Def. Fund v. Herbert*, 263 F. Supp. 3d 1193, 1206–08 (D. Utah 2017) (collecting cases protecting the First Amendment right to make an audiovisual recording). The Supreme Court has held that even horrific depictions of animal cruelty cannot be banned, so long as the underlying activities are legal. *Stevens*, 559 U.S. at 481. Where, as here, the underlying activity that is the source of the protected expression—flying falconry birds—is neither cruel nor illegal, there is even less basis for the government to make content-based distinctions about what sort of speech can and cannot be created by falconers. *Id.*

This is not a situation where regulations are directed at conduct that has an incidental effect on speech. *Cf. Zemel v. Rusk*, 381 U.S. 1 (1965). Rather, the "conduct triggering coverage under the statute consists of communicating a message." *Holder v. Humanitarian Law Project*, 561 U.S.

1, 28 (2010). Falconers are in the same position as the activists who challenged Wyoming's "ag gag" statute in *Western Watersheds Project v. Michael*, which applied heightened penalties to trespassing committed with the intention of creating speech, including photographing animals. *Western Watersheds*, 869 F.3d at 1197. The plaintiffs in *Western Watersheds* challenged "the constitutionality of Wyoming's differential treatment of individuals who create speech. . . . The challenged statutes apply specifically to the creation of speech, and thus we conclude they are subject to the First Amendment." *Id.* (citing *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 793 n.1 (2011)); *see also Western Watersheds Project v. Michael*, No. 15-cv-169-SWS, 2018 WL 5318261, at *10 (D. Wyo. Oct. 29, 2018) (striking down the same "ag gag" statutes on remand as unconstitutionally content-based). The regulations at issue here directly regulate photographing and filming birds and thus "apply specifically to the creation of speech" and are therefore subject to First Amendment scrutiny.

Preventing Falconers from photographing their birds stymies the creation of speech based on its content, both because the speech features falcons, and because it is not about falcons. Regulations that police expression based on its content are "'presumptively invalid,' and the Government bears the burden to rebut that presumption." *Stevens*, 559 U.S. at 468 (quoting *Playboy*, 529 U.S. at 817).

The only government interest that could be related to the falcon speech ban is the welfare of the birds. But any concerns about overworking birds or exposing them to dangerous conditions are easily addressed by regulations that do not impose content-based restrictions on speech. "[T]he remedy is not to restrict speech but to consider and explore other regulatory mechanisms." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 362 (2010). Valid regulations might limit the working hours and conditions of falcons generally, but "[t]he regulatory mechanism here, based on speech, contravenes the First Amendment." *Id.*; *see also Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 592 (1983) ("We have long recognized that even regulations aimed at proper governmental concerns can restrict unduly the exercise of rights protected by the First Amendment."). Banning images of falcons in all expression that is not about falcons is unconstitutional; 50 C.F.R. § 21.29(f)(9)(i) and 14 C.C.R. § 670(h)(13)(A) should be enjoined.

**b. Limiting commercials that feature falcons but are not about falcons or falconry is unconstitutional**

In addition to banning non-falcon-related movies and photographs generally, the regulations also specifically ban Falconers from creating non-falcon-related commercial speech. 50 C.F.R. § 21.29(f)(9)(ii); 14 C.C.R. § 670(h)(13)(A). Commercial speech "does no more than propose a commercial transaction." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 767 (1976) (Stewart, J., concurring). It is generally accepted that regulation of commercial speech is subject to a lesser degree of scrutiny, under the *Central Hudson* standard. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 561 (1980); *Retail Digital Network, LLC v. Prieto*, 861 F.3d 839, 849–50 (9th Cir. 2017) (en banc).

The *Central Hudson* intermediate scrutiny test has four parts: (1) whether the speech at issue is not misleading and concerns lawful activity; (2) whether the government interest is substantial; (3) whether the regulation directly advances that interest; and (4) whether the regulation is not more extensive than necessary to achieve the interest. *Cent. Hudson Gas & Elec. Corp.*, 447 U.S. at 561; *World Wide Rush, LLC v. City of Los Angeles*, 606 F.3d 676, 684 (9th Cir. 2010). The first step is a threshold issue that determines whether the restricted speech enjoys First Amendment protection. *World Wide Rush*, 606 F.3d at 684. If the speech at issue passes this threshold, then the government bears the burden of satisfying the other three steps. *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 816 (9th Cir. 2013).

The first factor is not at issue here, because the ban applies to all commercial advertisements, misleading or not, that include falcons but are not about falcons or falconry. The second factor is likewise uncontroversial; Falconers do not now dispute that the government has an interest in protecting migratory birds. But the commercial speech ban fails at step three.

Step three "concerns the relationship between the harm that underlies the State's interest and the means identified by the State to advance that interest." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001). Any restriction on commercial speech must "directly and materially advance[] the asserted governmental interest." *Greater New Orleans Broadcasting Ass'n, Inc. v. United States*, 527 U.S. 173, 188 (1999); *Metro Lights, LLC v. City of Los Angeles*, 551 F.3d 898,

905 (9th Cir. 2009) (A restriction on commercial speech must have a "logical connection" between means and end.).

A speech regulation also runs afoul of *Central Hudson*'s step three advancement requirement if it is under-inclusive. *Valle Del Sol Inc.*, 709 F.3d at 824. Under-inclusivity arises when a regulation reaches only a subset of the speech that causes the alleged harm, such that the regulation fails to achieve its purported goal or makes irrational distinctions between regulated and unregulated speech. *Metro Lights*, 551 F.3d at 906.

A classic example of an under-inclusive commercial speech restriction arose in *City of Cincinnati v. Discovery Network*, 507 U.S. 410 (1993). Cincinnati prohibited commercial handbills in news racks on public property but allowed noncommercial handbills. *Id.* at 412. Cincinnati's asserted interest was to reduce the clutter of news racks to promote aesthetics. *Id.* The Court noted, however, that the distinction between commercial and noncommercial handbills bore no relationship to the interest in aesthetics, since both types of handbill contributed equally to the proliferation of news racks. *Id.* at 425. The restriction thus lacked the required "'fit' between its goals and its chosen means" because the distinction drawn between commercial and noncommercial handbills "has absolutely no bearing on the interests [Cincinnati] has asserted." *Id.* at 428.

The government's interest in the welfare of birds is unaffected whether images of the birds are being shown to sell perches (allowed) or washing machines (not allowed), or to make political statements about freedom (not allowed). Banning falconers from contributing to commercials unrelated to falconry does nothing to "directly and materially advance the asserted governmental interest" in protecting migratory birds and is fatally under-inclusive because it unjustifiably targets commercial speech. *Id.* Therefore, 50 C.F.R. § 21.29(f)(9)(ii) and 14 C.C.R. § 670(h)(13)(A) should be enjoined.

**c. Limiting compensation for falcon-related expression is unconstitutional**

The offending regulations allow only one sort of falcon-containing speech: that which is related to falcons or falconry. 50 C.F.R. § 21.29(f)(8); (9)(ii)(A)–(B). But this outlet for speech comes with an important financial disincentive. Under the federal regulations Falconers'

Mem. in Supp. of Pl.s' Mot. for Prelim. Inj.
No. 1:18-cv-01505-LJO-BAM                22

"presentation of a conservation education program" may only be compensated if the fee does "not exceed the amount required to recoup . . . costs." 50 C.F.R. § 21.29(f)(8)(iv). The California regulations incorporate the same content-based restrictions as 50 C.F.R. § 21, but Falconers are entirely prohibited from collecting compensation for any falcon-containing expression that "exceed[s] the amount required to recover costs." 14 C.C.R. § 670(h)(13)(A).

First Amendment protection does not disappear because falcon-containing speech is compensated at a fair price that rewards Falconers for their time, their expertise, and the use of their birds. "[T]he degree of First Amendment protection is not diminished merely because the [protected expression] is sold rather than given away." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 756 n.5 (1988); *see also Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 801 (1988) ("It is well settled that a speaker's rights are not lost merely because compensation is received; a speaker is no less a speaker because he or she is paid to speak."); *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2375 (2018) ("[N]either California nor the Ninth Circuit has identified a persuasive reason for treating professional speech as a unique category that is exempt from ordinary First Amendment principles.").

Nor is preventing compensation a legitimate government interest that can justify speech restrictions. The First Amendment does not tolerate laws that impose a "disincentive to create or publish works," including diminishing the ability of speakers to profit from their communicative works. *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 118 (1991). Barring fair compensation for "presentation of a conservation education program" does nothing to further the government interest in protecting and preserving birds covered by federal statutory protections. Indeed, it has the opposite effect by making such presentations not profitable and thus less likely to occur. Scott Timmons decl. ¶ 22; Peter Stavrianoudakis decl. ¶¶ 36-40; Ron Kearney decl. ¶ 18; Bridget Rocheford-Kearney decl. ¶ 15. Nor does California have a legitimate basis for restricting payment for all falcon-related speech; discouraging the promotion of nonprofit falconry organizations or sale of useful falconry products would likewise harm these majestic birds. Limiting compensation for falcon-related speech is unconstitutional; 50 C.F.R. § 21.29(f)(8), (9)(ii)(A)–(B), and 14 C.C.R. § 670(h)(13)(A) should be enjoined.

### d. Dictating the content of conservation education programs is unconstitutional

Falconers who engage in conservation education despite the financial disincentives must also follow content-based guidelines about what can be discussed in conservation education programs—including "information about the biology, ecological roles, and conservation needs of raptors and other migratory birds." 50 C.F.R. § 21.29(f)(8)(v). The federal regulations do not require that "all of these topics must be addressed in every presentation." *Id.* But any "presentations that do not address falconry and conservation education" are expressly forbidden. *Id.*

As content-based limits on falconers' speech, these restrictions are "'presumptively invalid,' and the Government bears the burden to rebut that presumption." *Stevens*, 559 U.S. at 468 (quoting *Playboy*, 529 U.S. at 817). While the government might have an interest in ensuring the accuracy of educational materials, this interest in accuracy cannot justify untargeted content-based speech restrictions. *See, e.g.*, *United States v. Alvarez*, 567 U.S. 709, 727 (2012) ("The remedy for speech that is false is speech that is true."); *Edwards v. District of Columbia*, 755 F.3d 996, 1005 n.6 (D.C. Cir. 2014) ("We do not mean to suggest the District could somehow police the accuracy of a tour guide's speech by, for example, requiring that tour guides adhere to a script. Even if such speech advanced the District's interest in ensuring a quality consumer experience, its compulsion would doubtless be unconstitutional.").

Like the other content-based restrictions on Falconers' speech, dictating the content of any "presentations" falconers give is not necessary to address any actual problem. *Playboy*, 529 U.S. at 822–23. The restrictions are therefore unconstitutional; 50 C.F.R. § 21.29(f)(8)(v) and 14 C.C.R. § 670(h)(13)(A), and should be enjoined by this Court.

**B.    Falconers Are Suffering Irreparable Harm from Continuous Constitutional Injuries**

A plaintiff seeking preliminary relief must show a likelihood of irreparable harm. *Winter*, 555 U.S. at 22. "When an alleged deprivation of a constitutional right is involved, . . . most courts hold that no further showing of irreparable injury is necessary." 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948.1 (3d ed. 2013) (footnotes omitted). Indeed, "[u]nder the law of this circuit, a party seeking preliminary injunctive relief in a First

Amendment context can establish irreparable injury sufficient to merit the grant of relief by demonstrating the existence of a colorable First Amendment claim." *Sammartano v. First Judicial Dist. Court in & for County of Carson City*, 303 F.3d 959, 973–74 (9th Cir. 2002) (citation omitted); *Warsoldier v. Woodford*, 418 F.3d 989, 1002 (9th Cir. 2005) (same). The same is true for Fourth Amendment claims. *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("Defendants operated under the impression that they have authority to detain individuals solely because of their immigration status . . . Plaintiffs faced irreparable harm in the form of a deprivation of constitutional rights absent a preliminary injunction.").

Because Falconers raise substantial constitutional claims, no further showing of irreparable injury is necessary. *See Sanders County Republican Cent. Comm. v. Bullock*, 698 F.3d 741, 744 (9th Cir. 2012) ("When seeking a preliminary injunction 'in the First Amendment context, the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction.'" (quoting *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1116 (9th Cir. 2011)). It is the "purposeful unconstitutional suppression of speech [that] constitutes irreparable harm for preliminary injunction purposes." *Goldie's Bookstore v. Superior Court*, 739 F.2d 466, 472 (9th Cir. 1984); *Melendres*, 695 F.3d at 1002 (threat of Fourth Amendment injuries also creates irreparable harm); *see also Ochoa v. Campbell*, 266 F. Supp. 3d 1237, 1260 (E.D. Wash. 2017), *appeal dismissed as moot sub nom. Sanchez Ochoa v. Campbell*, 716 F. App'x 741 (9th Cir. 2018) (deprivation of Fourth Amendment rights "unquestionably constitutes irreparable injury").

## C.    The Balance of Equities Weighs in Falconers' Favor

A plaintiff seeking a preliminary injunction must show that "the balance of equities tips in his favor." *Winter*, 555 U.S. at 20. To assess the balance of hardships, the court "balance[s] the interests of all parties and weigh[s] the damage to each." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (quoting *Los Angeles Memorial Coliseum Comm'n v. NFL*, 634 F.2d 1197, 1203 (9th Cir. 1980)). Mere "inconvenience" to the government does not compare to the hardship imposed by "the potential loss of a constitutionally protected right" like speech or the right to be

Mem. in Supp. of Pl.s' Mot. for Prelim. Inj.
No. 1:18-cv-01505-LJO-BAM                25

free from unreasonable warrantless searches. *Citizens for Free Speech, LLC v. County of Alameda*, 62 F. Supp. 3d 1129, 1143 (N.D. Cal. 2014); *Melendres*, 695 F.3d at 1002; *Allen v. County of Lake*, 71 F. Supp. 3d 1044 (N.D. Cal. 2014).

In the absence of the regulations challenged here, Defendants will still be able to obtain lawful warrants if they have a genuine need to search Falconers' homes, but the ongoing threat of warrantless searches will be abated. Moreover, enjoining the speech restrictions will simply allow Falconers to speak—no other change in the way they care for, protect, or fly their birds will result from an injunction. Any harms Defendants might imagine are "entirely speculative and in any event may be addressed by more closely tailored regulatory measures." *Ezell v. City of Chicago*, 651 F.3d 684, 710 (7th Cir. 2011). The balance of equities favors Falconers.

**D.    A Preliminary Injunction Would Serve the Public Interest**

A motion for preliminary injunction must show "that an injunction is in the public interest." *Winter*, 555 U.S. at 20. Upholding First and Fourth Amendment values is always in the public interest: "Courts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles." *Thalheimer*, 645 F.3d at 1129 (citation omitted); *Sammartano*, 303 F.3d at 974 ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights." (citation omitted)); *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005) ("Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution."); *Melendres*, 695 F.3d at 1002 ("[E]quities favor issuance of a narrow, limited preliminary injunction . . . [that] does 'not enjoin[ ] [the Defendants] from enforcing valid state laws, or detaining individuals when officers have reasonable suspicion that individuals are violating a state criminal law.'" (citation omitted)). Given the primacy of the constitutional rights at stake, a preliminary injunction is in the public interest.

**E.    Waiver of Bond Is Appropriate**

This Court has discretion to waive the security requirements of Fed. R. Civ. P. 65(c) or require only a nominal bond. *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999). Where a preliminary injunction merely requires compliance with the Constitution, no bond is

Mem. in Supp. of Pl.s' Mot. for Prelim. Inj.
No. 1:18-cv-01505-LJO-BAM                    26

required. *Doe v. Pittsylvania County, Va.*, 842 F. Supp. 2d 927, 937 (W.D. Va. 2012) (fixing the bond at zero dollars where injunction merely required compliance with the Constitution); *Baca v. Moreno Valley Unified Sch. Dist.*, 936 F. Supp. 719, 738 (C.D. Cal. 1996) (waiving bond because "to require a bond would have a negative impact on plaintiff's constitutional rights, as well as the constitutional rights of other members of the public affected by the policy").

Plaintiffs seek only to vindicate their constitutional rights and to this end are represented pro bono. To require a bond when a plaintiff seeks to uphold constitutionally protected rights "would have the effect of discouraging suits to remedy more flagrant abuses." *Bartels v. Biernat*, 405 F. Supp. 1012, 1019 (E.D. Wis. 1975). Also, because Falconers have demonstrated a high likelihood of success on the merits, a bond waiver is appropriate. *People of State of Cal. ex rel. Van de Kamp v. Tahoe Regional Planning Agency*, 766 F.2d 1319, 1326 (9th Cir. 1985), *amended on other grounds*, 775 F.2d 998 (9th Cir. 1985). Therefore, it would be appropriate to waive the bond requirement or to set bond at a nominal amount.

## VI. CONCLUSION

Plaintiffs' Fourth Amendment claims in this case go to the heart of that amendment's purpose. Instead of "plac[ing] 'the liberty of [everyone] in the hands of every petty officer,'" *Boyd v. United States*, 116 U.S. 616, 625 (1886) (citation omitted), the Fourth Amendment protects our rights to be secure and safe in our own homes. Likewise, Falconers' First Amendment claims address the bedrock principle that the government may not ban speech based solely on its communicative content. *Reed*, 135 S. Ct. 2228–30.

Falconry may be older than the U.S. Constitution, but Falconers are still protected by it. A preliminary injunction is appropriate to prevent the continued violation of Falconers' Fourth and First Amendment rights.

DATED: January 28, 2019.

Respectfully submitted,

TIMOTHY R. SNOWBALL
ANTHONY L. FRANÇOIS
JAMES M. MANLEY

By: ___s/ Timothy R. Snowball____
    TIMOTHY R. SNOWBALL
*Attorneys for Plaintiffs*