IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PETER STAVRIANOUDAKIS, ET AL., | Case No. 1:18-cv-01505-LJO-BAM |
| Plaintiffs, | ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS AND ORDERING SUPPLEMENTAL BRIEFING RE REQUEST FOR PRELIMINARY INJUNCTION |
| v. | |
| U.S. DEPARTMENT OF FISH & WILDLIFE, ET AL., | (ECF Nos. 17, 24, 25) |
| Defendants. | |

## I. INTRODUCTION

Plaintiffs—Peter Stavrianoudakis, Katherine Stavrianoudakis, Eric Ariyoshi, Scott Timmons, and the American Falconry Conservancy ("AFC") (collectively "Plaintiffs")—brought the present lawsuit against the United States Fish and Wildlife Service ("FWS"), its Director, and the Director of the California Department of Fish and Wildlife ("DFW") (collectively "Defendants"), asserting that certain regulations violate the First and Fourth Amendments to the U.S. Constitution and were promulgated in excess of statutory authority in violation of the Administrative Procedure Act, ("APA"), 5 U.S.C. § 701, *et seq*. The Plaintiffs, except for Katherine Stavrianoudakis, are licensed falconers who own trained falcons that are housed inside

their homes or the curtilage of their homes. The challenged regulations govern the sport of falconry, which is defined by regulation to mean "the possession, housing, trapping, transport, and use of raptors[1] for the purpose of hunting or training." 14 C.C.R. § 670(b)(7).

Plaintiffs' Fourth Amendment claims in Counts I and II of the operative First Amended Complaint (ECF No. 16 ("FAC") at 12-13) are dismissed because Plaintiffs lack standing to assert these claims. Plaintiffs Peter Stavrianoudakis, Scott Timmons, and AFC's free speech claims under the First and Fourteenth Amendments—Counts III, IV, V, VI, and VI (second count)[2] (*id.* at 14-20) survive Defendants' motions to dismiss. The Federal Defendants' motion to dismiss with respect to Plaintiffs' APA claim, Count VII (*id.* at 20), is granted with respect to the challenge to the unannounced inspection provision claim and denied with respect to the claims related to falconers' presentations, making of media, and charging fees. For the claims that are dismissed in this order, Plaintiffs are granted leave to amend the FAC.

With respect to Plaintiffs' motion for preliminary injunction (ECF No. 17), the Court orders supplemental briefing as set forth in this order.

## II. BACKGROUND[3]

### A.    The Parties

#### 1.    Peter Stavrianoudakis

Plaintiff Peter Stavrianoudakis ("Peter") is the Pacific Coast Director for AFC and has been a licensed falconer for over 30 years. FAC ¶ 22. A Master Falconer, Peter also works as a

---

[1] "Raptor," another term for falcon, is defined as "any bird of the Order Falconiformes, Accipitriformes, or Strigiformes, or a hybrid thereof" by the California regulations. 14 C.C.R. § 670(b)(15).

[2] Plaintiffs erroneously label two counts "Count VI." FAC at 18-19. This Court refers to the second Count VI on page 19 as "Count VI (second count)." *Id.* at 19.

[3] Unless otherwise noted, the facts are taken from the FAC. For purposes of the motions to dismiss, all alleged material facts are construed in the light most favorable to the Plaintiffs. *Coalition For ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495, 501 (9th Cir. 2010).

Deputy Public Defender for Stanislaus County and resides in Hilmar, California. *Id.* Peter has held a valid falconry license for approximately 38 years. *Id.* ¶ 48. The FAC alleges that "[i]n approximately 1983, Peter was subject to an unreasonable warrantless search of his home and warrantless arrest by armed [DFW Officers] related to his lawful activities as a non-resident falconer in Nevada." *Id.* ¶ 51. Peter has cared for, trained, and flown approximately 15 birds, and he currently owns one four-year-old aplomado falcon named "Ares." *Id.* ¶¶ 56-57. Ares lives exclusively inside Peter's home and is occasionally housed in a protected enclosure in Peter's yard. *Id.* ¶ 61. There is no separate structure for the care or housing of Peter's falcon. *Id.* ¶ 62. Peter earns no income through his ownership, training, or care of Ares. *Id.* ¶ 60.

### 2. <u>Katherine Stavrianoudakis</u>

Plaintiff Katherine Stavrianoudakis ("Katherine") is Peter's wife and resides at the same residence. *Id.* ¶ 23. Peter and Katherine have lived in their home for five years. *Id.* ¶ 65. Katherine does not practice falconry and has never held a falconry license. *Id.* ¶ 66.

### 3. <u>Eric Ariyoshi</u>

Plaintiff Eric Ariyoshi has been a licensed falconer for approximately 30 years and resides in Novato, California. *Id.* ¶¶ 24, 68. Ariyoshi is the Secretary for AFC. *Id.* ¶ 24. Ariyoshi has housed, cared for, trained, and flown approximately 20 birds. *Id.* ¶ 71. Ariyoshi's three-year-old peregrine falcon named "Finn" is "housed in an unrestricted mews[4] located 30 feet away with a direct line of sight to the rear of Eric's home." *Id.* ¶ 74.

### 4. <u>Scott Timmons</u>

Plaintiff Scott Timmons has held a valid falconry license for approximately 30 years. *Id.* ¶ 77. He has housed and trained approximately 40 birds—20 falconry birds and 20 birds used for

---

[4] Mew: an enclosure for trained hawks—usually used in plural. *Mew*, Merriam-Webster, https://www.merriam-webster.com/dictionary/mew (last visited Jan. 15, 2020).

abatement services. *Id.* ¶ 80. In 1992, when Timmons was attending college and living with his mother, he was approached by officers of DFW who inquired if Timmons "was still in possession of a certain red-tailed hawk." *Id.* ¶¶ 82-84. After Timmons responded that the bird had flown away, the officers revealed that they were in possession of the hawk. *Id.* ¶ 85. Timmons's falcons live exclusively in mews and other structures directly adjacent to his home. *Id.* ¶ 90.

Timmons owns an abatement services company called Aerial Solutions. *Id.* ¶ 92. Abatement is the practice of flying certain species of raptor over a given area as a deterrent to the presence of other invasive bird species. *Id.* ¶ 93. Timmons has been asked to perform educational presentations, "including conservation education presentations," while flying his birds for abatement, but he has declined because the regulations proscribe being compensated for such education presentations. *Id.* ¶ 94. Timmons is also a member of the AFC. *Id.* ¶ 91.

### 5. **American Falconry Conservancy**

Plaintiff AFC, established in 2002, is a membership organization open to "[a]ny falconer—neither antagonistic nor detrimental to the association or its purpose—of good moral character and over the age of 17 years." *Id.* ¶¶ 26, 99. AFC has approximately 100 members. *Id.* ¶ 26. AFC's stated purpose is to promote "the broadest liberties possible that are not in conflict with legitimate conservation efforts based upon sound biological and legal reasoning," and "promote knowledge of quality falconry, as well as to instill pride in falconers for the cultural heritage of the sport, and its place in world history."[5] *Id.* ¶ 96.

The FAC alleges that by virtue of holding falconry licenses, all members of AFC are subject to the unconstitutional speech and search restrictions pursuant to the state and federal regulations. *See id.* ¶¶ 101-11.

---

[5] A separate organization, North American Falconers Association, filed an amicus brief which largely supports the position of the government defendants. *See* ECF No. 33.

### 6. __The Defendants__

The present lawsuit is brought against Jim Kurth, Deputy Director Exercising the Authority of the Director of the FWS[6] and Charles Bonham, the Director of DFW—both in their official capacities—and against FWS.[7] *Id.* at 1 & ¶¶ 27-29.

## B. __Regulatory Framework__

### 1. __Statutory authority for the challenged regulations__

The Migratory Bird Treaty Act ("MBTA") codifies the protections of migratory birds as outlined in various conventions between the United States and four foreign countries: Canada, Mexico, Japan, and Russia. 16 U.S.C. § 703; 50 C.F.R. § 10.13(a). The MBTA only applies to migratory birds native to the United States, which includes several types of Falconiformes (vultures, kites, eagles, hawks, caracaras, and falcons) and Strigiformes (owls). 50 C.F.R. §§ 10.13, 21.29(a)(1)(i). The MBTA authorizes the Secretary of the Interior ("Secretary") to adopt suitable regulations to determine, *inter alia*, when, and to what extent, it may be permissible to hunt, take, capture, possess, sale, and transfer protected birds, bird parts, nests, and eggs. 16 U.S.C. § 704(a); 50 C.F.R. § 21.29(a)(1).

Pursuant to the authority of the MBTA, the Secretary promulgated regulations to regulate falconry standards and falconry permitting. *See* 50 C.F.R. § 21.29. The federal regulations permit the Secretary to delegate responsibility for issuing falconry licenses and enforcing falconry standards to the relevant state, territorial, or tribal government upon a showing that their own laws

---

[6] The FAC erroneously names Greg Sheehan, Principal Deputy Director of FWS as the official being sued, FAC ¶ 27, while Jim Kurth is the official named in the lawsuit. FAC at 1. In the Federal Defendants' motion to dismiss, they name Margaret Everson as the Principal Deputy Director of FWS. ECF No. 24-1 at 1. According to FWS's National Organizational Chart, Ms. Everson is the Principal Deputy Director Exercising the Authority of the Director. https://www.fws.gov/offices/orgcht.html (last accessed January 6, 2020).

[7] FWS and its director are referred to as the "Federal Defendants." Director Bonham and DFW are referred to as the "State Defendants."

and regulations meet the standards established in § 21.29. *See* 50 C.F.R. §§ 21.29(b)(1)(i), (b)(3).

The current version of 50 C.F.R. § 21.29 became effective on November 7, 2008. *See* 73 Fed.

Reg. 59,448 (Oct. 8, 2008).

California has created its own regulatory scheme for falconry permitting; FWS (a branch of the Department of the Interior) approved California's regulations as being compatible with the federal regulations. *See* 78 Fed. Reg. 72830-01, 72831 (Dec. 4, 2013) ("[A] Federal permit will no longer be required to practice falconry in any State with its own falconry regulations beginning January 1, 2014."); 50 C.F.R. § 21.29(b)(3).[8] California's regulations are now controlling. *Id.*

## 2. The unannounced inspection provisions

Plaintiffs complain of regulations that give government agents the ability to conduct warrantless searches on their falconry facilities, including those located inside their home or in the curtilage of their home. For example, the federal regulation at issue requires each falconry license holder to agree to permit their falconry facilities to be inspected without advance notice. 50 C.F.R. § 21.29(d)(2)(ii) ("You must submit to your State, tribal, or territorial agency that regulates falconry a signed and dated statement showing that you agree that the falconry facilities and raptors may be inspected without advance notice by State, tribal (if applicable), or territorial authorities at any reasonable time of day, but you must be present."). The state regulation at issue likewise contains an unannounced inspection provision. 14 C.C.R. § 670(j)(3)(A) ("The department may conduct unannounced visits to inspect facilities, equipment, or raptors possessed by the licensee, and may enter the facilities of any licensee when the licensee is present during a reasonable time of the day and on any day of the week.").

---

[8] The Court notes that the federal regulations reserve the right to review the administration of a State's falconry program "if complaints from the public or law enforcement investigations indicate the need for a review . . . ." 50 C.F.R. § 21.29(b)(4). In addition, the California regulations explicitly incorporate the federal regulations by reference. 14 C.C.R. § 670(a)(4).

Both the federal and state regulations require the license holder to sign a statement consenting to unannounced inspections. 50 C.F.R. § 21.29(d)(2)(ii); 14 C.C.R. § 670(e)(2)(D) ("Each application shall contain a certification worded as follows: . . . 'I understand that my facilities, equipment, or raptors are subject to unannounced inspection pursuant to subsection 670(j), Title 14, of the California Code of Regulations.'").

### 3. Regulations that allegedly restrict falconers' speech and compensated activities

Plaintiffs raise several challenges to federal regulations and one state regulation as violating their First Amendment rights to free speech. FAC at 12-20. 50 C.F.R. § 21.29(f)(9)(i) prohibits photographing or filming falconry raptors for "movies commercials, or in other commercial ventures." 50 C.F.R. § 21.29(f)(9)(ii) prohibits falconers from photographing or filming their birds for "advertisements; as a representation of any business, company, corporation, or other organization; or for promotion or endorsement of any products, merchandise, goods, services, meetings, or fairs"—unless the promotion or endorsement is of "a nonprofit falconry organization or association" or "products or endeavors related to falconry."

50 C.F.R. § 21.29(f)(8)(v) dictates that during conservation education programs, falconers "must provide information about the biology, ecological roles, and conservation needs of raptors . . . although not all of these topics must be addressed in every presentation."

The challenged regulations also prohibit falconers from charging fees in excess of the amount required to recoup costs when speaking in a conservation education program or when giving presentations using their falcons. 50 C.F.R. § 21.29(f)(8)(iv) ("You may charge a fee for presentation of a conservation education program. The fee may not exceed the amount required to recoup your costs."); 14 C.C.R. § 670(h)(13)(A) ("Any fees charged, compensation, or pay received during the use of falconry raptors for these purposes may not exceed the amount required to recover costs.").

In five separate counts in the FAC, Plaintiffs challenge these regulations violate their right to freedom of speech and expression.

## C.  Procedural Posture

Plaintiffs filed the FAC on January 18, 2019. ECF No. 16. On January 28, 2019, Plaintiffs filed a motion for preliminary injunction. ECF No. 17. The State Defendants filed a motion to dismiss the FAC. ECF No. 25-1. The Federal Defendants filed a separate motion to dismiss. ECF No. 24-1. The matters are fully briefed, and the Court deemed the pending motions suitable for decision on the papers without oral argument pursuant to Local Rule 230(g). The Court notes that the issuance of this ruling has been delayed by numerous factors, including the extraordinarily heavy caseload of district judges in this district. However, the situation was exacerbated by the briefing, which did not, on all sides, explore the salient issues in enough depth. The Court will not be emused if this occurs again.

## IV. ANALYSIS

## A.  Rule 12(b)(1) Motion to Dismiss Fourth Amendment Claims on Standing, and Ripeness Grounds

The Federal Defendants argue that the Plaintiffs' Fourth Amendment claim is not ripe and this Court lacks jurisdiction to hear the matter. ECF No. 24-1 at 8. They contend that because no immediate controversy exists between the parties, the Fourth Amendment claims fail to meet the test of constitutional ripeness and should be dismissed. *Id.* The State Defendants similarly argue that this Court lacks subject matter jurisdiction to hear Plaintiffs' claims because Plaintiffs have not suffered an injury-in-fact and that no case or controversy exists.[9] ECF No. 25-1 at 20-21.

//

---

[9] The Federal Defendants bring their motion to dismiss only under Rule 12(b)(6) and not under Rule 12(b)(1) for lack of subject matter jurisdiction. ECF No. 24 at 1-2. The Court treats Defendants' justiciability arguments as a Rule 12(b)(1) motion to dismiss. *See Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011).

## 1.  Rule 12(b)(1) Standard of Review

Dismissal is appropriate under Fed. R. Civ. P. 12(b)(1) when a district court lacks subject matter jurisdiction over the claim. When a defendant brings a Rule 12(b)(1) motion, the plaintiff has the burden of establishing subject matter jurisdiction. *See Rattlesnake Coal. v. U.S. E.P.A.*, 509 F.3d 1095, 1102 n.1 (9th Cir. 2007) ("Once challenged, the party asserting subject matter jurisdiction has the burden of proving its existence.").

There are two permissible jurisdictional attacks under Rule 12(b)(1): a facial attack, where the court's inquiry is limited to the allegations in the complaint; or a factual attack, which permits the court to look beyond the complaint at affidavits or other evidence. *Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003). Here, Defendants appear to raise a facial attack, in which "the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). The Court therefore accepts as true the allegations in the FAC. *Whisnant v. United States*, 400 F.3d 1177, 1179 (9th Cir. 2005).

## 2.  Facial or As Applied Challenge

As a threshold issue, the Court addresses the nature of the Fourth Amendment allegations in this case. The FAC does not clearly articulate whether Plaintiffs' Fourth Amendment challenges are facial and/or as applied in nature, FAC ¶¶ 112-130, although Plaintiffs' opposition to the motions to dismiss discusses both forms, *see* ECF No. 38 at 4. The parties do not identify (and the Court has not located) any authority that suggests the justiciability analyses described below should be modified to reflect whether a challenge is facial or as applied, at least not in the context of the presented Fourth Amendment claims. As discussed below, Plaintiffs' Fourth Amendment claim is dismissed for lack of standing, but Plaintiffs will be afforded leave to amend that Fourth Amendment claim. Should Plaintiffs elect to amend, they are directed to clarify the

nature of their Fourth Amendment allegations keeping in mind the vast distinctions (discussed in the parties' briefs) between the merits standards that apply to facial versus as applied challenges.

### 3. <u>Ripeness</u>

Ripeness has two components: constitutional ripeness and prudential ripeness. *In re Coleman*, 560 F.3d 1000, 1004 (9th Cir. 2009). Constitutional ripeness depends on "'whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Id.* at 1005 (quoting *United States v. Braren*, 338 F.3d 971, 975 (9th Cir. 2003)).

The constitutional component of ripeness is a jurisdictional prerequisite. *Coleman*, 560 F.3d at 1005. The jurisdictional inquiry as one of standing or of ripeness are the same. *California Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1093-94, 1094 n.2 (9th Cir. 2003) ("[T]he constitutional component of ripeness is synonymous with the injury-in-fact prong of the standing inquiry.").

A plaintiff challenging a statute must demonstrate "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979). "But '[o]ne does not have to await the consummation of a threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough.'" *Id.* (quoting *Pennsylvania v. West Virginia*, 262 U.S. 553, 593 (1923)).

### 4. <u>Standing</u>

Injury-in-fact is the first of three irreducible requirements for Article III standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To establish Article III standing, an injury must be "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013*); see*

*also Lujan*, 504 U.S. at 560-61. Abstract injury is not enough. *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983).

Where plaintiffs seek prospective injunctive relief and declaratory relief, as Plaintiffs do here, a plaintiff must allege sufficient facts in the complaint to establish that she is "immediately in danger of sustaining some direct injury as a result of the challenged official conduct," and that the threat of injury facing her is "real and immediate, not conjectural or hypothetical." *Lyons*, 461 U.S. at 101-02 (holding plaintiff lacked standing to enjoin city from using chokeholds where plaintiff could not demonstrate real and immediate threat he would be subject to chokehold again) (internal quotation marks omitted); *see also Lujan*, 504 U.S. at 564. *But see Melandres v. Arpaio*, 695 F.3d at 994, 998 (holding plaintiffs were sufficiently likely to be seized again in violation of Fourth Amendment where defendants expressly claimed authority to detain persons defendants believed were not authorized to be in country based solely upon reasonable suspicion and evidence of defendants' pattern or practice of conducting traffic stops targeting Latinos suspected of being illegally present in country).

The Supreme Court has held that "[a]lthough imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes." *Clapper*, 568 U.S. at 409 (quoting *Lujan*, 504 U.S. at 565 n.2). "Imminence" means that a claimed threatened injury must be "certainly impending." *See Clapper*, 568 U.S. at 409. Allegations of "*possible* future injury" are insufficient. *Id.* (emphasis in original); *Oregon Prescription Drug Monitoring Program v. U.S. Drug Enf't Admin.*, 860 F.3d 1228, 1235 (9th Cir. 2017).

The elements of standing must be supported in the same way as any other matter for which the plaintiff bears the burden of proof, "*i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Gest*, 443 F.3d at 1181 (citing *Lujan*, 504 U.S.

at 561). The standing inquiry requires a careful judicial examination of a complaint's allegations to ascertain whether a particular plaintiff is entitled to adjudication of the particular claims asserted. *Oregon Prescription Drug Monitoring Program*, 860 F.3d at 1233.

**5. Standing/Ripeness Analysis**

Plaintiffs allege harm because they live in fear of *future* searches. However, Plaintiffs do not allege that they have been *personally* subjected to the unconstitutional searches pursuant to the challenged regulations. *See id.* ¶¶ 112-30.

Peter alleges he was subjected to a warrantless search and arrest in 1983. *See id.* ¶ 51; Declaration of Peter Stavrianoudakis ¶¶ 6-9 (ECF No. 17-2) ("Peter Decl.").[10] The challenged regulations took effect on November 7, 2008—twenty-five years *after* Peter's arrest. *See* Migratory Bird Permits; Changes in the Regulations Governing Falconry, 73 Fed. Reg. 59,448 (Oct. 8, 2008) ("These regulations are effective November 7, 2008").

Plaintiffs point to other individuals whom they contend have been subjected to warrantless searches. *See, e.g.*, Peter Decl. ¶ 29 ("I am aware of multiple incidents in which Fish and Wildlife officers have carried out warrantless searches of licensed falconers' homes and property . . . includ[ing] the warrantless search of Fred Seaman's home and property in 2017, the warrantless search of Leonardo Vasquez's home and property in 2017, the massive "Operation Falcon" in 1984, my own experience in 1983, and many others I have heard about over the years."); Declaration of Bridget Rocheford-Kearney ¶¶ 8-10 (ECF No. 17-6) ("Rocheford-Kearney Decl.") ("There are many examples of this continuing abuse of power by Fish and Wildlife officers. These include the search of Richard and Becky Brunotte in Colorado . . . . Another example was

---

[10] Although these affidavits are not part of the pleadings, the Court may consider matters outside the pleadings on a motion to dismiss, "such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction." *Coble v. DeRosia*, 823 F. Supp. 2d 1048, 1050 (E.D. Cal. 2011) (quoting *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988)).

an incident occurring at the home of Lydia Ash in approximately 2009 . . . . Another example is 'Operation Falcon,' which took place in 1982"); Declaration of Ron Kearney ¶¶ 2, 6-11 (ECF No. 17-5) ("Kearney Decl.") (AFC president's declaration stating "I am personally aware of many examples of this abuse of power over the years, both for [AFC] members and other licensed falconers. . . . Examples include the home of the Brunottes' [was] searched in Colorado in 2004 . . . . Then there was the search of my good friend Stephen Layman's home up on Whidbey Island . . . in approximately 2004 . . . . An early example was the so-called 'Operation Falcon' in the early 1980s.").

One Plaintiff alleges armed DFW officers visited his mother's home in 1992 demanding to speak with the Plaintiff. *See* Declaration of Scott Timmons ¶ 3 (ECF No. 17-4) ("Timmons Decl.") ("In 1992, I was living in my mother's home in Thousand Oaks, California. While I was at work, I received a call from my mother that armed California Fish and Wildlife . . . officers were on our property demanding to speak with me."). Plaintiffs contend that they live in ongoing fear that their home and curtilage will be subject to an unreasonable warrantless search by armed government agents. FAC ¶ 120. AFC claims that by virtue of holding falconry licenses, its members are subject to the warrantless search provisions. FAC ¶ 102. The FAC asserts that "[AFC] members have been subject to unreasonable warrantless searches pursuant to the regulations . . ." *Id.* ¶ 105.

The State Defendants acknowledge that DFW does conduct these warrantless searches. Declaration of Captain Todd Tognazzini ¶ 7 ("I have personally conducted investigations . . . under the unannounced, warrantless inspection provision . . .), ¶ 14 ("I conducted an unannounced inspection of Mr. Seaman's falconry raptors, facilities, equipment and records on September 27, 2016 . . .), ¶ 17 (On October 14, 2016, based on information gathered from the Seaman inspection, the Department conducted additional unannounced inspections pursuant to

the Unannounced Inspection Provision on several falconers associated with Mr. Seaman, including three locations in Marin/Contra Costa Counties, three in Monterey County, five in San Luis Obispo Counties, and four in Los Angeles/Riverside Counties.") (ECF No. 26-1). By the State Defendants' own admission, the unannounced inspection provision is utilized to conduct warrantless searches on falconers' facilities. *Id.* ¶¶ 7, 14, 17.

Given that none of the named Plaintiffs have ever previously been subjected to the unannounced inspections pursuant to the challenged regulations, the Court is forced to speculate as to whether unannounced inspections will be conducted on Plaintiffs in the future. The challenged regulations took effect twenty-five years after Peter's arrest. Likewise, the DFW officers appeared at Timmons's mother's house in 1992—sixteen years before the challenged regulations went into effect. Timmons Decl. ¶ 3.

AFC president Ron Kearney's declaration does not specify whether the Brunottes or Stephen Layman are AFC members. *See generally* Kearney Decl. ("I am personally aware of many examples of this abuse of power over the years, *both for [AFC] members and other licensed falconers*. . . . Examples include the home of the Brunottes' [was] searched in Colorado in 2004 . . . . Then there was the search of my good friend Stephen Layman's home up on Whidbey Island by Federal and Washington State Fish and Wildlife officers in approximately 2004 . . . . An early example was the so-called 'Operation Falcon' in the early 1980s.") (emphasis added). Even if they were AFC members, their alleged searches took place in Colorado and Washington in 2004—four years before the federal falconry regulations went into effect. *See id.* ¶¶ 8-9; Migratory Bird Permits; Changes in the Regulations Governing Falconry, 73 Fed. Reg. 59,448 (Oct. 8, 2008) ("These regulations are effective November 7, 2008").

The Court does not find Plaintiffs' alleged searches in 1983 and 1992 sufficiently qualify as a "past enforcement" that can be "good evidence that the threat of enforcement is not

'chimerical.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014) (holding plaintiffs had standing where organization was subject to challenged statute in recent election cycle and commission found probable cause to believe organization violated statute) (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)).

The individuals who have been subjected to the unannounced inspection provision are not before the Court today. Nothing in the declarations suggest that those same individuals are AFC members. Further, nothing about alleged past harms relating to *non-Plaintiffs* provides sufficient indication that enforcement against named *Plaintiffs* is "certainly impending." Therefore, because Peter's alleged arrest and Timmons's visit occurred long before the challenged regulations, these events fail to satisfy the "certainly impending" requirement outlined by the Supreme Court and adopted by the Ninth Circuit. *See Clapper*, 568 U.S. at 409; *Oregon Prescription Drug Monitoring Program*, 860 F.3d at 1235.

Plaintiffs' Fourth Amendment claims hang on a future contingency that is too speculative to create a justiciable controversy and they lack standing to bring these claims (Counts I and II). Without pleading additional facts, AFC's allegations do not survive the motion to dismiss. Accordingly, the Court finds that none of the Plaintiffs have alleged sufficient standing to bring their Fourth Amendment claims. Therefore, the motions to dismiss Counts I and II are GRANTED.

**6. <u>Leave to Amend to Address Lack of Standing as to Fourth Amendment Claims</u>**

The Ninth Circuit has long held that leave to amend should be granted "'even if no request [is] made, unless [the district court] determines that the pleading could not possibly be cured by the allegation of other facts.'" *Mason-Ealy v. City of Pomona*, 557 F. App'x 675, 677 (9th Cir. 2014) (quoting *Lacey v. Maricopa Cty.,* 693 F.3d 896, 926 (9th Cir.2012)). "Although leave to amend should be given freely, a district court may dismiss without leave where a plaintiff's

proposed amendments would fail to cure the pleading deficiencies and amendment would be futile." *Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1041 (9th Cir. 2011).

Plaintiffs have not requested leave to amend in the event this Court grants the motion to dismiss. *See* ECF No. 38. However, this is the first dismissal, and the Court cannot make the finding that leave to amend would necessarily be futile. Accordingly, Plaintiffs are granted leave to amend the Fourth Amendment claims.

## B.     Federal Defendants' Rule 12(b)(1) Motion to Dismiss First Amendment Claims

### 1.   Rule 12(b)(1) Standard of Review[11]

The Federal Defendants argue that the Plaintiffs' First Amendment claims are not ripe with respect to them because Plaintiffs have not alleged a genuine threat of prosecution to satisfy the case or controversy requirement. ECF No. 24-1 at 14. The standard of review for a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction is the same as indicated above. In short, Plaintiffs have the burden to establish subject matter jurisdiction. *See Rattlesnake Coal.*, 509 F.3d at 1102 n.1.

### 2.   Facial Versus As Applied Challenge Under the First Amendment

First Amendment challenges may be brought as "facial" or "as-applied" challenges. *See Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1033 (9th Cir. 2006). The Ninth Circuit described the distinction between these types of claims as follows:

> Facial constitutional challenges come in two varieties: First, a plaintiff seeking to vindicate his own constitutional rights may argue that an ordinance ... impermissibly restricts a protected activity. Second, an individual whose own speech or expressive conduct may validly be prohibited or sanctioned is permitted to challenge a statute on its face because it also threatens others not before the court. The former sort of challenge ... may be paired with the more common as-applied challenge, where a plaintiff argues that the law is unconstitutional as applied to his own speech or expressive conduct.

---

[11] In the analysis of the 12(b)(1) motion, the Court considers affidavits outside the pleadings on a motion to dismiss "to resolve factual disputes concerning the existence of jurisdiction." *Coble*, 823 F. Supp. 2d at 1050 (quoting *McCarthy*, 850 F.2d at 560).

*Id.* at 1033-34 (citations and quotation marks omitted). "It is within this framework that [Plaintiffs] . . . must . . . establish standing." *Id.* at 1034. Here, Plaintiffs' First Amendment claims raise both facial and as-applied challenges to the state and federal regulations with respect to their falconry activity. FAC ¶¶ 132-38. However, in part because Plaintiffs do not attempt to challenge the statute on behalf of others not before the Court, for practical purposes the justiciability inquiry is the same for both their facial and as-applied challenges here.

### 3. <u>Standing/Ripeness</u>

"[T]he constitutional component of ripeness overlaps with the 'injury in fact' analysis of Article III standing." *Wolfson v. Brammer*, 616 F.3d 1045, 1058 (9th Cir. 2010). For a claim to be ripe, the plaintiff must be subject to a genuine threat of imminent prosecution. *Id.* "Whether framed as an issue of standing or ripeness, the inquiry is largely the same: whether the issues presented are definite and concrete, not hypothetical or abstract." *Id.* (internal quotation marks omitted). The difference between an abstract question and a case and controversy is one of degree, and is not discernible by any precise test. *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 297 (1979). Where the court can only speculate as to the specific activities in which the party seeks to engage, it must dismiss the claim as nonjusticiable. *Protectmarriage.com-Yes on 8 v. Bowen*, 752 F.3d 827, 838-39 (9th Cir. 2014). The burden of establishing ripeness and standing rests on the party asserting the claim. *Colwell v. Dep't of Health & Human Servs.*, 558 F.3d 1112, 1121 (9th Cir. 2009).

"[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002). Because the Plaintiffs are not currently subject to an enforcement action, they are raising a pre-enforcement challenge to the regulations that restrict speech. *Wolfson*, 616 F.3d at 1058. Neither the mere existence of a proscriptive statute nor a

generalized threat of prosecution satisfies the case or controversy requirement, but the Ninth Circuit has "applied the requirements of ripeness and standing less stringently in the context of First Amendment claims." *Id.* at 1058.

An actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law. *Susan B. Anthony List*, 573 U.S. at 158. A plaintiff need not expose himself to liability before bringing suit to challenge the basis for the threat. *Id.*; *Wolfson*, 616 F.3d at 1058 (citing *Babbitt*, 442 U.S. at 298). Instead, pre-enforcement review is permissible "under circumstances that rendered the threatened enforcement sufficiently imminent." *Susan B. Anthony List*, 573 U.S. at 159; *see also Wolfson*, 616 F.3d at 1058 (quoting *San Diego Cty. Gun Rights Cmte. v. Reno*, 98 F.3d 1121, 1126 (9th Cir. 1996) ("[F]or a claim to be ripe, the plaintiff must be subject to a 'genuine threat of *imminent* prosecution.'")) (italics in original).

The Ninth Circuit has held on many occasions that "First Amendment cases raise 'unique standing considerations,' that 'tilt[] dramatically toward a finding of standing.'" *Lopez v. Candaele*, 630 F.3d 775, 781 (9th Cir. 2010) (internal citations omitted); *Wolfson*, 616 F.3d at 1058 ("Although the mere existence of a statute is insufficient to create a ripe controversy, we have applied the requirements of ripeness and standing less stringently in the context of First Amendment claims."). "Even though the standing inquiry tilts in favor of standing in these First Amendment pre-enforcement cases, a plaintiff must still show 'an actual or imminent injury to a legally protected interest.'" *Raymond v. Fenumiai*, No. 3:12-cv-00185 JWS, 2013 WL 496194, *3 (D. Alaska Feb. 8, 2013) (quoting *Lopez*, 630 F.3d at 785). In pre-enforcement cases, the actual or imminent injury is often self-censorship. *Ariz. Right to Life Political Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003). "Self-censorship is a constitutionally recognized injury." *Wolfson*, 616 F.3d at 1059 (citing *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988)).

"[I]t is 'sufficient for standing purposes that the plaintiff intends to engage in a course of

conduct arguably affected with a constitutional interest and that there is a credible threat that the

challenged provision will be invoked against the plaintiff.'" *Santa Monica Food Not Bombs*, 450

F.3d at 1034 (holding party sufficiently showed injury-in-fact and facial challenge where it

alleged it modified its behavior by choosing locations other than Santa Monica for its events

because of Santa Monica's permitting requirements) (quoting *Bayless*, 320 F.3d at 1006). One

need not await the "consummation of the threatened injury" before challenging a statute

restricting speech, to guard the risk that protected conduct will be deterred. *Wolfson*, 616 F.3d at

1058 (quoting *Bayless*, 320 F.3d at 1006). "To avoid the chilling effect of restrictions on speech,

the Ninth Circuit has endorsed a 'hold your tongue and challenge now' approach rather than

requiring litigants to speak first and take their chances with the consequences." *Id.* (quoting

*Bayless*, 320 F.3d at 1006). A pre-enforcement plaintiff can meet constitutional standing

requirements by "demonstrat[ing] a realistic danger of sustaining a direct injury as a result of the

statute's operation or enforcement." *Lopez*, 630 F.3d at 786.

> To determine if pre-enforcement plaintiffs face a credible threat of adverse state action
> sufficient to establish standing, the Ninth Circuit has identified three related inquiries. *Id.* at 786.

> First, we have considered whether pre-enforcement plaintiffs have failed to show
> a reasonable likelihood that the government will enforce the challenged law
> against them. Second, we have considered whether the plaintiffs have failed to
> establish, with some degree of concrete detail, that they intend to violate the
> challenged law. We have also considered a third factor, whether the challenged
> law is inapplicable to the plaintiffs, either by its terms or as interpreted by the
> government. Such inapplicability weighs against both the plaintiffs' claims that
> they intend to violate the law, and also their claims that the government intends to
> enforce the law against them.

*Id.*[12]

> Now the Court turns to the inquiry outlined in *Lopez* to determine if Plaintiffs have

---

[12] Although similar to the *Wolfson* factors (used to determine when a claimed threat of
prosecution is credible), *Lopez,* 630 F.3d 775, was published some four months after *Wolfson*.

standing to assert their pre-enforcement challenge.

### a. First Factor – Is there a reasonable likelihood that the government will enforce the challenged law?

A government's preliminary efforts to enforce a speech restriction or its past enforcement of a restriction is strong, though not dispositive, evidence that the pre-enforcement plaintiffs face a credible threat of adverse state action. *Lopez*, 630 F.3d at 786. For example, a threat of government prosecution is credible if the government has indicted or arrested the plaintiffs. *Id.* (citing *Younger v. Harris*, 401 U.S. 37, 41-42 (1971)). In *Steffel v. Thompson*, 415 U.S. 452, 459 (1974), a plaintiff was warned twice to stop handbilling and was told by police that he would likely be prosecuted if he repeated the conduct. Likewise, the plaintiff's companion was prosecuted for engaging in similar conduct. *Steffel*, 415 U.S. at 459. The *Steffel* Court held that these threats of prosecution were not imaginary or speculative, and the plaintiff did not need to expose himself to arrests in order to raise his First Amendment challenge to the statutes. *Id.*

However, the threatened state action need not be a prosecution and plaintiffs themselves need not be the direct target of government enforcement. *Lopez*, 630 F.3d at 786. A history of past prosecution of parties similarly situated to the plaintiffs will also support a credible threat of enforcement. *Id.* at 786-87. On the other hand, "general threat[s] by officials to enforce those laws which they are charged to administer" does not create the necessary injury in fact. *Id.* at 787; *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) ("We have held that neither the mere existence of a proscriptive statute nor a generalized threat of prosecution satisfies the 'case or controversy' requirement."); *see, e.g.*, *Poe v. Ullman*, 367 U.S. 497, 501 (1961) (plurality opinion) (the state attorney's assertion that he intended to prosecute any offense under Connecticut law, which plaintiffs averred included the law prohibiting the use of contraception, did not constitute a threat of prosecution); *Western Mining Council v. Watt*, 643 F.2d 618, 626 (9th Cir. 1981) (the Secretary of the Interior's statement that "plaintiffs cannot dig

in the ground" was not sufficiently specific threat of prosecution to confer standing).

In a case where multiple plaintiffs challenged a California law that criminalized teaching communism, the Supreme Court concluded that three of the plaintiffs lacked standing when they had not alleged that they had been threatened with prosecution, or that prosecution was even likely, but merely they felt "inhibited" in advocating and teaching political ideas. *Younger*, 401 U.S. at 42. "Mere allegations of subjective chill are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Lopez*, 630 F.3d at 787 (internal quotation marks omitted).

First, Plaintiffs claim that the FAC alleges enforcement. *See, e.g.*, ECF No. 38 at 8 (citing ECF No. 16 ¶ 20 ("Plaintiffs will suffer the continued deprivation of their constitutional rights due to the *continual enforcement* of the unconstitutional rules . . . .) (emphasis added)). The Court will analyze arguments for each party in turn.

### *Peter Stavrianoudakis*

Peter provides evidence of self-censorship.[13] However, self-censorship alone does not support a finding of a credible threat of enforcement as to Peter.

### *Eric Ariyoshi*

Plaintiffs allege that Eric Ariyoshi has given uncompensated educational presentations about falconry, but do not allege that he has been subject to past enforcement or threats of enforcement under the challenged regulations. FAC ¶¶ 67-76. Accordingly, the Court finds this factor indicates an absence of a credible threat of enforcement as to Ariyoshi.

//

---

[13] Peter Decl. ¶ 36 (noting Peter has repeatedly declined to give presentations because of the restrictions on content and compensation); *id.* ¶ 38 ("[i]t would be wonderful to have the ability to share my love of falconry without fear of violating the speech restrictions. If I had the chance to earn money with Ares and take him out onto a movie set for a shoot, I would absolutely do it," but he has declined to pursue such opportunities because of the regulations).

### *Scott Timmons*

Timmons provides specific examples where the State Defendants have warned him that certain conduct was illegal. Timmons was told on the phone by DFW staff that he was not allowed to give educational presentations or to speak to the public about his birds. Timmons Decl. ¶ 14. Timmons previously performed abatement services at a resort, and DFW advised him that he could not answer questions from resort guests about his birds. *Id.* ¶¶ 13-15. Timmons was also told that if he wanted to schedule time for a guest to come out to speak about his birds, that would be illegal. *Id.* ¶ 16. These examples show that the State Defendants specifically warned Timmons that the challenged regulations would be enforced.[14] Thus, the Court finds a credible threat of enforcement as to Timmons.

### *Boasting of Enforcement*

Next, Plaintiffs contend that the State Defendants boast enforcement. ECF No. 38 at 8 (citing ECF No. 25-1 at 3-6). The State Defendant's memorandum in support of the motion to dismiss outlines the structure of the challenged regulations and the interplay between the federal and state regulations. ECF No. 25-1 at 3-6. Indeed, the State Defendants' brief in support of the motion to dismiss states that falconers need a special purpose permit if they wish to engage in abatement or commercial exhibitions and that 14 C.C.R. § 670 authorizes the use of falconry raptors in educational and media activities only under certain circumstances and not for profit. *Id.*

---

[14] Nothing in the record suggests similar enforcement threats have been made by any employee of the Federal Defendants. However, the standing inquiry is whether each Plaintiff has standing to bring each claim in the case. Here, there is no question that the state regulation incorporates the federal regulations by reference. 14 C.C.R. § 670(a)(4)("Applicable regulations adopted by the U.S. Secretary of the Interior pursuant to the Migratory Bird Treaty Act (MBTA) and published in Title 50, Code of Federal Regulations, Part 21 (Revised 07/02/2015), hereinafter referred to as 50 CFR 21, are hereby incorporated and made a part of these regulations."). For purposes of this motion, the Court assumes DFW has authority to and does enforce those incorporated regulations. The Court further finds that, for purposes of this motion, a Plaintiff who is able to establish a credible threat of enforcement by DFW may challenge all of the regulations DFW claims authority to enforce.

at 5. However, this recitation of the regulations has no bearing on whether the Defendants actually enforce the regulations. *See Wolfson*, 616 F.3d at 1058 (neither the mere existence of a proscriptive statute nor a generalized threat of prosecution satisfies the case or controversy requirement).

In sum, Peter provides evidence of self-censorship for fear of violating the regulations, but does not provide concrete examples of past enforcement. There is nothing in the briefings for the Court to analyze this factor as to Katherine. Ariyoshi provides no examples of past enforcement. Timmons provides examples of warnings and previous threats of enforcement. For these reasons, the first factor supports a credible threat of enforcement as to Timmons. It does not necessarily support a credible threat of enforcement as to Peter. As to Ariyoshi, this factor indicates an absence of a credible threat of enforcement.

### b. Second Factor -Have Plaintiffs articulated a concrete plan to violate the law(s) in question?

Plaintiffs who fail to allege a concrete intent to violate the challenged law cannot establish a credible threat of enforcement. *Lopez*, 630 F.3d at 787. Because the Constitution requires something more than a hypothetical intent to violate the law, plaintiffs must give "details about their future speech such as 'when, to whom, where, or under what circumstances'" of the plan to violate the law. *Id.* (quoting *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134,1139 (9th Cir. 2000) (internal quotation marks omitted)). For example, a plaintiff challenging the licensing provisions of a state regulatory regime lacked standing because the plaintiff never indicated that it intended to pursue another license and therefore could not assert that it would ever again be subject to the licensing provisions. *Lopez*, 630 F.3d at 787 (citing *4805 Convoy, Inc. v. City of San Diego*, 183 F.3d 1108, 1112-13 (9th Cir. 1999)). By contrast, a group demonstrated a concrete plan to violate the law when it showed it planned to spend over $1,000 to defeat a specific California proposition in the November 2000 election. *Lopez*, 630 F.3d at 787 (citing

*Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d at 1088, 1093 (9th Cir. 2003)).

In *Wolfson*, 616 F.3d at 1059, the Ninth Circuit held that the plaintiff had established an intent to violate the law that was more than hypothetical. There, Randolph Wolfson, a candidate for judicial office, expressed an intention to run for office in the future and a desire to engage in two kinds of campaign-related conduct which would be prohibited by the Arizona Code of Judicial Conduct. *Wolfson*, 616 F.3d at 1051, 1059. Wolfson expressed his intent to solicit campaign contributions through live phone appearances, phone calls, and written requests, and he expressed a desire to endorse other candidates. *Id.* at 1059. These actions would have violated the Arizona Code of Judicial Conduct, and the Court held that Wolfson had specified a plan that was more than mere conjecture. *See id.*

In the present case, Plaintiffs claim in their opposition to Defendants' motion to dismiss that if the regulations were lifted, falconers "would immediately make plans to have their birds photographed and filmed and to speak about falconry for compensation while flying their birds . . . ." ECF No. 38 at 8. They assert they would photograph or film their birds in advertisements, as a representation of a business, or for promotion of products. FAC ¶ 150. Next, Plaintiffs would determine for themselves the content of their conservation education programs, *id.* ¶ 162, and would accept compensation for these programs, *id.* ¶ 179. These portions of the FAC show Plaintiffs' general intent to violate the regulations.

The Court analyzes arguments specific to each Plaintiff below.

### ***Peter Stavrianoudakis***

Peter has not attempted to violate the regulations restricting speech or compensation. *See* FAC ¶¶ 47-66. However, in his sworn declaration in support of the motion for preliminary injunction, Peter states that he has been asked on multiple occasions to give demonstrations with his birds, but he has declined for fear of violating the regulations on content and compensation.

ECF No. 17-2 ¶ 36. He states that "[i]t would be wonderful to have the ability to share my love of falconry without fear of violating the speech restrictions," and if he could take his bird out on a movie set for compensation, he would absolutely do it. *Id.* ¶ 38. Peter's affidavit shows that he has engaged in self-censorship due to the regulations. Although Peter's future plans to violate the regulations are not set in stone, he still demonstrates an intention to speak and use his bird to be compensated if the regulations are lifted.

### *Katherine Stavrianoudakis*

Katherine is not a falconer and does not hold a falconry license. FAC ¶ 66. Katherine also submitted a sworn affidavit in support of the motion for preliminary injunction, but she in no way alleges that the speech and compensation regulations are applicable to her. *See* ECF No. 17-2. Katherine has never violated these regulations and shows no intention to violate them in the future.

### *Eric Ariyoshi*

The FAC and the pleadings do not allege that Ariyoshi has a concrete plan to violate the challenged speech and compensation restrictions. *See* FAC ¶¶ 67-76. The FAC alleges "Eric [Ariyoshi] has given uncompensated educational presentations about falconry." *Id.* ¶ 76. On its face, this assertion does not allege self-censorship or a future plan to violate the regulations.

### *Scott Timmons*

The FAC alleges that Timmons has declined to perform presentations due to the limits on compensation. FAC ¶ 94. Although the FAC does not allege that he intends to give such presentations, it is clear from his sworn affidavit that Timmons has plans to engage in the prohibited conduct if the ban on speech and compensation were lifted. *See* ECF No. 17-4. Timmons gives four to six tours per year while flying his abatement bird at the South Coast Recycling and Transfer Station. ECF No. 17-4 ¶ 11. He believes he should be compensated for

these tours but cannot be paid because of the regulations. *Id.* ¶¶ 11-12. In the last five years, Timmons has turned down four to five opportunities to use his birds in the entertainment industry because of the regulations. *Id.* ¶ 18. Timmons has had specific conversations with local wine-tasting rooms about bringing his birds in for demonstrations or presentations. *Id.* ¶ 22. Timmons would like to engage in such activities and charge for his services, but the regulations prohibit the conduct. *Id.* Lastly, Timmons would like to take paying clients on hunting expeditions with his birds, an activity that is banned by the regulations. *Id.* ¶ 24. These examples show that Timmons has concrete plans to engage in conduct prohibited by the challenged regulations. Timmons's affidavit gives details about when, to whom, where, and under what circumstances his future conduct would run afoul of the challenged regulations.

Overall, under the second factor, Peter and Timmons have demonstrated plans to violate the regulations. Ariyoshi and Katherine have not.

### c. <u>Factor Three–Are the challenged speech restrictions applicable to Plaintiffs?</u>

A plaintiff's claim of future harm lacks credibility when the challenged speech restriction, by their terms, are not applicable to the plaintiff or the enforcing authority disavows the applicability with respect to the plaintiff. *Lopez*, 630 F.3d at 788. In the First Amendment context, "a fear of prosecution will only inure if the plaintiff's intended speech arguably falls within the statute's reach." *Getman*, 328 F.3d at 1095. The Ninth Circuit held that individual firemen did not have standing to challenge a portion of their union's collective bargaining agreement because, by its plain terms, the provision at issue only applied to the union and not its members. *Lopez*, 603 F.3d at 788 (citing *Leonard v. Clark*, 12 F.3d 885, 888-89 (9th Cir. 1994)); *see also Getman*, 328 F.3d at 1095. In *Lopez*, 630 F.3d at 791, the plain language of the sexual harassment policy was inapplicable to the plaintiff's speech and the absence of any official interpretation of the policy cut against finding a credible threat of enforcement.

In the present case, the government defendants do not disavow the applicability of the challenged speech regulations to Plaintiffs. The regulations appear to apply to the named plaintiffs except as to Katherine. The regulations restrict certain speech by falconers engaged in falconry and restrict falconers' compensation for education programs. For instance, 50 C.F.R. § 21.29(f)(9)(i) prohibits photographing or filming falconry raptors in movies, commercials, or other commercial ventures. Subsection (f)(9)(ii) prohibits the use of the birds in advertisements, as representations of businesses unless such promotion is for a nonprofit falconry organization. Subsection (f)(8)(v) restricts what content falconers can put in their conservation education programs. Lastly, subsection (f)(8)(iv) and 14 C.C.R. § 670(h)(13)(A) prohibit falconers from turning a profit. Because the named plaintiffs, except for Katherine, are falconers, these regulations apply to them and their proposed conduct. The FAC does not allege that Ariyoshi has or intends to engage in speech that would violate the regulations. Timmons has declined to perform due to the compensation restrictions so the regulations that prohibit turning a profit apply to his conduct. The other restrictions on falconers' speech and the content of their conservation education programs are also applicable to Timmons.

Lastly, under the third factor, the Court finds that challenged regulations could be imposed on the Plaintiffs in the future. In *Lopez*, 630 F.3d at 791-92, the Court determined that it was unlikely the community college district would enforce the sexual harassment policy against the student in the future because the policy was inapplicable to his class speech and there was no official interpretation of the policy to the contrary. In the present case, although the speech and compensation regulations have not been explicitly applied to the Plaintiffs, the regulations prohibit certain conduct that Plaintiffs intend to engage in. *See, e.g.*, Peter Decl. ¶¶ 36-38, 40 (noting Peter has declined to perform falcon demonstrations because of restrictions on content and compensation but he and other falconers would use falcons for commercial purposes if they

could); Timmons Decl. ¶ 11-12, 18, 22-24 (noting Timmons cannot be paid for falcons presentations but believes he should be compensated and has declined artistic and business opportunities because of speech regulations).

Ultimately, the third factor supports a finding of a credible threat of enforcement as to all the named Plaintiffs except Katherine and Ariyoshi.

### d. Combining the *Lopez* factors shows that Peter and Timmons have standing to bring the First Amendment claims. Katherine and Ariyoshi do not.

Applying the three factors set forth in *Lopez*, Peter and Timmons have properly alleged that they face a credible threat of enforcement of the speech and compensation regulations. Timmons claims a desire to be compensated for using his birds, and he cites specific examples where he intends to engage in such conduct. Thus, Timmons has standing as to the challenges of 50 C.F.R. § 21.29(f)(8)(iv) (Count VI) and 14 C.C.R. § 670(h)(13)A) (Count VI (Second Count)). Peter, although not as specifically as Timmons, has clearly alleged self-censorship and a desire to engage in conduct prohibited by the regulations. Accordingly, both Peter and Timmons have standing to challenge 50 C.F.R. § 21.29(f)(9)(i) (Count III), 50 C.F.R. § 21.29(f)(9)(ii) (Count IV), 50 C.F.R. § 21.29(f)(8)(v) (Count V), and 14 C.C.R. § 670(h)(13)(A) (Count VI (Second Count)).

As explained above, Ariyoshi does not claim to have self-censored and does not establish a plan to violate the speech and compensation restrictions. The speech and compensation regulations are similarly inapplicable to Katherine because she is not a falconer and does not engage in falconry. For these reasons, Peter and Timmons have alleged a present injury or threatened injury sufficient to make their First Amendment claims justiciable. Katherine and Ariyoshi have not. Accordingly, the motion to dismiss these claims with respect to Peter and Timmons is denied. The First Amendment claims (Counts III, IV, V, VI, VI (Second Count))

with respect to Katherine and Ariyoshi are dismissed with leave to amend.[15]

### e. __Associational Standing for AFC__

Plaintiffs assert that "members of the American Falconry Conservancy have declined to create photographs, movies, commercials, and other expression due to Defendants' active enforcement of the regulations . . . ." FAC ¶¶ 107-09. Although the parties do not substantially brief the issue of whether the AFC has associational standing, this Court must determine the existence of standing *sua sponte*. *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 488 n.4 (1980).

Injury to an organization may involve matters no different than injury to a person and courts have recognized standing to protect against such injury. Wright & Miller, Federal Practice and Procedure, § 3531.9.5 (3d ed. Aug. 2019 update). An association has standing to bring suit on behalf of its members when: "(a) its members would otherwise have standing to sue in their own right; (b) the interest it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

In *Hunt*, 432 U.S. at 335, the Washington State Apple Advertising Commission brought a lawsuit against the governor of North Carolina challenging a North Carolina statute that prohibited closed apple containers from having a grade other than the applicable U.S. grade. The Apple Commission challenged this law as a burden on interstate commerce because it prohibited the Washington growers from marking their containers with the Washington State apple grades. *Id.* The Supreme Court reasoned that plaintiffs had sustained direct and sufficient injuries because the North Carolina statute caused some Washington apple growers and dealers: "(a) to obliterate

---

[15] The Court has serious doubts as to whether the complaint could be amended to establish that Katherine has standing to bring any First Amendment claims. But the Court cannot absolutely rule out this possibility. Plaintiffs are cautioned to abide by their responsibilities under Federal Rule of Civil Procedure 11 in filing any amended complaint.

Washington State grades from the large volume of closed containers destined for the North Carolina market at a cost ranging from 5 to 15 cents per carton; (b) to abandon the use of preprinted containers, thus diminishing the efficiency of their marketing operations; or (c) to lose accounts in North Carolina." *Id.* at 343-44. Next, the Apple Commission's attempt to remedy these injuries and to secure the industry's right to publicize its grading system was central to the Commission's purpose of protecting and enhancing the market for Washington apples. *Id.* at 344. Lastly, the interstate commerce claim did not require individualized proof and was thus properly resolved in a group context. *Id.*

On the other hand, in *American-Arab Anti-Discrimination Comm. v. Thornburgh*, 970 F.2d 501, 510 (9th Cir. 1991), the Ninth Circuit held that an organization lacked associational standing because it failed to allege that its members were or would be subjected to the challenged statutory provision. In *Thornburgh*, the American-Arab Anti-Discrimination Committee ("American-Arab") joined other plaintiffs in a lawsuit claiming that certain provisions of the McCarran-Walter Act of 1952 violated the First and Fifth Amendments. *Id.* at 504-05. The former Immigration and Naturalization Service ("INS") alleged that the individual plaintiffs violated 8 U.S.C. § 1251(a)(6)(D) for their membership in the Popular Front for the Liberation of Palestine ("PFLP"). *Id.* Four days prior to the hearing for preliminary injunction, the INS dropped charges under section 1251(a)(6) while retaining others. *Id.* at 505. In rejecting the district court's finding that American-Arab had associational standing, the Ninth Circuit held that American-Arab had not alleged that its members had been charged under the challenged provisions, or that they were members or desired to be members of PFLP. *Id.* at 510. The allegation that American-Arab members received two publications purportedly espousing the views of PFLP did not support a finding that American-Arab members were or would be subjected to deportation under the challenged provisions. *Id.* Without drawing a line in the sand as to when allegations of "chilling

effect" are sufficient to support standing, the Ninth Circuit held that American-Arab's allegations were not enough. *Id.*

### AFC members have standing to sue in their own right

In the present case, the Court finds that AFC has properly pleaded associational standing on behalf of its members. First, the AFC does not allege an injury to the organization itself so it must meet the requirements of associational standing. *Int'l Union, United Auto., Aerospace, & Ag. Implement Workers of Am. v. Brock,* 477 U.S. 274, 281 (1986). "'The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit.'" *United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 552 (1996) (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 169 (2000) ("injury in fact was adequately documented by the affidavits and testimony of [petitioner's] members asserting that [respondent's] pollutant discharges, and the affiants' reasonable concerns about the effects of those discharges, directly affected those affiants' recreational, aesthetic, and economic interests.").

The FAC alleges that the AFC members have engaged in self-censorship: certain members of the AFC have "modified the content of their educational presentations due to Defendants' active enforcement of the regulations complained of in this action." FAC ¶ 108. Also, certain members of AFC have declined to perform educational presentations and engage in other expression due to the active enforcement of the regulations limiting compensation. *Id.* ¶ 109. The alleged self-censorship by the members can be a cognizable harm for purposes of standing. *See American Booksellers Ass'n, Inc.*, 484 U.S. at 393. However, "[t]he self-censorship door to standing does not open for every plaintiff." *Cal. Pro-Life Council, Inc. v. Getman*, 328

F.3d 1088, 1095 (9th Cir. 2003). The potential plaintiff must have an actual and well-founded fear that the law will be enforced against him or her. *Id.*

Plaintiffs Peter and Timmons are AFC members. Peter Decl. ¶ 28; Timmons Decl. ¶ 26. As discussed above, this Court has already analyzed Peter and Timmons under the *Lopez* factors and held that Peter and Timmons have standing to challenge 50 C.F.R. § 21.29(f)(9)(i) (Count III), 50 C.F.R. § 21.29(f)(9)(ii) (Count IV), 50 C.F.R. § 21.29(f)(8)(v) (Count V), and 14 C.C.R. § 670(h)(13)(A) (Count VI). Peter and Timmons demonstrated a credible threat of enforcement of the speech and compensation regulations. Timmons cited specific examples where he intends to engage in commercial activities to be compensated for using his birds. Peter also alleged self-censorship and a desire to engage in conduct prohibited by the regulations. Lastly, the challenged regulations apply to Peter and Timmons because they are falconers who intend to engage in the conduct prohibited by the regulations. Therefore, AFC members, including Peter and Timmons, have standing to sue in their own right.

Plaintiffs also filed an affidavit of Ron Kearney, the current president of AFC who states, "I am also aware of specific examples of the negative effect of the anti-speech rules." Kearney Decl. ¶ 16. He continues, "In my own experience, I was forced to revise the content of a presentation I prepared to deliver to the Klamath Audubon Society. The regulations required that the content of the presentation could only be about conservation. . . . I was not free to speak about whatever I wanted with regard to falconry." *Id.* ¶ 17. Kearney then asserts, "But for the speech rules, I would allow my birds to be filmed and photographed for non-falconry related speech and I would pursue opportunities to speak about falconry, including speaking for pay." *Id.* ¶ 18. Kearney claims that he has self-censored due to the regulations and that he would engage in prohibited conduct in the future, but for its illegality.

Considering the allegations of the FAC, and the declarations of Peter, Timmons, and Ron

Kearney, certain members of AFC have self-censored and would engage in conduct that the speech and compensation regulations prohibit if the regulations were lifted. Overall, the Court finds that Plaintiffs have satisfied the first element of associational standing that the individuals would have standing to sue.

### *Interests germane to the organization's purpose*

Second, the interests raised by the AFC are germane to the organization's purpose. *See Hunt*, 432 U.S. at 343-44 (holding respondent's "attempt to remedy [business injuries] and to secure the [apple] industry's right to publicize its grading system is central to the [respondent's] purpose of protecting and enhancing the market for Washington apples."). This factor for organizational standing requires only "mere pertinence between litigation subject and organizational purpose." *Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1159 (9th Cir. 1998) (internal citation omitted).

AFC's purpose is to protect and preserve the practice of falconry and to protect falconers' rights. FAC ¶ 110. AFC seeks to "promote 'the broadest liberties possible that are not in conflict with legitimate conservation efforts based upon sound biological and legal reasoning,' and 'promote knowledge of quality falconry, as well as to instill pride in falconers for the cultural heritage of the sport, and its place in world history.'" *Id.* ¶ 96. Likewise, the claims brought in the FAC seek to protect the constitutional rights of the organization's members, including members' rights under the First, Fourth, and Fourteenth Amendments, which is pertinent to AFC's organizational mission. *See id.* ¶¶ 101-81. Thus, the second *Hunt* element is satisfied.

### *Neither the claims asserted, nor the relief requested requires the participation of individual members*

Third, neither the claims asserted, nor the relief requested requires the participation of the individual members. *See Hunt*, 432 U.S. at 343. Plaintiffs seek declaratory and injunctive relief and an order that the challenged regulations violate the First Amendment. *See Associated Gen.*

*Contractors of Cal., Inc. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1408 (9th Cir. 1991)

(participating of individual members not required where "the claims proffered and relief

requested [by organization] do not demand individualized proof on the part of its members"). In a

facial challenge such as this, "there is complete identity between the interest of the [AFC] and

those of its members[s] . . .with respect to the issues raised in this suit, and the necessary proof

[can] be presented 'in a group context.'" *New York State Club Ass'n v. City of New York*, 487

U.S. 1, 10 n. 4 (1988) (quoting *Hunt*, 432 U.S. at 344 (1977)); *Brock*, 477 U.S. at 287-88 (holding

union met third *Hunt* factor where union could litigate labor action without participation of

individual claimants and still ensure "the remedy, if granted, will inure to the benefit of those

members of the association actually injured") (quoting *Warth v. Seldin*, 422 U.S. 490, 515

(1975)). *But see Warth*, 422 U.S. at 515-16 (holding organization of construction firms could not

seek damages for members' lost profits and business because "whatever injury might have been

suffered is peculiar to the individual member concerned, and both the fact and extent of injury

would require individualized proof.").

    As in *Associated Gen. Contractors of Cal., Inc.*, Plaintiffs here seek declaratory and

injunctive relief, which do not require individualized proof on the part of its members. 950 F.2d at

1408. Like in *New York State Club Association*, where the Court held there was a "complete

identity between the interest" of the organization and its members with respect to the issues raised

in the lawsuit, here, AFC's interest in protecting the constitutional rights of its members aligns

with the interests raised in the instant action to protect the Plaintiffs' First Amendment rights. 487

U.S. at 10 n.4. Unlike in *Warth*, where the nature of the relief sought would have necessarily

required an individualized analysis of each member's damages, here, however, the relief sought

regarding the unannounced inspections and limitations on falconry programming is conceivably

shared by all organization members. *See Warth*, 422 U.S. at 515-16. Thus, the third *Hunt* factor is

satisfied.

Accordingly, all of the elements of associational standing are met with respect to the *Hunt* criteria. Defendants' motions to dismiss with respect to the AFC's First Amendment claims are therefore denied.

## C. Defendants' Rule 12(b)(6) Motion to Dismiss First Amendment claims

Next, the Federal and State Defendants move to dismiss Plaintiffs' First Amendment claims pursuant to Rule 12(b)(6) for failure to state a claim for relief. The Court will separately address the Federal and State Defendants' arguments.

### 1. Rule 12(b)(6) Standard of Review

A motion to dismiss pursuant to Rule 12(b)(6) is a challenge to the sufficiency of the allegations set forth in the complaint. Dismissal under Rule 12(b)(6) is proper where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balisteri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990). In considering a motion to dismiss for failure to state a claim, the court generally accepts as true the allegations in the complaint, construes the pleading in the light most favorable to the party opposing the motion, and resolves all doubts in the pleader's favor. *Lazy Y. Ranch LTD v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).

To survive a 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the Plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. (quoting *Twombly*, 550 U.S. at 556). "While a complaint attacked by a Rule 12(b)(6) motion

to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions." *Twombly*, 550 U.S. at 555 (internal citations omitted). Thus, "bare assertions . . . amount[ing] to nothing more than a 'formulaic recitation of the elements' . . . are not entitled to be assumed true." *Iqbal*, 556 U.S. at 681. "[T]o be entitled to the presumption of truth, allegations in a complaint . . . must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). Conclusory allegations of law, however, are insufficient to defeat a motion to dismiss. *Lee v. City of Los Angeles*, 250 F.3d 668, 679 (9th Cir. 2001). In practice, "a complaint . . . must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Twombly*, 550 U.S. at 562. To the extent that the pleadings can be cured by the allegation of additional facts, a plaintiff should be afforded leave to amend. *Cook, Perkiss and Liehe, Inc. v. N. Cal. Collection Serv., Inc*., 911 F.2d 242, 247 (9th Cir. 1990) (citations omitted).

## 2.  The First Amendment

The First Amendment prohibits laws "abridging the freedom of speech." U.S. Const. amend. I. Its protection extends beyond verbal and written statements to expressive conduct that is "sufficiently imbued with elements of communication." *Texas v. Johnson*, 491 U.S. 397, 404 (1989). The Supreme court has eschewed a rule that all conduct is presumptively expressive. *Knox v. Brnovich*, 907 F.3d 1167, 1181 (9th Cir. 2018). Rather the First Amendment protects only conduct that "is intended to convey a 'particularized message' and the likelihood is great that the message would be so understood." *Id.* (quoting *Nunez v. Davis*, 169 F.3d 1222, 1226 (9th Cir. 1999)).

The First Amendment generally prevents government from proscribing speech and

expressive conduct because of disapproval of ideas. *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 382 (1992). The level of scrutiny applied to laws regulating speech varies depending on whether the law is content-based or content-neutral. *Victory Processing, LLC v. Fox*, 937 F.3d 1218, 1226 (9th Cir. 2019). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.* (quoting *Reed v. Town of Gilbert*, -- U.S. --, 135 S. Ct. 2218, 2226 (2015)). Content-based restrictions in certain limited areas do not violate the First Amendment. *R.A.V.*, 505 U.S. at 382-83; *see*, *e.g.*, *Roth v. United States,* 354 U.S. 476 (1957) (obscenity); *Beauharnais v. Illinois,* 343 U.S. 250 (1952) (defamation); *Chaplinsky v. New Hampshire,* 315 U.S. 568 (1942) ("'fighting' words").

Content-neutral laws, on the other hand, are subject to lesser scrutiny and can be justified as time, place, and manner restrictions. *Victory Processing, LLC*, 937 F.3d at 1226 (citing *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)). "The most commonsense way a law can be content-based is if it distinguishes particular speech based on the *topic discussed*, viewpoint or idea expressed, or more subtly, the function or purpose of the speech." *Id.* (emphasis added).

### 3. <u>The Relevant Regulations</u>

In Count III of the FAC, Plaintiffs claim that 50 C.F.R. § 21.29(f)(9)(i) is a content-based restriction that violates the First Amendment. Section 21.29(f)(9)(i) states "You may not use raptors to make movies, commercials, or in other commercial ventures that are not related to falconry."

In Count IV, Plaintiffs contend that 50 C.F.R. § 21.29(f)(9)(ii) is an unconstitutional restriction on commercial speech. ECF No. 16 at 15-16. 50 C.F.R. § 21.29(f)(9)(ii) states that

falconers may not use their raptors for "commercial entertainment; for advertisements; as representation of any business . . . or for promotion . . . of any products [or] services . . . with the following exceptions: (A) . . . to promote . . . a nonprofit falconry organization . . . [and] (B) . . .to promote . . . products . . . related to falconry . . . ."

In Count V, Plaintiffs challenge 50 C.F.R. § 21.29(f)(8)(v) which requires falconers giving conservation education programs to provide "information about the biology, ecological roles, and conservation needs of raptors."

In Count VI, Plaintiffs challenge the prohibitions on charging fees that exceed the amount required to recoup costs under 50 C.F.R. § 21.20(f)(8)(iv).

### 4. **The Federal Defendants' motion to dismiss on the ground that the regulations do not restrict protected speech is denied.**

The Federal Defendants move to dismiss Counts III through VI of the FAC, arguing that 50 C.F.R §§ 21.29(f)(9)(i)-(ii) and § 21.29(f)(8)(iv)-(v) do not restrict "protected speech." ECF No. 24-1 at 15-16. They contend that the regulation permits activities that falconers can undertake with their raptor. *Id.* at 15. The Federal Defendants argue that because falconers could use nonnative raptors to communicate their intended messages or for paid opportunities, the restriction on the type of raptor is not a restriction on expressive conduct. *Id.* at 16. The Court finds this to be a bit of ostrich and the Federal Defendants cite to no case law supporting this argument.

"[P]ure speech" is entitled to First Amendment protection unless it falls within one of the categories outside the protection of the First Amendment. *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1058 (9th Cir. 2010) (citing *United States v. Stevens*, 559 U.S. 460, 471 (2010)). Conduct intending to express an idea is constitutionally protected only if it is "'sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments,'" which means that "'[a]n intent to convey a particularized message [is] present,

and . . . the likelihood [is] great that the message w[ill] be understood by those who view [] it.'" *Anderson*, 621 F.3d at 1058 (quoting *Spence v. Washington*, 418 U.S. 405, 409-11 (1974)). Conduct expressive of an idea is protected by the First Amendment, but the government generally has a "freer hand in restricting expressive conduct than it has in restricting the written or spoken word." *Texas v. Johnson*, 491 U.S. at 406. Restrictions on expressive conduct are analyzed under the four-part test announced in *United States v. O'Brien*, 391 U.S. 367, 376 (1968), a less stringent test than those established for regulations on pure speech. *Anderson*, 621 F.3d at 1059.

The distinction between whether the activity is purely expressive activity, *i.e.*, pure speech, or conduct that merely contains an expressive component is the former "is more akin to writing (an example of purely expressive activity)" and the latter is more akin to "burning a draft card (an example of conduct that can be used to express an idea but does not necessarily do so)." *Id.*

The Supreme Court has recognized that various forms of entertainment and visual expression are purely expressive activities—including *movies*. *Id.* at 1060 (citing *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501-02 (1952)). Therefore, 50 C.F.R. § 21.29(f)(9)(i)'s restrictions on movies and § 21.29(f)(9)(ii)'s restriction on commercial entertainment go beyond restricting expressive conduct and restrict purely expressive activity.

The restriction compelling the content of falconers' conservation education program under 50 C.F.R. § 21.29(f)(8)(v) is clearly a content-based restriction because it explicitly restricts the topic of the speech that can be discussed: "you must provide information about the biology, ecological roles, and conservation needs of raptors . . . ." This follows from *Victory Processing, LLC*'s common-sense approach that a regulation is content-based if it restricts based on the topic, viewpoint or purpose of the speech. 937 F.3d at 1226. The regulation unequivocally discriminates based on the topic of the educational presentation.

"A statute is presumptively inconsistent with the First Amendment if it imposes a financial burden on speakers because of the content of their speech." *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 115 (1991). 50 C.F.R. § 21.29(f)(8)(iv) limits the fee that falconers can charge when giving a conservation education program. Therefore, this regulation imposes a financial burden on falconers depending on the content of their presentation.

The Federal Defendants do not argue in the motion to dismiss that the regulations restrict excludable speech (i.e. obscenity, *see Roth v. United States*, 354 U.S. at 484-85), or that the regulations are valid time, place, and manner restrictions. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). It is inconsequential that falconers could merely use nonnative raptors to engage in the prohibited activities. Because the restrictions are content based, they are not subject to reasonable time, place, and manner restrictions. *Id.* (the government may impose reasonable time, place, and manner restrictions, provided the restrictions are justified without reference to the content of the regulated speech). The Federal Defendants provide no such support that the restriction on use of native raptors is no less a restriction on falconers' speech.

In addition, the Federal Defendants make no argument in the motion to dismiss that the content-based restrictions pass strict scrutiny. Thus, the Federal Defendants' motion to dismiss Counts III, IV, V, and VI on the grounds that the regulations do not restrict protected speech is DENIED.

### 5. The Federal Defendants' motion to dismiss on the grounds that the restrictions are permissible restrictions on commercial speech is denied.

Next, the Federal Defendants contend that, assuming the speech restricted by the regulations is protected speech, the regulations do not violate the First Amendment because they are permissible regulations on commercial speech. ECF No. 24-1 at 17-19. Commercial speech is "expression related solely to the economic interests of the speaker and its audience." *Central*

40

*Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 561 (1980).[16] Such speech is protected by the First Amendment, but to a lesser degree than other types of speech. *Id.* The Federal Defendants contend that 50 C.F.R. §§ 21.29(f)(9)(i) and (ii) do nothing more than restrict speech that proposes a commercial transaction. Courts determine if a law regulates commercial speech by inquiring whether the speech does no more than propose a commercial transaction. *Bd. of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 473-74 (1989) (citing *Virginia Pharmacy Board v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976)); *see also Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 818-19 (9th Cir. 2013).

By the very language of the §§ 21.29(f)(9)(i) & (ii), the restrictions are not limited to only speech that does no more than propose a commercial transaction. The Federal Defendants argue that restrictions on commercials, advertisements, and the endorsement of products are restrictions on commercial speech. ECF No. 24-1 at 18. The Court agrees that these categories are restrictions on commercial speech.

In *Valle Del Sol Inc.*, Arizona Senate Bill 1070 made it unlawful for a motor vehicle occupant to hire or attempt to hire a person to work at another location from a stopped car, if that car impedes traffic. 709 F.3d at 814. The Ninth Circuit reasoned that a motorist pulling over to hire a day laborer and a day laborer soliciting work were both examples of speech aimed at proposing a commercial transaction. *Id.* at 818. Similarly, in *Victory Processing, LLC*, 492 U.S. at 472-74, the Supreme Court concluded that "Tupperware parties," whereby a host invites others to

---

[16] As discussed below, even assuming the speech regulations are aimed at only commercial speech, the Court finds that Defendants are not entitled to dismissal. In light of that finding and because the First Amendment test for commercial speech is less stringent, at this stage, the Court is not required to determine definitively the commercial or noncommercial nature of speech being restricted. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571, 575-76, 579 (2011) (declining to decide if speech constituted commercial speech because the "outcome is the same whether a special commercial speech inquiry or a stricter form of judicial scrutiny is applied"; Court rejected state's justifications for law and argument that law was integral to state's achievement of policy objectives).

a gathering for the purpose of selling housewares, constituted no more than speech to propose a commercial transaction. When commercial speech is "inextricably intertwined" with otherwise fully protected speech, the commercial speech may lose its commercial character. *See Riley Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988). Although Tupperware parties at issue in *Victory Processing*, touched on other subjects such as home economics, the Court reasoned that the commercial speech was not inextricably intertwined with the noncommercial speech. *Victory Processing*, 492 U.S. at 474. Nothing "makes it impossible to sell housewares without teaching home economics, or to teach home economics without selling housewares." *Id.*

In the present case, the limits on "commercials," under §§ 21.29(f)(9)(i) and "advertisements," under subsection (ii), standing alone, are restrictions on commercial speech. However, restrictions on film (movies), photography, or on commercial entertainment are not restrictions on commercial speech. *See ETW v. Jireh Pub., Inc.*, 332 F.3d 915, 925 (6th Cir. 2003) (holding "prints," or copies, of paintings were not commercial speech because they did not propose a commercial transaction); *see also Anderson*, 621 F.3d at 1060 (recognizing various forms of entertainment and visual expression—including movies—are purely expressive activities). Thus, §§ 21.29(f)(9)(i) & (ii) place restrictions on commercial speech— advertisements, commercials, and promoting a business or product—and on non-commercial, fully-protected speech.

As stated above, the speech restrictions under §§ 21.29(f)(9)(i) & (ii) are content based. The Ninth Circuit's analysis in *Valle Del Sol Inc.*, 709 F.3d at 819-20, confirms this finding. There, the day laborer solicitation law said nothing about other types of roadside solicitation. *Id.* at 819. The purpose of the statute to suppress labor solicitation confirmed the district court's finding that the restrictions were content based. *Id.* Similarly, in the present case, the challenged regulations prevent speech that is unrelated to falconry and thus specify the only permissible

content. Therefore, the restrictions under subsections (f)(9)(i) and (ii) are content based and limit both commercial and non-commercial speech.

The Court evaluates restrictions on commercial speech using the four-part test in *Central Hudson*:

> (1) if the communication is neither misleading nor related to unlawful activity, then it merits First Amendment scrutiny as a threshold matter; in order for the restriction to withstand such scrutiny, (2) [t]he State must assert a substantial interest to be achieved by restrictions on commercial speech; (3) the restriction must directly advance the state interest involved; and (4) it must not be more extensive than is necessary to serve that interest.

*Valle Del Sol, Inc.*, 709 F.3d at 820-21.

Plaintiffs argue that Defendants cannot make the showing on the fourth prong that the restrictions fit the government's interest at the motion to dismiss stage. ECF No. 38 at 27-30. Where the challenged regulation is a content-based restriction subject to strict scrutiny, the issue of whether the challenged restrictions adequately fit the government interest was a question for summary judgment or trial. *Frudden v. Pilling*, 742 F.3d 1199, 1207-08 (9th Cir. 2014). The summary judgment process requires defendants to show a compelling government interest and permits plaintiffs an opportunity to present countervailing evidence. *Id.*

The Court acknowledges Defendants have a substantial interest in protecting native raptors. In arguing that the regulations meet the fourth prong as a matter of law, the Federal Defendants claim that "the regulations are directed specifically at commercial endeavors, with a limited carve-out for falconry related undertakings." ECF No. 24-1 at 19. However, in light of *Frudden*, the present record is not developed sufficiently. Accordingly, the Federal Defendants' motion to dismiss the challenges to 50 C.F.R. § 21.29(f)(9)(i) and (ii) (Counts III & IV) on the theory that they are permissible commercial speech restrictions is DENIED.

//

//

**6. The State's motion to dismiss Count VI (Second Count) under 14 C.C.R. § 670(h)(13)(A) is denied because the regulation is a content-based restriction on expressive activity, and Plaintiffs have adequately pleaded First Amendment violations.**

In Count VI (Second Count), Plaintiffs claim that the California regulation, 14 C.C.R. § 670(h)(13)(A), violates the First and Fourteenth Amendments in the same way that the federal regulations do. This regulation states:

> Education and Exhibiting. A licensee may use raptors in his or her possession for training purposes, education, field meets, and media (filming, photography, advertisements, etc.), as noted in 50 CFR 21, if the licensee possesses the appropriate valid federal permits, as long as the raptor is primarily used for falconry and the activity is related to the practice of falconry or biology, ecology or conservation of raptors and other migratory birds. Any fees charged, compensation, or pay received during the use of falconry raptors for these purposes may not exceed the amount required to recover costs.

14 C.C.R. § 670(h)(13)(A).

Like the federal regulations in Counts III, IV, V, and VI, this regulation is also a restriction of expressive activity based on content. It demands that when using the raptors in presentations or media, the content must be related to falconry. Section 670(h)(13)(A) also imposes a restriction on compensation that corresponds to the federal regulations. The State Defendants argue that § 670(h)(13)(A) does not ban speech. ECF No. 25-1 at 19. For the same reasons stated above that the federal regulations are content-based restrictions on expressive activity, the Court rejects this argument. Because the regulations are content based, they are presumptively unreasonable and subject to strict scrutiny review.

Next, the State Defendants contend that should falconers desire to use raptors for exhibiting or commercial uses not authorized in § 670(h)(13)(A), they may obtain the appropriate permit to engage in such activity. ECF No. 25-1 at 19-20. It is somewhat unclear what State Defendants are pecking at. The Court has reviewed the falconry regulations raised by the parties. It is possible there is a separate regulatory regime that supports State Defendants'

argument that falconers can obtain a separate permit to engage in the prohibited activities. State Defendants have not identified any such alternative regulations or laws.

The language of the regulations does not support the State Defendant's position. 14 C.C.R. § 670(h)(13)(A) provides "A licensee may use raptors in his or her possession for training purposes, education field meets, and media (filming, photography, advertisements, etc.), as noted in 50 CFR 21, if the licensee possesses the appropriate valid federal permits, as long as the raptor is primarily used for falconry and the activity is related to the practice of falconry or biology, ecology or conservation of raptors and other migratory birds." By this provision's plain language, it does not appear that a falconer could seek a permit to give a talk with the raptor that is unrelated to the practice of falconry. For instance, even with an exhibiting permit under 14 C.C.R. § 671.1(b)(6), a falconer could not give a presentation using her raptor about her political or religious views, or throw a Harry Potter party for a relative, because these topics are not related to the practice of falconry or the biology, ecology, or conservation of raptors. Furthermore, it is notable that the provision requires the licensee to possess the "appropriate valid federal permits." 14 C.C.R. § 670(h)(13)(A). Thus, the Court rejects the State Defendants' argument that Count VI (Second Count) fails to state a claim for relief on the theory Plaintiffs could simply get a separate federal permit.

**D.    APA Claim – Count VII**

Plaintiffs claim that the federal regulations it challenges were promulgated in excess of statutory jurisdiction and authority under the MBTA and the Eagle Act. FAC ¶¶ 182-87. For these reasons, Plaintiffs argue that such regulations are invalid under the APA, 5 U.S.C. § 706.

First, Plaintiffs contend that since the MBTA grants the Secretary of the Interior ("Secretary") the "authority, *with a search warrant*, to search any place," 16 U.S.C. § 706 (emphasis added), the MBTA impliedly denies Defendants the authority to conduct warrantless

searches. FAC ¶ 184. Next, Plaintiffs allege in the FAC that the MBTA and the Eagle Act do not grant Defendants the authority to regulate falconers' speech. *Id.* ¶ 185. Plaintiffs argue that an administrative agency's power to regulate must always be grounded in a valid grant of authority from Congress and none is present here. ECF No. 38 at 32 (citing *Food & Drug Admin. v. Brown and Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000)).

The APA allows judicial review of agency regulations claimed to have been promulgated in excess of statutory authority. 5 U.S.C. § 706(2)(C). The relevant provision in the APA provides:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right . . . .

5 U.S.C. § 706(2)(C).

**1. Plaintiffs lack standing to bring the APA challenge to the unannounced inspection regulations.**

Because the Plaintiffs lack standing to bring the substantive Fourth Amendment claims, they similarly lack standing to bring the APA challenge to the unannounced inspection provisions.

The APA allows "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute" to challenge the agency action. 5 U.S.C. § 702; *see Lujan*, 497 U.S. at 883. The "plaintiff must establish that the injury he complains of falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis of his complaint." *Id.* As discussed above, Plaintiffs have not alleged an actual injury or a threat of enforcement that is certainly impending with respect to the unannounced inspection provisions. Without alleging a proper injury, the

Court need not address the zone of interest test.

Accordingly, to the extent that Count VII challenges the federal unannounced inspection provisions (50 C.F.R. §§ 21.29(b)(4)(i), (d)(2), (d)(9)), the Court lacks subject matter jurisdiction because the Plaintiffs do not have standing.[17]

**2.  APA challenge to the regulations restricting falconers' ability to give presentations, create media, and to charge fees.**

The Federal Defendants contend that the agency's interpretation of the authorizing statute should be accorded deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

Courts give deference to an agency's interpretation of the statutes that define the scope of the agency's authority when the interpretation meets the two-step *Chevron* test. *Turtle Island Restoration Network v. U. S. Dep't of Commerce*, 878 F.3d 725, 733 (9th Cir. 2017) (citing *Chevron*, 467 U.S. at 843). Under the *Chevron* analysis, the court first determines whether Congress has "directly spoken to the precise question at issue." 467 U.S. at 842. If the court determines that the statute is silent or ambiguous on the question at hand, then the court proceeds to *Chevron* step two. *Id.* at 843. Under step two, the court must respect the agency's interpretation if it is "based on a permissible construction of the statute." *Id.*

As stated above, Plaintiffs Peter, Timmons, and AFC have alleged plausible claims for relief under the First Amendment. Because they have standing to bring the substantive First Amendment claims, the Court finds that they have also shown that they are arguably aggrieved by agency action—the rulemaking by the Secretary—under 5 U.S.C. § 702 for purposes of judicial

---

[17] The APA allows for judicial review of an "agency action." 5 U.S.C. § 702. Under 5 U.S.C. § 701(b)(2), "'person,' 'rule,' 'order,' 'license,' 'sanction,' 'relief,' and 'agency action' have the meanings given them by section 551 of this title." Under 5 U.S.C. § 551, "agency" means "each authority of the Government of the United States, whether or not it is within or subject to review by another agency . . . ." Accordingly, the California regulations are not subject to challenge under the APA.

review under the APA.

16 U.S.C. § 704 grants the Secretary the authority to establish rules outlining "when, to what extent, if at all, and by what means, it is compatible with the terms of the conventions to allow hunting, taking, capture, killing, possession, sale, purchase, shipment, transportation, carriage, or export of any such bird, or any part, nest, or egg thereof . . . ." Under step one of *Chevron*, the statute does not directly speak to the precise question at issue; that is, the statute does not directly authorize the Secretary to regulate falconers' ability to perform exhibitions or give educational classes, or their ability to earn money from such activities.

Accordingly, the Court proceeds to step two: is it a reasonable interpretation of this language to draft rules that prohibit such conduct? Plaintiffs contend that the MBTA's silence on the regulation of speech does not render the Secretary's unsupported interpretation of the statute reasonable. ECF No. 38 at 32. The Federal Defendants claim that under the authority to control the hunting, taking, capturing, possession, sale, and purchase, etc. of raptors, the agency has the authority to prohibit raptors from being used in activities such as movies, commercials, and other presentations. ECF No. 42 at 10 (asserting the regulations "fall comfortably within that authorization and are a reasonable interpretation of the ambiguity inherent in it"). Federal Defendants fail however to offer any analysis or authority to support this assertion. The Court is not required to find support for parties' Rule 12(b)(6) dismissal arguments.

In sum, the motion to dismiss largely ignores the question most relevant to the viability of Plaintiffs' APA challenge to the speech-related regulations: whether it is reasonable for FWS to interpret its statutory authority to regulate "possession" of migratory birds so as to permit the promulgation of the challenged regulations. Federal Defendants bear the burden on this Rule 12(b)(6) motion. They have not met their burden here. The motion to dismiss the APA challenge with respect to 50 C.F.R. §§ 21.29(f)(9)(i), (f)(9)(ii), (f)(8)(iv) & (f)(8)(v) is therefore DENIED

WITHOUT PREJUDICE to renewal of this argument at a later stage of the case.

## V. MOTION FOR PRELIMINARY INJUNCTION
### (ECF No. 17)

**A.**     **<u>Standard of Review</u>**

"[P]laintiffs seeking a preliminary injunction must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) a preliminary injunction is in the public interest." *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1021 (9th Cir. 2009) (citing *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008)). A stronger showing on one of these four elements may offset a weaker showing on another, but the movant must nonetheless "make a showing on all four prongs." *All. for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1134-35 (9th Cir. 2011). The Ninth Circuit has held that "serious questions going to the merits" sliding scale test is still valid post *Winter* so long as plaintiff satisfies all the remaining prongs set forth in *Winter*. *Id.* at 1135. Under this approach, a preliminary injunction is appropriate when a plaintiff demonstrates that "serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor"; and the plaintiff shows a likelihood of irreparable harm and that the injunction is in the public interest. *Id.* at 1134-35 (internal citation omitted). A preliminary injunction is an extraordinary remedy that may only be awarded when the plaintiff makes a clear showing of entitlement to relief. *Winter*, 555 U.S. at 24.[18]

*//*

---

[18] The Federal Defendants asserted various objections to much of the evidence put forth by Plaintiffs in the preliminary injunction motion. ECF No. 27 at 6,7 n.2. The Court need not consider the Federal Defendants' objections at this time because the Court requires supplemental briefing to fully evaluate the preliminary injunction factors.

**B.  Fourth Amendment Claims**

Because Plaintiffs lack standing to bring the Fourth Amendment claims they are not likely to succeed on those claims.[19] As the Fourth Amendment claims fail on the first prong of the *Winter* preliminary injunction test, the motion for preliminary injunction with respect to these claims (Counts I and II) is denied. The Court will not address the remaining prongs.

**C.  First Amendment Claims**

Plaintiffs' First Amendment challenges generally fall into three categories: (1) the restrictions on falconers' ability to give presentations and to film and photograph their birds, (2) compensation restrictions, and (3) restrictions on commercial speech. The analysis for the first two categories differs from the *Central Hudson* factors for commercial speech. For all three categories, however, the Court must evaluate the likelihood of success of Plaintiffs' claims, as well as the balance of equities and the public interest. *See Winter*, 555 U.S. at 20. After reviewing the parties' briefing and the relevant case law, it has become obvious to the Court that the strength of the government's interest for the challenged regulations and the fit of those interests to the speech restrictions at issue are material to the Court's preliminary injunction analysis for all three categories of the First Amendment challenges.

The Court tentatively finds that the government has a strong interest in protecting the native raptor species, but because the briefing has failed to sufficiently discuss any aspect of fit, and because the Court is responsible for evaluating how a preliminary injunction would impact the public interest, the Court must hear from the Federal and State Defendants before it takes any action.

For example, it is unclear from the present record whether prohibiting falconers from

---

[19] Plaintiffs do not premise their preliminary injunction motion on their APA claim. *See generally* ECF No. 17-1.

earning money for educational presentations is a narrowly-tailored solution to combat a

marketplace for the protected birds. Federal and State Defendants must discuss why the

restrictions on falconers' ability to give presentations and to film and photograph their birds meet

strict scrutiny.

As with analyzing the restrictions on falconers' ability to give presentations and film their

birds, the Court will need supplemental briefing to thoroughly analyze whether the compensation

restrictions are narrowly tailored to achieve the government's interest. Federal and State

Defendants must discuss why the compensation restrictions meets strict scrutiny.

As to the third category relating to commercial speech, the Federal Defendants contend

that the regulations affecting commercial transactions of falconers are necessary to prevent a

market for the protected birds from developing. ECF No. 27 at 9. Federal Defendants argue that

lifting the regulations would undermine the goal of falconry raptor preservation and cause

detrimental effects on the protected species.

Any restriction on commercial speech must directly advance the state's substantial

interest. *Central Hudson*, 447 U.S. at 564. Regulations that only indirectly advance the state

interest will not be upheld. *Id.* One consideration in the direct advancement inquiry is

"underinclusivity." *Valle Del Sol Inc.*, 709 F.3d at 824 (quoting *Metro Lights L.L.C. v. City of

Los Angeles*, 551 F.3d 898, 904 (9th Cir. 2009)). This inquiry "requires a logical connection

between the interest a speech restriction advances and the exceptions a law makes to its own

application." *Valle Del Sol Inc.*, 709 F.3d at 824. In the context of restrictions regulating the

display of signs, to describe the concept of underinclusivity, the Supreme Court held that a

regulation can be unconstitutional if it "in effect restricts too little speech because its exemptions

discriminate on the basis of the signs' messages." *City of Ladue v. Gilleo,* 512 U.S. 43, 50-51

(1994). Aside from the risks of viewpoint and content discrimination, exemptions from an

otherwise legitimate regulation of a medium of speech "may diminish the credibility of the government's rationale for restricting speech in the first place." *Id.* at 52.

> To put it in the context of the *Central Hudson* test, a regulation may have exceptions that "undermine and counteract" the interest the government claims it adopted the law to further; such a regulation cannot "directly and materially advance its aim."

*Metro Lights, L.L.C.*, 551 F.3d at 905 (quoting *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 489 (1995)).

As with the other restrictions, the Defendants claim that the restrictions on commercial speech further the important interest in protecting native raptors. *See* Crum Decl., ECF No. 27-1 ¶ 6. There does not appear to be underinclusivity problem with the challenged regulations.[20] If anything, the provisions seem to go beyond regulating merely commercial speech. It also appears that the regulations are aimed at preventing a marketplace in the possession, buying, selling, and commercial exhibition of native raptor species. Thus, Defendants have made at least some showing that the challenged regulations were promulgated to achieve the government interest.

Under *Central Hudson*, the restriction must not be more extensive than necessary to serve the government interest. *Valle Del Sol, Inc.*, 709 F.3d at 821. The test is sometimes phrased as requiring a "reasonable fit" between the government's legitimate interests and the means it uses to serve those interests, or that the government narrowly tailors the means to meet its objective. *Id.* at 825 (citing *City of Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 416 (1993)); *Bd. of Trs. of State Univ. of N.Y.*, 492 U.S. at 480. In *Sorrell v. IMS Health, Inc.*, 564 U.S. at 571-72, the Supreme Court stated that under the commercial speech inquiry, to "sustain [a] targeted, content-based" restriction, "the State must show at least that the statute directly advances a substantial governmental interest and that the measure is drawn to achieve that interest." The likelihood of

---

[20] However, this analysis could be affected by the supplemental briefing and further development of the record.

success of the commercial speech claims turns on whether the government restrictions on commercial speech are not more extensive than necessary to serve the government interest. *Valle Del Sol, Inc.*, 709 F.3d at 821.

At present, the Federal and State Defendants' briefing does not explain how the regulations are not more extensive than necessary to serve an important state interest. Additionally, the State Defendants argue their interests in protecting raptors to defend the warrantless search claims, but no such interests have been articulated regarding the speech regulations. *See generally* ECF No. 26 at 23. The State Defendants similarly do not address how the restrictions on commercial speech are not more extensive than necessary to promote the health and welfare of raptors. *See id.* Therefore, on the present record, the Court cannot determine if the restrictions on commercial speech are not more extensive than necessary to serve these interests.

The Court will order the Federal and State Defendants to submit supplemental briefing with respect to these narrow issues. The Defendants should discuss the nature of the government interest involved and how the three categories of speech restrictions (falconers' presentations and media, compensation, and commercial speech) are drawn to meet such interest. Lastly, Defendants should provide an analysis for the third and fourth prongs of the *Winter* test: the balance of equities and the public interest. Plaintiffs will then have an opportunity to respond.

## VI. CONCLUSION

### A. <u>Motions to Dismiss (ECF Nos. 24 & 25)</u>

The motions to dismiss are granted in part with respect to Counts I and II because Plaintiffs lack standing to bring the Fourth Amendment challenges. In addition, Counts III, IV, V, VI, and VI are dismissed with respect to Plaintiffs Katherine and Ariyoshi because those Plaintiffs lack standing to bring their First Amendment challenges. Plaintiffs' APA challenge with

respect to the unannounced inspection provisions is dismissed on standing grounds as well. Plaintiffs are granted limited leave to amend the complaint to allege additional facts to cure these dismissed claims. The motions to dismiss are otherwise denied.

Plaintiffs shall have **30 Days** from the date of the order to file an amended complaint or to file a notice of their intent not to amend the complaint. Defendants shall have **30 Days** from the date the amended complaint is served to file an answer or dispositive pleading.

**B.  <u>Motion for Preliminary Injunction (ECF No. 17)</u>**

The State and Federal Defendants are ordered to file supplemental briefs addressing the state interest(s) in the regulations challenged under the First Amendment and how those speech restrictions are tailored to achieve those interests, and relatedly, the balance of equities and the public interest prongs under *Winter*. The State Defendants' brief shall not exceed **10 pages** excluding any supplemental declarations, and the Federal Defendants' brief shall not exceed **10 pages** excluding any supplemental declarations. The Defendants shall have **30 days** from the date of this order to file the briefs. Toucan, of course, play at this game, so Plaintiffs will then have **30 days** from the date they are served with both State Defendants' and Federal Defendants' briefs to file a responsive brief. The Plaintiffs' combined response shall not exceed **20 pages** excluding any supplemental declarations.

IT IS SO ORDERED.

Dated:   <u>**January 22, 2020**</u>          <u>        **/s/ Lawrence J. O'Neill**        </u>
                                                       UNITED STATES DISTRICT JUDGE