1   ANTHONY L. FRANÇOIS, Cal. Bar No. 184100
    Email: TFrancois@pacificlegal.org
2   TIMOTHY R. SNOWBALL, Cal. Bar No. 317379
    Email: TSnowball@pacificlegal.org
3   Pacific Legal Foundation
    930 G Street
4   Sacramento, California 95814
    Telephone: (916) 419-7111
5   Facsimile: (916) 419-7747

6   JAMES M. MANLEY, Ariz. Bar No. 031820* (*Pro Hac Vice*)
    Email: JManley@pacificlegal.org
7   Pacific Legal Foundation
    3241 E. Shea Blvd., # 108
8   Phoenix, Arizona 85028
    Telephone: (916) 288-1405
9   Facsimile: (916) 419-7747

10  Attorneys for Plaintiffs

11              UNITED STATES DISTRICT COURT

12              EASTERN DISTRICT OF CALIFORNIA

13                   FRESNO DIVISION

14

15  PETER STAVRIANOUDAKIS; et al.,           No. 1:18-cv-01505-NONE-BAM

16              Plaintiffs,                   **RESPONSE TO DEFENDANTS'
                                              SUPPLEMENTAL PRELIMINARY
17       v.                                   INJUNCTION BRIEFS**

18
    UNITED STATES FISH & WILDLIFE SERVICE;    JUDGE:  The Hon. Dale A. Drozd
19  et al.,

20              Defendants.

21

22

23

24

25

26

27

28  *Licensed to practice law in Arizona and Colorado. Not licensed to practice law in California.

1
2

# TABLE OF CONTENTS

**Page**

3    I.      INTRODUCTION ........................................................................................... 1

4    II.     PLAINTIFFS' CLAIMS ................................................................................ 1

5    III.    DEFENDANTS' RESPONSES AND CONCESSIONS .................................... 3

6    IV.   PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION ON THEIR
7                COMMERCIAL SPEECH CLAIMS........................................................... 4

8       A. The Regulations Burden Protected Expression.................................. 5

9       B. The Government Has an Interest in Protecting Migratory Birds ....................... 6

10      C. The Commercial Speech Regulations Do Not Directly and Materially Advance Any
Governmental Interest ...................................................................... 6

11          1. The Connection Between Commercial Speech and the Asserted Interest in Managing
12              Wild Take Is Hopelessly Attenuated.......................................... 6

13          2. The Distinction Between Commercial and Non-Commercial Speech Is Fatally Under-
Inclusive ............................................................................. 8

14          3. The Service's Own Evidence Disproves a Connection Between Commercial Speech
15              and Wild Take ..................................................................... 9

16       D. The Commercial Speech Regulations Are Not Narrowly Tailored ................. 11

17    V.     A PRELIMINARY INJUNCTION IS APPROPRIATE .................................. 13

18          1. Plaintiffs Are Suffering Irreparable Harm From Continuous Constitutional Injuries,
Which Would Be Addressed by a Preliminary Injunction........................... 13

19          2. The Balance of Equities Weighs in Plaintiffs' Favor and a Preliminary Injunction
20              Would Serve the Public Interest............................................... 14

21    VI.   CONCLUSION ......................................................................................... 15

22
23
24
25
26
27
28

1

**TABLE OF AUTHORITIES**

2

Page

3

<u>Cases</u>

4

*adidas-America, Inc. v. Payless Shoesource, Inc.*, 546 F. Supp. 2d 1029 (D. Or. 2008) ............... 3

5

*Bd. of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469 (1989) ................................... 11

6

*Brown v. Entertainment Merchants Association*, 564 U.S. 786 (2011) ........................................ 6

7

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557 (1980) ........ 4

8

*Citizens for Free Speech, LLC v. County of Alameda*, 62 F. Supp. 3d 1129 (N.D. Cal. 2014) .... 15

9

*Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010) .................................................. 12

10

*City of Cincinnati v. Discovery Network*, 507 U.S. 410 (1993) ................................................. 7-8

11

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ............................................................. 15

12

*FDA v. Brown and Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ......................................... 12

13

*Florida Bar v. Went For It, Inc.*, 515 U.S. 618 (1995) ............................................................... 11

14

*Goldie's Bookstore v. Superior Ct.*, 739 F.2d 466 (9th Cir. 1984) ............................................ 13

15

*Greater New Orleans Broadcasting Ass'n, Inc. v. United States*, 527 U.S. 173 (1999)................ 6

16

*Hansen Beverage Co. v. Vital Pharm., Inc.*, 2008 WL 5427601 (S.D. Cal. Dec. 30, 2008) ........ 14

17

*Lisa Frank, Inc. v. Impact Int'l., Inc.*, 799 F. Supp. 980 (D. Ariz. 1992) ................................... 14

18

*Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001) .......................................................... 6, 11

19

*Lydo Enterprises, Inc. v. City of Las Vegas*, 745 F.2d 1211 (9th Cir. 1984) .............................. 14

20

*Metro Lights, LLC v. City of Los Angeles*, 551 F.3d 898 (9th Cir. 2009)........................... 6, 8, 11

21

*Mexichem Fluor, Inc. v. EPA*, 866 F.3d 451 (D.C. Cir. 2017) .................................................... 12

22

*Morris v. U.S. Army Corps of Engineers*, 990 F. Supp. 2d 1082 (D. Idaho 2014) ...................... 13

23

*Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.*, 762 F.2d 1374 (9th Cir. 1985) .................... 14

24

*Preminger v. Principi*, 422 F.3d 815 (9th Cir. 2005).................................................................. 15

25

*Retail Digital Network, LLC v. Prieto*, 861 F.3d 839 (9th Cir. 2017) .......................................... 4

26

*Sammartano v. Cty. of Carson City*, 303 F.3d 959 (9th Cir. 2002) ....................................... 13-14

27

28

*Sanders County Republican Cent. Committee v. Bullock*, 698 F.3d 741 (9th Cir. 2012) ............. 13

*Simon and Schuster v. Members of the New York State Crime Victims Board*,
        502 U.S. 105 (1991) ................................................................................................... 6

*Southern Nevada Shell Dealers Ass'n v. Shell Oil Co.*, 725 F. Supp. 1104 (D. Nev. 1989) .......... 4

*Stavrianoudakis v. U.S. Dep't of Fish & Wildlife*,
        2020 WL 406767 (E.D. Cal. Jan. 24, 2020) ...................................................... 1, 4, 13

*Thalheimer v. City of San Diego*, 645 F.3d 1109 (9th Cir. 2011) ................................................. 15

*United States v. Doe*, 53 F.3d 1081 (9th Cir. 1995) ...................................................................... 4

*United States v. Stevens*, 559 U.S. 460 (2010) ............................................................................. 6

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976) ........... 4

*Valle Del Sol, Inc. v. Whiting*, 709 F.3d 808 (9th Cir. 2013) ...................................................... 5, 8

*Warsoldier v. Woodford*, 418 F.3d 989 (9th Cir. 2005) ............................................................. 13

*World Wide Rush, LLC v. City of Los Angeles*, 606 F.3d 676 (9th Cir. 2010) ............................... 4

**State Regulations**

14 C.C.R § 670 ............................................................................................................................. 2

14 C.C.R § 670(h)(13)(A) ......................................................................................................... 2-3, 6

**Federal Regulations**

50 C.F.R. § 21 .............................................................................................................................. 3

50 C.F.R. § 21.29 ......................................................................................................................... 2

50 C.F.R. § 21.29(8)(v) ................................................................................................................ 3

50 C.F.R. § 21.29(b) ..................................................................................................................... 2

50 C.F.R. § 21.29(c) ..................................................................................................................... 2

50 C.F.R. § 21.29(c)(2)(ii)(F), (c)(2)(iii)(E) .............................................................................. 10

50 C.F.R. § 21.29(e)(1) ................................................................................................................ 7

50 C.F.R. § 21.29(e)(2) .............................................................................................................. 10

50 C.F.R. § 21.29(e)(2)(iii), (3)(ii) ............................................................................................ 10

50 C.F.R. § 21.29(f)(8) ................................................................................................................. 2

50 C.F.R. § 21.29(f)(8)(iii) ............................................................... 7

50 C.F.R. § 21.29(f)(8)(iv) ............................................................... 3

50 C.F.R. § 21.29(f)(8)-(9) ............................................................... 2

50 C.F.R. § 21.29(f)(9)(i) ............................................................... 2

50 C.F.R. § 21.29(f)(9)(ii) ............................................................... 2

**Federal Constitution**

U.S. Const. amend. I ...........................................................1-2, 4-6, 13, 15

U.S. Const. amend. IV ............................................................... 1

**Miscellaneous**

37 Fed. Reg. 22,633 (Oct. 20, 1972) ............................................... 2

65 Fed. Reg. 49,509 (Aug. 14, 2000) ............................................... 9

70 Fed. Reg. 34,698 (June 15, 2005) ............................................... 9

74 Fed. Reg. 64,640 (Dec. 8, 2009) ............................................... 9

*A History of Falconry*, International Association for Falconry &
    Conservation of Birds of Prey, https://iaf.org/a-history-of-falconry/ ....................................... 7

Landfried, Jessalee, Note, *Bound & Gagged: Potential First Amendment Challenges
    to "Ag-Gag" Laws*, 23 DUKE ENVTL. L. & POL'Y F. 377 (2013) ............................................ 7

Millsap, B. A. & Allen, G. T., *Effects of Falconry Harvest on Wild Raptor
    Populations in the United States: Theoretical Considerations and Management*,
    34 WILDLIFE SOC'Y BULL. 1392 (2006) ............................................... 9

11A Wright, Charles Alan, et al., *Federal Practice and Procedure* § 2948.1 (2013) ................. 13

1    **I.     INTRODUCTION**

2          Plaintiffs brought First and Fourth Amendment and Administrative Procedure Act claims

3    against various state and federal falconry regulations and sought preliminary injunctive relief on

4    their constitutional claims. ECF Nos. 1 and 17. Defendants United States Fish and Wildlife Service

5    (Service) and Director of the California Department of Fish and Wildlife Charlton H. Bonham

6    (Department) opposed Plaintiffs' first motion for preliminary injunction and moved to dismiss.

7    ECF Nos. 24-27, 41-42. This Court denied Defendants' motions to dismiss the First Amendment

8    claims of Plaintiffs Peter Stavrianoudakis, Scott Timmons, and the American Falconry

9    Conservancy and ordered Defendants to file supplemental briefs "addressing the state interest(s) in

10   the regulations challenged under the First Amendment and how those speech restrictions are

11   tailored to achieve those interests, and relatedly, the balance of equities and the public interest

12   prongs under *Winter*." *Stavrianoudakis v. U.S. Dep't of Fish & Wildlife*, ECF No. 59, 2020 WL

13   406767, at *28 (E.D. Cal. Jan. 24, 2020). Specifically, this Court ordered Defendants to discuss

14   three topics they had neglected in their previous briefing, in addition to the *Winter* factors: "why

15   the restrictions on falconers' ability to give presentations and to film and photograph their birds

16   meet strict scrutiny"; "why the compensation restrictions meets strict scrutiny"; and "how the

17   restrictions on commercial speech are not more extensive than necessary to promote the health and

18   welfare of raptors." *Id*. at *26-27.

19         Defendants filed supplemental briefs in response to that order, but only addressing the third

20   question and the *Winter* factors related to that question. ECF Nos. 67 and 69. Defendants conceded

21   that they could not meet strict scrutiny as to the first two questions, significantly narrowing the

22   issues this Court has to decide. Given Defendants' inability to defend the non-commercial speech

23   regulations and, as explained herein, their failure to justify the commercial speech regulations, a

24   preliminary injunction enjoining enforcement of all the challenged speech restrictions is

25   appropriate.

26   **II.    PLAINTIFFS' CLAIMS**

27         The practice of falconry is a rich cultural tradition in the western world dating back

28   thousands of years. *See generally A History of Falconry*, International Association for Falconry &

1    Conservation of Birds of Prey.[1] Falconers develop deep and personal relationships with their birds,

2    through whom they express themselves in meaningful, individualized, and unique ways. Since its

3    introduction in the United States, falconry has drawn a passionate but relatively small group of

4    enthusiasts, who spend at least seven years developing the skill and knowledge to attain a Master

5    Falconer license. 50 C.F.R. § 21.29(c).

6         The Service has promulgated extensive regulations governing falconry, under the guise of

7    regulating the "taking, possessing, purchasing, bartering, [or] selling" of certain birds of prey

8    pursuant to the Migratory Bird Treaty Act of 1918 and the Bald and Golden Eagle Protection Act

9    of 1940. 50 C.F.R. § 21.29; 37 Fed. Reg. 22,633 (Oct. 20, 1972). The Service substantially revised

10   these regulations in 2008 and encouraged states to create licensing and regulatory schemes

11   consistent with the federal regulations. 50 C.F.R. § 21.29(b). California accepted this invitation.

12   *See* 14 C.C.R § 670.

13        Nestled among the regulations governing the care of falconry birds are regulations imposing

14   a variety of content-based restrictions on falconers' speech. 50 C.F.R. § 21.29(f)(8)-(9); 14 C.C.R

15   § 670(h)(13)(A). The falconry regulations significantly impair Plaintiffs' First Amendment

16   rights—both to create expression featuring their birds and to talk about their birds—based solely

17   on the content of the expression.

18        Falconers are prohibited from photographing or filming their birds—but only if the images

19   will be used in a production that is not about falcons or falconry. Second Amended Complaint

20   (SAC), ECF No. 64 at Counts IV and VIII[2]; 50 C.F.R. § 21.29(f)(9)(i); 14 C.C.R. § 670(h)(13)(A).

21   The regulations also specifically ban falconers from creating non-falcon-related commercial

22   speech. SAC at Counts V and VIII; 50 C.F.R. § 21.29(f)(9)(ii); 14 C.C.R. § 670(h)(13)(A). Only

23   one sort of falcon-containing speech is allowed: that which is related to falcons or falconry. 50

24   C.F.R. § 21.29(f)(8); (9)(ii)(A)-(B). But this outlet for speech comes with an important financial

25

26   _____
     [1] https://iaf.org/a-history-of-falconry/.
27   [2] Plaintiffs filed a Second Amended Complaint on Feb. 24, 2020, but the SAC does not make
     substantive changes to the First Amendment claims; those claims are merely renumbered to
28   conform to the SAC and narrowed to make clear that they are alleged only on behalf of Peter
     Stavrianoudakis, Scott Timmons, and American Falconry Conservancy. ECF No. 64 ¶¶ 191-241.

1  disincentive. Under the federal regulations, falconers' "presentation of a conservation education

2  program" may only be compensated if the fee does "not exceed the amount required to recoup . . .

3  costs." SAC at Count VII; 50 C.F.R. § 21.29(f)(8)(iv).

4        Falconers who engage in conservation education programs despite the financial

5  disincentives must also follow content-based guidelines about what can be discussed—including

6  "information about the biology, ecological roles, and conservation needs of raptors and other

7  migratory birds." SAC at Count VI; 50 C.F.R. § 21.29(8)(v). Graciously, the federal regulations do

8  not require that "all of these topics must be addressed in every presentation." *Id.* But any

9  "presentations that do not address falconry and conservation education" are expressly forbidden.

10  *Id.* The California regulations incorporate the same content-based restrictions as 50 C.F.R. § 21,

11  but go further by entirely prohibiting compensation above costs for any falcon-containing

12  expression. SAC at Count VIII; 14 C.C.R. § 670(h)(13)(A).

13  **III.    DEFENDANTS' RESPONSES AND CONCESSIONS**

14        Despite previously opposing Plaintiffs' motion for preliminary injunction, Defendants now

15  make many dispositive concessions in their supplemental briefing.

16        The Department declines to defend the state or federal regulations at all: "Because

17  California's restrictions were set to comply with the federal requirements for state falconry

18  programs, the [Service] is in a better position to explain the interests behind the restrictions and

19  why they are narrowly tailored to achieve those interests . . . .  Accordingly, the Director defers to

20  the [Service's] discussion of these issues." ECF No. 67 at 2:8-12.

21        The Service also declines to defend the regulations governing non-commercial speech,

22  conceding that "the Department of Justice does not take the position that the challenged regulations

23  satisfy strict scrutiny insofar as they apply to non-commercial speech." ECF No. 69 at 6:16-18.

24        Given the Department's deference to the Service, no Defendant is defending the regulations

25  "insofar as they apply to non-commercial speech." *Id*. The parties agree this includes Counts VI

26  and VII, and Counts IV and VIII to the extent they regulate non-commercial speech. *Id*. at 3 n.2.

27  Accordingly, Plaintiffs are entitled to immediate entry of a permanent injunction and entry of a

28  final judgment with respect to those claims. *adidas-America, Inc. v. Payless Shoesource, Inc.*, 546

1   F. Supp. 2d 1029, 1076 (D. Or. 2008) (citing *Southern Nevada Shell Dealers Ass'n v. Shell Oil Co.*,

2   725 F. Supp. 1104, 1109 (D. Nev. 1989)) (failing to respond to argument raised in summary

3   judgment papers concedes argument); *cf. United States v. Doe*, 53 F.3d 1081 (9th Cir. 1995)

4   (government waives argument by failing to brief it or raise it at oral argument).

5          For the reasons explained below, Plaintiffs are also entitled to a preliminary injunction with

6   respect to their commercial speech claims, Counts V and VIII. Defendants have failed to justify the

7   state and federal falconry regulations that impose content-based limits on commercial speech by

8   preventing falconers from photographing or filming their birds in speech that proposes a

9   commercial transaction, but is unrelated to falconry.

10  **IV.   PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION ON THEIR
        COMMERCIAL SPEECH CLAIMS**

11

12         Defendants' concessions leave this Court with only one question regarding the Service's

13  decision to ban commercial speech featuring falcons that is not about falcons or falconry: are "the

14  restrictions on commercial speech . . . more extensive than necessary to promote the health and

15  welfare of raptors." *Stavrianoudakis*, ECF No. 59, 2020 WL 406767, at *27. This concerns the

16  operative portion of the *Central Hudson* intermediate scrutiny test. *Cent. Hudson Gas & Elec. Corp.*

17  *v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 561 (1980); *Retail Digital Network, LLC v.*

18  *Prieto*, 861 F.3d 839, 849-50 (9th Cir. 2017) (en banc).

19         *Central Hudson* intermediate scrutiny applies to speech that "does no more than propose a

20  commercial transaction." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425

21  U.S. 748, 762 (1976). The test has four parts: (1) whether the speech at issue is not misleading and

22  concerns lawful activity; (2) whether the government interest is substantial; (3) whether the

23  regulation directly advances that interest; and (4) whether the regulation is not more extensive than

24  necessary to achieve the interest. *Cent. Hudson Gas & Elec. Corp.*, 447 U.S. at 561; *World Wide*

25  *Rush, LLC v. City of Los Angeles*, 606 F.3d 676, 684 (9th Cir. 2010). The first step is a threshold

26  issue that determines whether the restricted speech enjoys First Amendment protection. *World Wide*

27  *Rush*, 606 F.3d at 684. If the speech at issue passes this threshold, then the government bears the

28  ///

1  burden of satisfying the other three steps. *Valle Del Sol, Inc. v. Whiting*, 709 F.3d 808, 816 (9th

2  Cir. 2013).

3      Other than a flight of fancy about which of the falconry regulations affect First Amendment

4  activity, the Service's supplemental brief relies on the same attenuated connection between speech

5  and bird welfare that it raised in the first round of preliminary injunction briefing. But the

6  challenged speech regulations burden protected expression and do not directly advance any

7  government interest. Plaintiffs are likely to succeed on the merits of their First Amendment

8  commercial speech claims.

9      **A. The Regulations Burden Protected Expression**

10     The Service concedes the first *Central Hudson* step because the First Amendment protects

11  "much of the activity covered by § 21.29(f)(9)(i) and (ii), such as commercials and advertisements."

12  ECF No. 69 at 3:13-14. The Service then asserts that "at least some of the regulated activity—such

13  as 'commercial ventures that are not related to falconry' and 'commercial entertainment'—is not

14  necessarily entitled to First Amendment protection." *Id*. at 3:15-16. The Service's argument on the

15  first point—regarding "commercial ventures that are not related to falconry"—is rendered

16  irrelevant by Defendants' concessions on the non-commercial speech claims. The second point is

17  contrary to long-established precedent.

18     The Service's only discussion about "commercial ventures" involves Plaintiff Timmons'

19  plans to "take paying clients out with me on falconry hunting expeditions with my birds. I would

20  explain the mechanics and beauty of the craft to them. I have had 5 or 6 opportunities for such

21  services in the last 5 years that I have been forced to turn down because of these restrictive speech

22  rules." ECF No. 17-4 ¶ 24. The Service's fixation on these plans is irrelevant because this is a

23  "commercial venture[] . . . related to falconry" and an "educational use[] of falconry raptors . . .

24  [about] the practice of falconry;" allowed by both Section 21.29(f)(9) and (9)(i). Plaintiff

25  Timmons's problem is with the compensation limits that prevent him from being paid to "explain

26  the mechanics and beauty of the craft" and the regulations that dictate the content of conservation

27  education programs. *Id.*; *see also* ECF No. 38 at 25:3-12 (explaining how the regulations restrict

28  Plaintiffs' speech). These compensation limits and content restrictions are contained in the final

sentence of Section 21.29(f)(9), which says he "may not be paid for doing so" (that is, for sharing "information on the practice of falconry"), and Section 21.29(f)(8)(v) and 14 C.C.R. § 670(h)(13)(A), which limit compensation for conservation education programs and dictate those programs' content. But Defendants do not defend the compensation or content limits. ECF No. 69 at 6:16-18. In short, the Service's concerns about Plaintiff Timmons's plans are already resolved by Defendants' concession on Counts VI and VII.

The Service doesn't belabor the second point, but "commercial entertainment" *is* protected by the First Amendment, and to the extent the falconry regulations govern speech as "commercial entertainment," they are subject to strict scrutiny. *United States v. Stevens*, 559 U.S. 460 (2010) (hunting videos); *Brown v. Entertainment Merchants Association*, 564 U.S. 786 (2011) (video games); *Simon and Schuster v. Members of the New York State Crime Victims Board*, 502 U.S. 105 (1991) (books). Defendants have already conceded that they cannot meet strict scrutiny. The speech burdened by the regulations is protected by the First Amendment.

**B.  The Government Has an Interest in Protecting Migratory Birds**

The second *Central Hudson* factor is uncontroversial; Plaintiffs do not now dispute that the government has an interest in protecting migratory birds pursuant to the Migratory Bird Treaty Act. But the commercial speech ban fails at step three.

**C.  The Commercial Speech Regulations Do Not Directly and Materially Advance Any Governmental Interest**

**1.  The Connection Between Commercial Speech and the Asserted Interest in Managing Wild Take Is Hopelessly Attenuated**

Step three of *Central Hudson* "concerns the relationship between the harm that underlies the State's interest and the means identified by the State to advance that interest." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001). Any restriction on commercial speech must "directly and materially advance the asserted governmental interest." *Greater New Orleans Broadcasting Ass'n, Inc. v. United States*, 527 U.S. 173, 188 (1999); *Metro Lights, LLC v. City of Los Angeles*, 551 F.3d 898, 905 (9th Cir. 2009) (A restriction on commercial speech must have a "logical connection" between means and end.).

///

1       The Service suggests the speech restrictions advance a single government purpose:

2 conserving native bird populations by "limiting the demand for taking wild raptors." ECF No. 69

3 at 4:22-27.[3] But banning falconers from photographing or filming their birds in commercials

4 unrelated to falconry does nothing to "directly and materially advance the asserted governmental

5 interest" in protecting migratory birds.

6       On its face, the connection between commercial speech and wild take is not an argument

7 that the regulation of commercial speech *directly* and *materially* advances the Service's interests.

8 The supposed connection between commercial speech and wild take is at least three steps removed:

9 first, a commercial market *might* develop; second that *might* create "sources of pressure on wild

10 raptor populations;" third, that "pressure" *might* lead to expanded wild take, both legal and illegal.

11 Only at this third step is Falconers' commercial speech finally connected to wild take. But this

12 requires further inferential leaps to assume that: (1) more people will spend several years to become

13 falconers and capture two falcons per year from the wild, based on the lucrative opportunity to have

14 their birds appear in advertisements, even though they "must use the bird primarily for falconry,"

15 50 C.F.R. § 21.29(f)(8)(iii); or (2) existing falconers will expand their wild flocks—to a maximum

16 of three to five birds—based on this same tantalizing opportunity; or (3) some unknown third

17 persons will violate other regulations against capturing falconry birds without a license, 50 C.F.R.

18 § 21.29(e)(1). This meandering trail of speculation is not the direct link *Central Hudson*

19 intermediate scrutiny requires—and as discussed below, the Service's own evidence shows that it

20 is indeed an implausible connection. It is tantamount to the government arguing that its interest in

21 preserving virgin forests justifies banning newspapers—or maybe only commercial handbills—in

22 order to conserve paper. *Cf. Discovery Network*, 507 U.S. at 428 (ban on only commercial handbills

23 to preserve aesthetics held unconstitutional).

24 ///

---

25 [3] In its previous briefing, the Service asserted this same interest in preventing "a commercial market
to develop." ECF No. 24-1 at 19:6. It also asserted an interest in "discourage[ing] the use of
26 protected raptors for commercial purposes that could cause abuse or misuse of the raptors to occur,"
*id*. at 19:4-5, but it has since abandoned that second justification for the speech regulations. Indeed,
27 animal cruelty laws in all 50 states address this issue without hampering freedom of speech. *See*
Jessalee Landfried, Note, *Bound & Gagged: Potential First Amendment Challenges to "Ag-Gag"*
28 *Laws*, 23 DUKE ENVTL. L. & POL'Y F. 377, 382 (2013).

2. **The Distinction Between Commercial and Non-Commercial Speech Is Fatally Under-Inclusive**

The commercial speech regulations also run afoul of *Central Hudson*'s step three advancement requirement because the distinction between commercial and non-commercial speech is under-inclusive. *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 824 (9th Cir. 2013). Under-inclusivity arises when a regulation reaches only a subset of the speech that causes the alleged harm, such that the regulation fails to achieve its purported goal or makes irrational distinctions between regulated and unregulated speech. *Metro Lights*, 551 F.3d at 906.

A classic example of an under-inclusive commercial speech restriction arose in *City of Cincinnati v. Discovery Network*, 507 U.S. 410 (1993). Cincinnati prohibited commercial handbills in news racks on public property but allowed non-commercial handbills. *Id.* at 412. Cincinnati's asserted interest was to reduce the clutter of news racks to promote aesthetics. *Id.* The Court noted, however, that the distinction between commercial and non-commercial handbills bore no relationship to the interest in aesthetics, since both types of handbill contributed equally to the proliferation of news racks. *Id.* at 425. The restriction thus lacked the required "fit between its goals and its chosen means" because the distinction drawn between commercial and non-commercial handbills had "absolutely no bearing on the interests" the city asserted. *Id.* at 428.

Here, banning falconers from photographing or filming their birds in commercials unrelated to falconry is also fatally under-inclusive because it unjustifiably targets commercial speech. The Service points to nothing in particular about commercial speech that might increase the demand for wild take. The Service does not defend the ban on falconers flying their birds in films or in paid demonstrations. ECF No. 69 at 6:16-18. The Service only attempts to defend the ban on speech that proposes a commercial transaction. This is the same commercial/non-commercial dichotomy the Court struck down in *Discovery Network*. The distinction between falcon-containing non-commercial speech and falcon-containing commercial speech bears no relationship to the interest in preventing wild take, since both types of speech could contribute equally to the demand for falconry birds. *See Discovery Network*, 507 U.S. at 425. The restriction on commercial speech thus lacks the required "fit between its goals and its chosen means." *Id*. at 428. Banning certain types of

falcon-containing advertisements, but not others, "has absolutely no bearing on the interests" the Service has asserted. *Id*.

### 3. The Service's Own Evidence Disproves a Connection Between Commercial Speech and Wild Take

Defendants' restriction on commercial speech as a means to limit the demand for wild raptors fails as a matter of law, but it also fails for lack of evidentiary support. The Service's speculative argument is contradicted by the Service's own evidence. The totality of this evidence is a bald assertion by declarant Brian Millsap that "[i]f falconry raptors were permitted to be used in those ways [filmed or photographed for commercial speech unrelated to falconry], the demand for falconry raptors would increase, potentially quite substantially." ECF No. 68-2 ¶ 11. Based on this sole unsupported statement, the Service asserts that "even a moderate increase" in licensed falconry could hurt wild populations. ECF No. 69 at 7:2-3. But Millsap's own research contradicts this guess in two ways: (1) Millsap's research shows that wild take was rare when falconry regulations *did not* contain speech restrictions; and (2) Millsap's research illuminates the important role falconers play in protecting native species.

Millsap "conducted the scientific analyses that underlie the 2008 falconry regulations, and these analyses concluded that falconry, *as currently practiced*, was extremely unlikely to result in levels of take that would be harmful to wild populations of any species of raptor." ECF No. 68-2 ¶ 17 (emphasis added) (citing B. A. Millsap & G. T. Allen, *Effects of Falconry Harvest on Wild Raptor Populations in the United States: Theoretical Considerations and Management*, 34 WILDLIFE SOC'Y BULL. 1392 (2006)).[4] As noted, the falconry regulations in place when Millsap did his wild take analysis *did not contain the speech restrictions at issue in this case*. *See* 70 Fed. Reg. 34,698 (June 15, 2005); 65 Fed. Reg. 49,509 (Aug. 14, 2000). Only after Millsap concluded that "falconry, as currently practiced, was extremely unlikely to result in levels of take that would be harmful to wild populations of any species of raptor," ECF No. 68-2 ¶ 17, did the Service—and then the Department in response—introduce the speech restrictions. 74 Fed. Reg. 64,640 (Dec. 8, 2009); 2012 CA REG TEXT 312178. Millsap's Declaration humbly admits that the effect of

---

[4] Available at https://tinyurl.com/w8g6fop

1    commercial speech on "native raptor populations would be impossible to predict," ECF No. 68-2

2    ¶ 17, but he already answered this question through empirical analysis in 2006 when he concluded

3    that "falconry, as currently practiced [without restrictions on speech], was extremely unlikely" to

4    affect wild take. *Id*. Millsap also concluded that illegal wild take is "infrequent enough to be

5    considered inconsequential in the context of this analysis." Millsap & Allen, *supra*, at 1393. Under

6    the pre-2008 regulations, wild take was "well below the recommended thresholds," due in part,

7    according to Millsap, to the strict two-bird per-year harvest limits imposed then and still in effect

8    today. *Id.* at 1398; 50 C.F.R. § 21.29(e)(2). Millsap concluded that "harvest rates were extremely

9    conservative under this regulatory framework; only 11.7% of the recommended take occurred."

10   Millsap & Allen, *supra*, at 1398-99. These conclusions directly contradict the idea that "even a

11   moderate increase" in licensed falconry could hurt wild populations, or that the commercial speech

12   rules are related to preventing unsustainable wild take. ECF No. 69 at 7:2-3.

13       Millsap's 2006 research also helpfully explains that licensed falconers, like Plaintiffs, are

14   part of the solution to managing wild take. The Service acknowledges that "falconry itself provides

15   conservation benefits by maintaining a captive reserve." ECF No. 69 at 5:10-11. Millsap points out

16   that "nearly half of all raptors used in the sport are produced through captive breeding and not taken

17   from the wild" and that captive-bred falconry birds have helped to reestablish wild populations.

18   Millsap & Allen, *supra*, at 1398-99. Moreover, the post-2008 regulations make captive-bred falcons

19   more easily available. Under the pre-2008 regulations in effect when Millsap published his analysis,

20   General Falconers were limited to possession of two birds total, and Master Falconers were limited

21   to three birds. 50 C.F.R. § 21.29(e)(2)(iii), (3)(ii) (2005). After 2008, those possession limits

22   increased to three birds and five *wild* birds, for General and Master Falconers respectively, but

23   Master Falconers are now also allowed to possess unlimited captive-bred birds (although all

24   falconry birds must still be trained "in the pursuit of wild game and use[d] . . . in hunting"). 50

25   C.F.R. § 21.29(c)(2)(ii)(F), (c)(2)(iii)(E) (2008). Even if one accepts that commercial speech would

26   increase demand for falconry birds, the empirical evidence and regulatory framework suggest that

27   any increased demand would more likely be met by the captive market, not unsustainable wild take.

28       Banning falconers from contributing to commercials unrelated to falconry does nothing to

"directly and materially advance the asserted governmental interest" in protecting migratory birds and is fatally under-inclusive because it unjustifiably targets commercial speech. Even the suggestion of such a connection is dispelled by the Service's own declarant. The government's interest in the welfare of falconry birds is unaffected whether images of the birds are being shown to sell perches (allowed) or washing machines (not allowed), or to make political statements about freedom (not allowed).[5]

### D.  The Commercial Speech Regulations Are Not Narrowly Tailored

If the Service's arguments did not fail at prong three of *Central Hudson*, we would proceed to the fourth prong where they would fare no better. The final prong runs to the "fit between the legislature's ends and the means chosen to accomplish those ends." *Lorillard Tobacco v. Reilly*, 533 U.S. 525, 556 (2001) (quoting *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 632 (1995)). The means must be "narrowly tailored to achieve the desired objective." *Id*. The government bears the burden to "affirmatively establish the reasonable fit," including identifying a substantial goal and carefully calculating the costs. *Bd. of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 480 (1989).

The Service suggests that its ban on falcon-containing commercial speech that is not about falconry is tailored to its interest in promoting falconry and the conservation benefits of the sport. ECF No. 69 at 5:12-15. But this argument fails the test of non-contradiction. *Metro Lights*, 551 F.3d at 906. The Service argues that the commercial speech regulations are meant to prevent "even a moderate increase" in licensed falconry, ECF No. 69 at 7:2-3, while at the same time arguing that the regulations are tailored to the promotion of falconry. It cannot accomplish both. The Service cannot argue that limiting the number of falconers is critical to preventing wild take (although its own evidence shows it is not), while at the same time arguing that its regulations are tailored because they only focus on promoting falconry.

The Service's tailoring argument is also backward; the question is not whether allowing advertisements about falconry promote falconry—they surely do—but whether the evidence

---

[5] Although the Service now concedes the non-commercial speech ban would fail strict scrutiny. ECF No. 69 at 6:16-18.

1    establishes a fit between controlling wild take and banning all other advertising featuring falcons

2    that is not about falconry. As established above, not only is there a lack of fit between the

3    commercial speech ban and limiting wild take, the Service's own evidence shows that the ban does

4    not even advance that interest. Falconers are already strictly limited in the number of wild birds

5    they can harvest per year, or possess in total. If those limits are too high, "the remedy is not to

6    restrict speech but to consider and explore other regulatory mechanisms. The regulatory mechanism

7    here, based on speech, contravenes the First Amendment." *Citizens United v. Fed. Election*

8    *Comm'n*, 558 U.S. 310, 362 (2010). But the Service's own evidence shows that the current wild

9    take limits, even in a regulatory environment with no speech restrictions, are "extremely

10   conservative." Millsap & Allen, *supra*, at 1398.

11       The Service also boldly asserts that its regulations are tailored because they only target

12   native raptor species, as authorized by the Migratory Bird Treaty Act. ECF No. 69 at 5:21-25. But

13   hewing to the limits of the statute that authorizes the regulations is not constitutional tailoring—it

14   is Administrative Law 101. *FDA v. Brown and Williamson Tobacco Corp.*, 529 U.S. 120, 161

15   (2000) ("[A]n administrative agency's power to regulate . . . must always be grounded in a valid

16   grant of authority from Congress."); *accord Mexichem Fluor, Inc. v. EPA*, 866 F.3d 451, 461 (D.C.

17   Cir. 2017) ("However much we might sympathize or agree with [the agency]'s policy objectives,

18   [the agency] may only act within the boundaries of its statutory authority.").

19       This supposed tailoring to native raptor species is also irrelevant to the tailoring inquiry

20   because it depends on what someone else might do with some other birds. But Plaintiffs' expressive

21   activities like lecturing and photo taking here are regulated and their speech is stymied when they

22   are holding or flying their birds. ECF No. 64 ¶¶ 112, 145-47. What *other* parties not before the

23   Court might be able to say or what pictures they might be able to take while flying *other* birds has

24   no bearing on Plaintiffs' claims that *they* are muzzled while flying *their* birds.

25       Most critically, the Service has still failed to address why regulatory measures actually

26   tailored to the health and welfare of the birds, not based on the content of speech, would be a less

27   reasonable fit. *See Citizens United*, 558 U.S. at 362 ("[T]he remedy is not to restrict speech but to

28   consider and explore other regulatory mechanisms."). For all the foregoing reasons, the commercial

1   speech restrictions fail under *Central Hudson* scrutiny and Plaintiffs are likely to succeed on the

2   merits of Counts V and VIII.

3   **V.      A PRELIMINARY INJUNCTION IS APPROPRIATE**

4           **1.   Plaintiffs Are Suffering Irreparable Harm From Continuous Constitutional
                    Injuries, Which Would Be Addressed by a Preliminary Injunction**
5

6           This Court has already held that Plaintiffs raised substantial constitutional claims and are

7   currently suffering injury to their First Amendment rights, *Stavrianoudakis*, ECF No. 59, 2020 WL

8   406767, at *8-18; no further showing of irreparable injury is necessary. *See Sanders County*

9   *Republican Cent. Committee v. Bullock*, 698 F.3d 741, 744 (9th Cir. 2012) ("When seeking a

10  preliminary injunction in the First Amendment context, the moving party bears the initial burden

11  of making a colorable claim that its First Amendment rights have been infringed, or are threatened

12  with infringement, at which point the burden shifts to the government to justify the restriction.").

13  "When an alleged deprivation of a constitutional right is involved, most courts hold that no further

14  showing of irreparable injury is necessary." 11A Charles Alan Wright, et al., *Federal Practice and*

15  *Procedure* § 2948.1 (2013). Indeed, "[u]nder the law of this circuit, a party seeking preliminary

16  injunctive relief in a First Amendment context can establish irreparable injury sufficient to merit

17  the grant of relief by demonstrating the existence of a colorable First Amendment claim."

18  *Sammartano v. Cty. of Carson City*, 303 F.3d 959, 973-74 (9th Cir. 2002); *Warsoldier v. Woodford*,

19  418 F.3d 989, 1002 (9th Cir. 2005) (same). It is the "purposeful unconstitutional suppression of

20  speech [that] constitutes irreparable harm for preliminary injunction purposes." *Goldie's Bookstore*

21  *v. Superior Ct.*, 739 F.2d 466, 472 (9th Cir. 1984).

22          The Service tries to shoehorn its failed argument about unreasonable delay into the balance

23  of the equities and public interest analysis this Court requested, ECF No. 69 at 8:3-11, but delay

24  goes to irreparable harm, not those other factors. ECF No. 37 at 7 (disposing of these arguments).

25  And the Service is still wrong about what delay means in the preliminary injunction context. The

26  Service points to the time between the enactment of the regulations and the filing of suit, but that

27  time is irrelevant—particularly where constitutional rights are being infringed. *See, e.g.*, *Morris v.*

28  *U.S. Army Corps of Engineers*, 990 F. Supp. 2d 1082, 1088 (D. Idaho 2014) (granting preliminary

1  injunction against 40-year-old regulation because it violated the Second Amendment).

2         The only delay that potentially matters is delay between filing the complaint and seeking

3  preliminary relief. *See Lydo Enterprises, Inc. v. City of Las Vegas*, 745 F.2d 1211, 1214 (9th Cir.

4  1984). But the Service's argument that Plaintiffs delayed "nearly two additional months before

5  seeking injunctive relief" is factually incorrect and legally irrelevant. The Service already

6  acknowledged that the actual "delay" was a mere 22 calendar days (15 working days) between the

7  time service of process was perfected and the federal government shut down due to a lapse in

8  appropriations. ECF No. 27 at 8:14-15. The parties then agreed to a short delay in the proceedings

9  to accommodate that temporary situation. ECF No. 15. The Service acknowledges that the 38 days

10 between the lapse in appropriations and the filing of the preliminary injunction *was* reasonable,

11 ECF NO. 69 at 8 n.4, but then quibbles that the additional two weeks between filing suit and the

12 lapse in appropriations was unreasonable. This is splitting hairs.

13        Moreover, the hairs the Service would split do not matter. There is no bright line rule that

14 delay of any length precludes the granting of a preliminary injunction. *Lydo*, 745 F.2d at 1214 ("We

15 would be loath to withhold relief solely" because of delay and holding injunction unwarranted on

16 the merits.). The Service relies on an inapposite case, in which delay was not a dispositive factor.

17 *Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.*, 762 F.2d 1374, 1377 (9th Cir. 1985) (denying

18 injunction because loss of reputation not shown to be result of defendant's actions). Nor is the short

19 time period here even close to the long delays that courts have found problematic. *Hansen Beverage

20 Co. v. Vital Pharm., Inc.*, 2008 WL 5427601, at *6 (S.D. Cal. Dec. 30, 2008) (noting delay of

21 "several months before taking legal action" but denying injunction on other factors). *See also Lisa

22 Frank, Inc. v. Impact Int'l., Inc.*, 799 F. Supp. 980, 1000 (D. Ariz. 1992) (six-month delay). And

23 neither of those cases involved constitutional injuries.

24

25        **2.  The Balance of Equities Weighs in Plaintiffs' Favor and a Preliminary Injunction
        Would Serve the Public Interest**

26        The public interest and balance of equities favor preliminary relief, because it "is always in

27 the public interest to prevent the violation of a party's constitutional rights," *Sammartano v. Cty. of

28 Carson City*, 303 F.3d 959, 974 (9th Cir. 2002) (quote omitted), and courts "have consistently

1  recognized the significant public interest in upholding First Amendment principles." *Thalheimer v.*

2  *City of San Diego*, 645 F.3d 1109, 1129 (9th Cir. 2011); *Preminger v. Principi*, 422 F.3d 815, 826

3  (9th Cir. 2005) ("Generally, public interest concerns are implicated when a constitutional right has

4  been violated, because all citizens have a stake in upholding the Constitution."). Given the primacy

5  of the constitutional rights at stake, a preliminary injunction is in the public interest.

6        In contrast, and as discussed above, the harms the Service has imagined are "entirely

7  speculative and in any event may be addressed by more closely tailored regulatory measures"—

8  namely regulations that actually address wild take. *Ezell v. City of Chicago*, 651 F.3d 684, 710 (7th

9  Cir. 2011). The speculative harms the Service posits cannot compare to the hardship imposed by

10 "the potential loss of a constitutionally protected right" like free speech. *Citizens for Free Speech,*

11 *LLC v. County of Alameda*, 62 F. Supp. 3d 1129, 1143 (N.D. Cal. 2014). Enjoining the speech

12 restrictions will simply allow Plaintiffs to speak—no other change in the way they care for, protect,

13 fly, or capture wild birds will result from an injunction. The Service admits that the harms it

14 imagines are "difficult to predict" and its own declarant's published research contradicts the notion

15 that "even a moderate increase in the number of permitted falconers" would have any effect on wild

16 take. ECF No. 69 at 7:2-4. On the contrary, wild take is rare and less attractive than ever given

17 expanded flexibility for captive breeding under the post-2008 regulations. The balance of equities

18 and public's interest in enforcing the Constitution favors a preliminary injunction.

19 **VI.   CONCLUSION**

20       Defendants declined to defend the non-commercial speech restrictions and failed to justify

21 the commercial speech restrictions. Accordingly, a preliminary injunction enjoining enforcement

22 of all the challenged speech restrictions is appropriate.

23       DATED: April 24, 2019.

                                 Respectfully submitted,

24

25                                  TIMOTHY R. SNOWBALL
                                 ANTHONY L. FRANÇOIS
                                 JAMES M. MANLEY (*Pro Hac Vice*)

26

27                                  By:    s/Timothy R. Snowball
                                    TIMOTHY R. SNOWBALL

28                                  Attorneys for Plaintiffs