1
2
3
4
5
6
7
8                     UNITED STATES DISTRICT COURT

9               FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   PETER STAVRIANOUDAKIS, et al.,          No. 1:18-cv-01505-NONE-BAM

12              Plaintiffs,                   ORDER GRANTING IN PART AND
                                             DENYING IN PART DEFENDANTS'
13        v.                                 MOTIONS TO DISMISS AND DENYING
                                             PLAINTIFFS' MOTIONS FOR
14   U.S. DEPARTMENT OF FISH &               PRELIMINARY INJUNCTION
     WILDLIFE, et al.,
15                                           (Doc. Nos. 17, 65, 66, 68)
                Defendants.
16

17

18        Plaintiffs Peter Stavrianoudakis ("Peter"), Katherine Stavrianoudakis ("Katherine"), Eric

19   Ariyoshi, Scott Timmons, and the American Falconry Conservancy ("AFC") (collectively,

20   "plaintiffs") initiated the present lawsuit against defendants United States Fish & Wildlife Service

21   ("USFWS") and its director[1] (collectively, "Federal Defendants") and Charlton H. Bonham, the

22   director of the California Department of Fish & Wildlife ("DFW" or "State Defendant")

23   (collectively with Federal Defendants, "defendants"), claiming that certain regulations violate the

24   First and Fourth Amendments to the United States Constitution and were promulgated in excess

25   of statutory authority in violation of the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*

26   ("APA").  Plaintiffs, except Katherine, are licensed falconers who own trained falcons that are

27   _____

28   [1]  Aurelia Skipworth was Director of USFWS until January 19, 2021.  The Clerk of Court will be
     instructed to substitute Martha Williams, Principal Deputy Director, with defendant Aurelia
     Skipworth.

                                                    1

housed inside their homes or within the curtilage of their homes. The challenged regulations govern the sport of falcony, which is defined by regulation as "caring for and training raptors[2] for pursuit of wild game, and hunting wild game with raptors." 50 C.F.R. § 21.3 ("Falcony includes the taking of raptors from the wild to use in the sport; and caring for, training, and transporting raptors held for falcony."); *see also* 14 C.C.R. § 670(b)(7) (defining falcony as "the possession, housing, trapping, transport, and use of raptors for the purpose of hunting or training.").

Presently before the court are two motions for preliminary injunction filed by plaintiffs (Doc. Nos. 17, 65) and two motions to dismiss plaintiffs' second amended complaint ("SAC") filed by the Federal Defendants and State Defendant, respectively (Doc. Nos. 66, 68). A hearing on those motions was held back on August 20, 2021, at which time the motions were taken under submission for decision. Attorney James Manley appeared at the hearing on behalf of plaintiffs, Assistant United States Attorney Philip Scarborough appeared on behalf of the Federal Defendants, and California Deputy Attorney General Ali Karaouni appeared on behalf of State Defendant. For the reasons set forth below, the court will grant in part and deny in part defendants' motions to dismiss and deny plaintiffs' motions for preliminary injunction.[3]

///// 

///// 

///// 

---

[2] Another term for falcon, a "raptor" is defined as "any bird of the Order Falconiformes, Accipitriformes, or Strigiformes, or a hybrid thereof" by the California regulations. 14 C.C.R. § 670(b)(15); *see also* 50 C.F.R. § 21.3 (defining raptor as "a migratory bird of the Order *Accipitriformes*, the Order Falconiformes, or the Order Strigiformes . . .").

[3] The undersigned apologizes for the delay in the issuance of this order. This court's overwhelming caseload has been well publicized and the long-standing lack of judicial resources in this district long-ago reached crisis proportion. That situation, which continued unabated for over twenty-two months but has now been partially addressed by the U.S. Senate's confirmation of a new district judge for this court on December 17, 2021, left the undersigned presiding over 1,300 civil cases and criminal matters involving 735 defendants at last count. Unfortunately, that situation sometimes results in the court not being able to issue orders in submitted civil matters within an acceptable period of time. This situation has been frustrating to the court, which fully realizes how incredibly frustrating it is to the parties and their counsel.

**BACKGROUND**

**A.     Regulatory Background**

1.     <u>Migratory Bird Treaty Act</u>

The Migratory Bird Treaty Act ("MBTA") codifies the protections of migratory birds as

outlined in various conventions between the United States and four neighboring countries:

Canada, Mexico, Japan, and Russia.  16 U.S.C. § 703(a); 50 C.F.R. § 10.13(a).  It applies only to

migratory birds native to the United States, including several types of *Falconiformes* (vultures,

kites, eagles, hawks, caracaras, and falcons) and *Strigiformes* (owls).  50 C.F.R. §§ 10.13(c),

21.29(a)(1)(i).  The Secretary of the Interior ("Secretary") is authorized to adopt suitable

regulations to determine, *inter alia*, when, to what extent, and by what means it may be

permissible to hunt, take, capture, possess, sell, or transfer protected birds, bird parts, nests, and

eggs.[4]  16 U.S.C. § 704; 50 C.F.R. § 21.29(a)(1).

Pursuant to the MBTA, USFWS promulgated regulations on falconry standards and

falconry permitting, which became effective on November 7, 2008.  *See* 50 C.F.R. § 21.29; 73

Fed. Reg. 59,448 (Oct. 8, 2008).  For example, the Secretary may delegate responsibility for

issuing falconry licenses and enforcing falconry standards to the relevant state, territorial, or tribal

government upon a showing that their own laws and regulations meet the federal standards.  50

C.F.R. § 21.29(b)(1)(i), (b)(3).  California has created its own regulatory scheme for falconry

permitting, which USFWS approved as being compatible with the federal regulations.  *See* 78

Fed. Reg. 72830–01 (Dec. 4, 2013) ("[A] Federal permit will no longer be required to practice

falconry in any State with its own falconry regulations beginning January 1, 2014."); 50 C.F.R.

§ 21.29(b)(3).  The California regulations explicitly incorporate the federal regulations by

reference.  14 C.C.R. § 670(a)(4).

USFWS "may review the administration of an approved State's . . . falconry program if

complaints from the public or law enforcement investigations indicate the need for a review or for

---

[4]  USFWS, a part of the Department of the Interior, is the relevant regulatory agency, and the director of USFWS "is frequently the authorized representative of the Secretary of the Interior . . . ."  50 C.F.R. § 1.2.

revisions to the State's . . . laws, or falconry examination." 50 C.F.R. § 21.29(b)(4) (stating the review may involve "[r]eviewing laws to determine if they meet the requirements of this section"). If USFWS determines that the state regulatory scheme has deficiencies, then USFWS "may propose to suspend, and may suspend, the approval of a State . . . falconry program . . ." *Id.* § 21.29(b)(5)(i). USFWS will first provide written notice to the State and the State "will have 2 years from the date of [the] notification to correct the deficiencies." *Id.* § 21.29(b)(5)(ii)–(iii). After two years, if USFWS still finds suspension is warranted, it "will provide written notice of suspension" and "[t]he suspension of approval of the State's . . . falconry program will be effective 180 days from the date of [USFWS's] final notification of suspension." *Id.* § 21.29(b)(5)(iv). USFWS "will honor all falconry permits in that jurisdiction for 2 years from the date of [its] final notification of suspension of certification." *Id.* § 21.29(b)(5)(v).

### 2. Unannounced Inspection Provisions

Every falconry license holder "must submit to [their] State, tribal, or territorial agency that regulates falconry a signed and dated statement showing that [they] agree that the falconry facilities and raptors may be inspected without advance notice by State, tribal (if applicable), or territorial authorities at any reasonable time of day, but [they] must be present." 50 C.F.R. § 21.29(d)(2)(ii). The California regulations contain a similar provision, which reads that "[t]he department may conduct unannounced visits to inspect facilities, equipment, or raptors possessed by the licensee, and may enter the facilities of any licensee when the licensee is present during a reasonable time of day and on any day of the week." 14 C.C.R. § 670(j)(3)(A). Like the federal regulation, California also requires falconry license applicants to sign a certification stating, in part, "I understand that my facilities, equipment, or raptors are subject to unannounced inspection pursuant to [14 C.C.R. § 670(j)]." *Id.* § 670(e)(2)(D).

### 3. Regulations Relating to Falconers' Speech and Compensated Activities

Federal regulations provide the following falconry standards relating to speech and compensated activities:

(f) Additional information on the practice of falconry—

. . .

4

(8)  Use of falconry raptors in conservation education programs.  If you are a General or Master Falconer, you may use a bird you possess in conservation education programs presented in public venues.

. . .

(iv)  You may charge a fee for presentation of a conservation education program.  The fee may not exceed the amount required to recoup your costs.

(v)  In conservation education programs, you must provide information about the biology, ecological roles, and conservation needs of raptors and other migratory birds, although not all of these topics must be addressed in every presentation.  You may not give presentations that do not address falconry and conservation education.

. . .

(9)  Other educational uses of falconry raptors.  You may allow photography, filming, or other such uses of falconry raptors to make movies or other sources of information on the practice of falconry or on the biology, ecological roles, and conservation needs of raptors and other migratory birds, though you may not be paid for doing so.

(i)  You may not use falconry raptors to make movies, commercials, or in other commercial ventures that are not related to falconry.

(ii)  You may not use falconry raptors for commercial entertainment; for advertisements; as a representation of any business, company, corporation, or other organization; or for promotion or endorsement of any products, merchandise, goods, services, meetings, or fairs, with the following exceptions:

(A)  You may use a falconry raptor to promote or endorse a nonprofit falconry organization or association.

(B)  You may use a falconry raptor to promote or endorse products or endeavors related to falconry, including, but not limited to items such as hoods, telemetry equipment, giant hoods, perches, materials for raptor facilities, falconry training and education materials, and scientific research and publication.

50 C.F.R. § 21.29(f)(8)(iv)–(v), (f)(9)(i)–(ii).  A California regulation similarly provides the following:

(h)  Possession, Transfer, and Disposition of Raptors.

. . .

(13)  Other Uses of Falconry Raptors.  A licensee may use falconry raptors for education, exhibiting, propagation, or abatement.

5

. . .

> (A) Education and Exhibiting.  A licensee may use raptors in his or her possession for training purposes, education, field meets, and media (filming, photography, advertisements, etc.), as noted in 50 CFR 21, if the licensee possesses the appropriate valid federal permits, as long as the raptor is primarily used for falconry and the activity is related to the practice of falconry or biology, ecology or conservation of raptors and other migratory birds.  Any fees charged, compensation, or pay received during the use of falconry raptors for these purposes may not exceed the amount required to recover costs.  An Apprentice falconer may use the licensee's falconry raptor for education purposes only under the supervision of a General or Master falconer.

14 C.C.R. § 670(h)(13)(A).

**B.    Factual Background**

1.    Peter and Katherine Stavrianoudakis

Peter Stavrianoudakis is the president of AFC, has been licensed as a falconer for over thirty years, and is a master falconer.  (Doc. No. 64 ¶ 24.)  Katherine Stavrianoudakis has been married to Peter since May 2014 and has lived with him in the same residence for a total of five years, but she does not have a falconry license.  (*Id.* ¶¶ 25, 81, 83.)  Both reside in Hilmar, California.  (*Id.* ¶¶ 24–25.)  Peter has "housed, cared for, trained, and flown approximately 15 birds," including a four-year-old aplomado falcon named "Ares" who he currently owns.  (*Id.* ¶¶ 74–76.)  According to the SAC, "[t]here is no separate structure used for the care or housing of Ares," and instead, "Ares lives exclusively inside Peter's home, specifically inside his and Katherine's bedroom, and to ensure Ares' health, is occasionally weathered in a protected enclosure in on [sic] their fenced property approximately 20 feet from their home."  (*Id.* ¶ 79–80.)  Peter neither earns income nor participates in any kind of industry through his ownership, training, or care of Ares.  (*Id.* ¶ 78.)

Peter alleges that "[i]n approximately 1983, [he] was subject to an unreasonable warrantless search of his home and warrantless arrest by armed members of the California Department of Fish and Wildlife related to his lawful activities as a non-resident falconer in Nevada."  (*Id.* ¶ 69.)  No charges were filed against Peter following this alleged search and arrest, and he "has never been sanctioned or cited by U.S. Fish and Wildlife, California Fish and

6

Wildlife, or any other agency or body, related to his practice of falconry." (*Id.* ¶¶ 70, 73.)

### 2. Eric Ariyoshi

Eric Ariyoshi is the secretary for AFC and resides in Novato, California. (Doc. No. 64 ¶ 26.) He "has housed, cared for, trained, and flown approximately 20 birds," including a three-year-old peregrine falcon named "Finn," who is currently "housed in an unrestricted mews[5] located 30 feet away with a direct line of sight to the rear of [Ariyoshi's] home." (*Id.* ¶¶ 89, 91–92.) Ariyoshi has given educational presentations about falconry without compensation. (*Id.* ¶ 94.) As a licensed falconer for over 30 years, Ariyoshi "has never been sanctioned or cited by U.S. Fish and Wildlife, California Fish and Wildlife, or any other agency or body, related to his practice of falconry." (*Id.* ¶¶ 86, 90.)

### 3. Scott Timmons

Scott Timmons is a member of AFC, has been a licensed falconer for over 30 years, and resides in Lompoc, California. (Doc. No. 64 ¶ 27.) Additionally, Timmons has been licensed for over ten years to use falcons in professional abatement and owns Aerial Solutions, a small privately-owned abatement company. (*Id.* (defining abatement as "the practice of flying certain species of raptor over a given area as a deterrent to the presence of other invasive bird species.").) As a falconer, Timmons "has housed, cared for, trained, and flown approximately 40 birds," 20 of which have been used for abatement services. (*Id.* ¶ 98.) Timmons currently owns three birds: (1) a five-year-old goshawk named "June"; (2) a five-year-old peregrine falcon named "Jeppa"; and (3) a six-year-old harris hawk named "Tio." (*Id.* ¶ 106.) All three birds "live exclusively in mews and other structures directly adjacent to [Timmons'] home." (*Id.* ¶ 108.)

In 1992, Timmons alleges that he "was approached on his mother's private property in Thousand Oaks, California, by officers of the California Fish & Game Department" who were inquiring "as to whether he was still in possession of a certain red-tailed hawk." (*Id.* ¶¶ 100, 102.) Timmons, who was living with his mother and attending college at that time, told the officers that the hawk flew away but he soon learned that the officers were already in possession

---

[5] A mew is defined as "an enclosure trained for hawks—usually used in plural." *Mew*, Merriam Webster, https://www.merriam-webster.com/dictionary/mew (last visited August 30, 2021).

of the hawk. (*Id.* ¶¶ 101, 103.) According to Timmons, the officers "used the hawk as a pretext to attempt an unreasonable warrantless search of his mother's private property." (*Id.* ¶ 104.) To date, Timmons "has never been sanctioned or cited by U.S. Fish and Wildlife, California Fish and Wildlife, or any other agency or body, related to his practice of falconry." (*Id.* ¶ 105.)

4. AFC

Established in 2002, AFC is a membership organization comprised of approximately 100 members across the United States and is open to any "falconer—neither antagonistic nor detrimental to the association or its purpose—of good moral character and over the age of 17 years." (Doc. No. 64 ¶¶ 113, 117.) Its stated purpose is to promote "the broadest liberties possible that are not in conflict with legitimate conservation efforts based upon sound biological and legal reasoning," and "promote knowledge of quality falconry, as well as to instill pride in falconers for the cultural heritage of the sport, and its place in world history."[6] (*Id.* ¶ 114.) According to the SAC, AFC members are subject to the challenged regulations by virtue of holding falconry licenses. (*See id.* ¶¶ 119–24.)

**C. Procedural History**

On January 18, 2019, plaintiffs filed their first amended complaint ("FAC") in this action, which defendants moved to dismiss in two separate motions. (Doc. Nos. 16, 24, 25.) Plaintiffs also filed a motion for preliminary injunction on January 28, 2019. (Doc. No. 17.)

On January 24, 2020, the court issued an order addressing those three motions. (Doc. No. 59.) First, the court granted in part and denied in part both motions to dismiss, and plaintiffs were granted leave to amend to attempt to cure any pleading deficiencies noted by the court. (Doc. No. 59 at 53–54.) At that time, counts I and II of the original complaint were dismissed as to all plaintiffs due to their lack of standing to bring their Fourth Amendment challenges. Counts III, IV, V, VI, and VI (second count)[7] were dismissed with respect to Katherine and Ariyoshi based

---

[6] A separate organization, North American Falconers Association, filed an amicus brief which largely supports the position of defendants. (*See* Doc. No. 33.)

[7] In their FAC, plaintiffs erroneously labeled two counts "Count VI." (Doc. No. 16 at 18–19.) In its prior order, the court referred to the second Count VI as "Count VI (second count)." (Doc. No. 59 at 2 n.2.) Plaintiffs corrected this mislabeling in their SAC.

upon the finding that they lacked standing to bring their First Amendment challenges. Count VII which addressed the unannounced inspection provisions was also dismissed due to plaintiffs' lack of standing to bring their Fourth Amendment challenges. Defendants' motions to dismiss were otherwise denied.

Second, the court denied plaintiffs' motion for preliminary injunction with respect to Counts I and II, finding that plaintiffs were unlikely to succeed on the merits of those counts since they lacked standing to bring their Fourth Amendment claims. (*Id.* at 50.) Regarding the First Amendment claims, however, the court ordered defendants to file supplemental briefing "addressing the state interest(s) in the regulations challenged under the First Amendment and how those speech restrictions are tailored to achieve those interests, and relatedly, the balance of equities and the public interest prongs under *Winter*." (*Id.* at 54.)

On February 24, 2020, plaintiffs filed their SAC, alleging the following causes of action against all named defendants: (1) unconstitutional condition on falconry licenses in violation of the Fourth Amendment on behalf of Peter, Ariyoshi, Timmons, and AFC ("Count I"); (2) authorization and practice of unconstitutional warrantless searches of property of falconry license holders in violation of the Fourth Amendment on behalf of Peter, Ariyoshi, Timmons, and AFC ("Count II"); (3) warrantless search of non-falconry license holders in violation of the Fourth Amendment on behalf of Katherine ("Count III"); (4) prohibitions against free speech in violation of the First Amendment on behalf of Peter, Timmons, and AFC ("Count IV") (challenging 50 C.F.R. § 21.29(f)(9)(i)); (5) prohibitions against commercial speech in violation of the First Amendment on behalf of Peter, Timmons, and AFC ("Count V") (challenging 50 C.F.R. § 21.29(f)(9)(ii)); (6) compelled content of conservation education programs in violation of the First Amendment on behalf of Peter, Timmons, and AFC ("Count VI") (challenging 50 C.F.R. § 21.29(f)(8)(v)); (7) prohibitions on payment for conservation education programs in violation of the First Amendment on behalf of Peter, Timmons, and AFC ("Count VII") (challenging 50 C.F.R. § 21.29(f)(8)(iv)); (8) prohibitions against free speech in violation of the First Amendment on behalf of Peter, Timmons, and AFC ("Count VIII") (challenging 14 C.C.R. § 670(h)(13)(A)); and (9) regulations in excess of statutory jurisdiction, authority, or limitations

in violation of the APA on behalf of all plaintiffs ("Count IX"). (*See generally* Doc. No. 64 at 17–28.) Plaintiffs also filed a separate, renewed motion for preliminary injunction based on their Fourth Amendment claims, seeking to enjoin the enforcement of "the regulations authorizing unreasonable warrantless searches of the homes, curtilage, papers, and effects of licensed falconers. . . ." (Doc. No. 65 at 2.) Defendants subsequently filed their respective motions to dismiss the SAC and their supplemental briefing in response to the court's order regarding plaintiffs' original motion for preliminary injunction based on the First Amendment claims. (Doc. Nos. 66–69.) All matters have been fully briefed and a hearing on the pending motions was held on August 20, 2021.

## LEGAL STANDARDS

### A.     Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(1)

Under Rule 12(b)(1), a party may move to dismiss an action for lack of subject matter jurisdiction. "When a defendant brings a Rule 12(b)(1) motion, the plaintiff has the burden of establishing subject matter jurisdiction." *Johnson v. Jacobs*, No. 2:14-cv-02323-JAM-EFB, 2015 WL 1607986, at *1 (E.D. Cal. Apr. 9, 2015) (citing *Rattlesnake Coal. v. U.S. Envt'l Prot. Agency*, 509 F.3d 1095, 1102 n.1 (9th Cir. 2007)).

"A Rule 12(b)(1) jurisdictional attack may be facial or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) (citing *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000)). "The district court resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6): [a]ccepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction." *Leite v. Crane Co.*, 797 F.3d 1117, 1121 (9th Cir. 2014). As in a Rule 12(b)(6) motion, the court need not assume the truth of legal conclusions cast in the form of factual allegations. *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003). "By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air for Everyone*, 373 F.3d at 1039. Notably, extrinsic evidence is heard on factual attacks and the court may review "*any* evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of

jurisdiction." *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988) (emphasis added) (citing *Land v. Dollar*, 330 U.S. 731 (1947)).

**B.     Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)**

A motion to dismiss pursuant to Rule 12(b)(6) is a challenge to the sufficiency of the allegations set forth in the complaint.  Dismissal under Rule 12(b)(6) is proper where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balisteri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). In considering a motion to dismiss for failure to state a claim, the court generally accepts as true the allegations in the complaint, construes the pleading in the light most favorable to the party opposing the motion, and resolves all doubts in the pleader's favor. *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).

To survive a 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the Plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions." *Twombly*, 550 U.S. at 555 (internal citations omitted).  Thus, "bare assertions . . . amount[ing] to nothing more than a 'formulaic recitation of the elements' . . . are not entitled to be assumed true." *Iqbal*, 556 U.S. at 681.  "[T]o be entitled to the presumption of truth, allegations in a complaint . . . must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).  In practice, "a complaint . . . must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Twombly*, 550 U.S. at 562.  To the extent that the pleadings can be cured by the

allegation of additional facts, a plaintiff should be afforded leave to amend. *Cook, Perkiss and Liehe, Inc. v. N. Cal. Collection Serv., Inc.*, 911 F.2d 242, 247 (9th Cir. 1990) (citations omitted).

**C.      Motion for Preliminary Injunction**

"[P]laintiffs seeking a preliminary injunction must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) a preliminary injunction is in the public interest." *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1021 (9th Cir. 2009) (citing *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  A stronger showing on one of these four elements may offset a weaker showing on another, but the movant must nonetheless "make a showing on all four prongs." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011).  The Ninth Circuit has held that "[a] preliminary injunction is appropriate when a plaintiff demonstrates . . . that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *Id.* (finding this "serious question" version of the circuit's sliding scale approach survives "when applied as part of the four-element *Winter* test.") (citation omitted).  "That is, 'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135.  The party seeking the injunction bears the burden of proving these elements. *Klein v. City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009).  Finally, a preliminary injunction is an extraordinary remedy that may only be awarded when the plaintiff makes a clear showing of entitlement to relief. *Winter*, 555 U.S. at 24.

# ANALYSIS

**A.      Facial or As-Applied Challenges**

  1.      Fourth Amendment

In its prior order, the court noted that plaintiffs FAC did not clearly articulate whether their Fourth Amendment claims were facial and/or as-applied in nature.  (Doc. No. 59 at 9.)  Under Counts I, II, and III of the SAC, plaintiffs specify that they are asserting both facial and as-applied challenges (Doc. No. 64 ¶¶ 158, 171, 177, 189), and their opposition briefs again discuss

both forms of the claim (*see* Doc. Nos. 73 at 18, 74 at 15 ("The allegations in the SAC sufficiently establish cognizable injuries, facially for all individuals forced to waive their Fourth Amendment rights as a condition of receiving falconry licenses, and as-applied to the [falconry license holder plaintiffs].").  Regardless of the distinctions, as discussed below, the court again concludes that plaintiffs lack standing to bring their Fourth Amendment claims and thus the court need not reach the merits of either a facial or as-applied challenge in ruling on the pending motions to dismiss.

        2.     First Amendment

       The court previously found that plaintiffs' First Amendment claims in the FAC raised both facial and as-applied challenges and that "in part because Plaintiffs do not attempt to challenge the statute on behalf of others not before the Court, for practical purposes the justiciability inquiry is the same for both their facial and as-applied challenges here." (Doc. No. 59 at 17.)  Counts IV, V, VI, VII, and VIII of the SAC, the relevant language mirrors that of the FAC.  *See, e.g.*, Doc. No. 64 ¶ 206 ("On its face and as enforced by Defendants, 50 C.F.R. § 21.29(f)(9)(ii) burdens speech protected by the First Amendment."); Doc. No. 16 ¶ 146 (same). Accordingly, for the same reasons outlined in the court's prior order, the court again finds that plaintiffs' First Amendment claims raise both facial and as-applied challenges and that the justiciability inquiry will be the same for both aspects of this challenge.

**B.**     **Defendants' Motions to Dismiss the SAC Based on Plaintiffs' Lack of Standing**[8]

       The court previously granted defendants' motions to dismiss plaintiffs' Fourth Amendment claims based on lack of standing.  (*See* Doc. No. 59 at 12–15.)  Specifically, the court noted that "none of the named Plaintiffs have ever previously been subjected to the unannounced inspections pursuant to the challenged regulations, [and thus] the Court is forced to speculate as to whether unannounced inspections will be conducted on Plaintiffs in the future."

---

[8]  Plaintiffs, in part, assert that Federal Defendants' motion to dismiss is actually an improper motion for reconsideration since it attempts to relitigate issues already decided by this court.  (*See* Doc. No. 73 at 11–14.)  However, a second amended complaint supersedes both the original and amended complaint and Federal Defendants must present arguments to avoid waiver, even if those arguments were previously addressed by the court in the context of plaintiffs' previous complaint.

(*Id.* at 14.)  As for AFC's associational standing, which relied on the alleged warrantless searches of persons not named as plaintiffs, the court found that AFC did not specify whether these non-plaintiffs were AFC members and regardless, their alleged searches occurred outside of California and years before the challenged regulations went into effect.  (*Id.*)

Similarly, the court granted defendants' motions to dismiss plaintiffs' First Amendment claims as to Katherine and Ariyoshi based on lack of standing.  (*See* Doc. No. 59 at 28–29.) However, the court found that Peter and Timmons "have alleged a present injury or threatened injury sufficient to make their First Amendment claims justiciable," (*id.* at 28), and that AFC sufficiently alleged associational standing with regard to the First Amendment claims (*id.* at 35). Accordingly, defendants' motions to dismiss plaintiffs' First Amendment claims as to Peter, Timmons, and AFC were denied on standing grounds.  (*See id.* at 28–29, 35.)

### 1. Standing and Ripeness

To maintain an action in federal court, plaintiffs must allege facts showing that they have Article III standing.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Article III standing consists of three elements:  "injury in fact, causation, and a likelihood that a favorable decision will redress the plaintiff's alleged injury."  *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) ("To establish Article III standing, an injury must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'") (citations omitted); *City of L.A. v. Lyons*, 461 U.S. 95, 101 (1983) (holding that abstract injury is insufficient to establish Article III standing).  Where prospective injunctive and declaratory relief is sought, "[t]he plaintiff must show that he 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct and the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'"  *Lyons*, 461 U.S. at 101–02 (citations omitted); *see also Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) ("The plaintiff [seeking prospective injunctive relief] must demonstrate that he has suffered or is threatened with a 'concrete and particularized' legal harm, coupled with a 'sufficient likelihood

/////

14

that he will again be wronged in a similar way.'") (citing *Lujan*, 504 U.S. at 560; *Lyons*, 461 U.S. at 111).

"Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes." *Clapper*, 568 U.S. at 409 (citing *Lujan*, 504 U.S. at 564 n.2) (internal quotation marks omitted). Therefore, the "threatened injury must be *certainly impending* to constitute injury in fact," and "[a]llegations of *possible* future injury" are insufficient. *Id.* (citations omitted) (emphasis in original). Ultimately, "the standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the *particular plaintiff* is entitled to an adjudication of the *particular claims* asserted." *Or. Prescription Drug Monitoring Program v. U.S. Drug Enf't Admin.*, 860 F.3d 1228, 1233 (9th Cir. 2017) (emphasis in original).

The related doctrine of ripeness is a means by which federal courts dispose of matters that are premature for review because the purported injuries are too speculative and may never occur. The ripeness doctrine "is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993). "[T]he ripeness inquiry contains both a constitutional and a prudential component." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (internal quotation marks and citations omitted). "The constitutional component focuses on whether there is sufficient injury, and thus is closely tied to the standing requirement; the prudential component, on the other hand, focuses on whether there is an adequate record upon which to base effective review." *Portman v. Cnty. of Santa Clara*, 995 F.2d 989, 902–03 (9th Cir. 1993) (internal citation omitted). The pivotal concern of the ripeness inquiry is "whether the case involves uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all." *Richardson v. City & Cnty. of Honolulu*, 124 F.3d 1150, 1160 (9th Cir. 1997) (citation omitted). "Where a dispute hangs on future contingencies that may or may not occur, it may be too impermissibly speculative to present a justiciable controversy." *Davis v. Guam*, 785 F.3d 1311, 1318 (9th Cir. 2015) (internal quotation marks and citations omitted).

/////

"Whether framed as an issue of standing or ripeness, the inquiry is largely the same: whether the issues presented are 'definite and concrete, not hypothetical or abstract.'" *Wolfson v. Brammer*, 616 F.3d 1045, 1058 (9th Cir. 2010) (citing *Thomas*, 220 F.3d at 1139). "In assuring that this jurisdictional prerequisite is satisfied, [courts] consider whether the plaintiffs face 'a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement,' or whether the alleged injury is too 'imaginary' or 'speculative' to support jurisdiction." *Thomas*, 220 F.3d at 1139 (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). "Concrete legal issues require more than mere 'hypothetical threat[s],' and where [the court] can 'only speculate' as to the specific activities in which a party seeks to engage, [the court] must dismiss a claim as nonjusticiable." *Protectmarriage.com–Yes on 8 v. Bowen*, 752 F.3d 827, 838–39 (9th Cir. 2014) (citing *United Pub. Workers of Am. (C.I.O.) v. Mitchell*, 330 U.S. 75, 89 (1947)). "The party asserting federal jurisdiction bears the burden of proving the case is properly in federal court." *In re Ford Motor Co./Citibank (S.D.), N.A.*, 264 F.3d 952, 957 (9th Cir. 2001).

### 2.    Counts I, II, and III as to Peter, Katherine, Ariyoshi, and Timmons

In the pending motions to dismiss, defendants argue that this court lacks subject matter jurisdiction to hear plaintiffs' Fourth Amendment claims because the individual plaintiffs lack standing, and because such claims are not ripe. (*See* Doc. Nos. 66-1 at 12–16, 68-1 at 14–20.) State Defendant specifically argues that the individual plaintiffs have failed to establish that they "have been subjected to, or are facing imminent threat of, involuntary searches under the Unannounced Inspection Provision." (Doc. No. 66-1 at 14.) The Federal Defendants similarly contend that there is no immediate controversy between them and the individual plaintiffs with respect to the Fourth Amendment claims because the SAC does not contain any allegations that any federal searches have taken place in the last decade and because falconry licensing and enforcement have been delegated to state officials. (*See* Doc. No. 68-1 at 15–16.)

Plaintiffs Peter, Katherine, Ariyoshi, and Timmons again allege injury-in-fact based on their fear of being the target of future searches, asserting that defendants frequently perform unannounced warrantless searches of plaintiffs' homes, papers, and effects. (*See* Doc. Nos. 73 at

22, 74 at 19.) Just as was the case with their FAC, however, these plaintiffs have again failed to allege that they have been personally subjected to searches pursuant to the challenged regulations. (*See* Doc. No. 64 ¶¶ 150–78.) First, the SAC does not contain any allegations indicating that either Katherine or Ariyoshi were ever subjected to a warrantless search or that they face unannounced inspections in the future. (*See id.* ¶¶ 81–94.)

Second, Peter again alleges that he was subjected to a warrantless search and arrest back in 1983 by members of the DFW whereas Timmons reasserts that officers of the California Fish & Game Department approached him at his mother's property back in 1992. (*Id.* ¶¶ 69, 100.) As the court previously noted, these events took place years before the challenged regulations took effect on November 7, 2008. *See* 73 Fed. Reg. 59,448 (Oct. 8, 2008). In their oppositions to the pending motions to dismiss, plaintiffs recognize this timeline but insist that "[t]hese examples provide context to the Court regarding the long running heavy-handed enforcement of federal and state fish and wildlife officers in this area." (Doc. Nos. 73 at 15 n.8, 74 at 12 n.7.) However, it would be ostrich-like to conclude that two alleged searches conducted in 1983 and 1992 under a different regulatory regime demonstrate, or even suggest, that defendants routinely conduct unannounced searches under the challenged regulations or that the individual plaintiffs face unannounced warrantless searches pursuant to the challenged regulations in the future.[9] *See Ervine v. Desert View Reg'l Med. Ctr. Holdings, LLC*, 753 F.3d 862, 868 (9th Cir. 2014) ("[I]t is not the presence or 'absence of a past injury' that determines Article III standing to seek injunctive relief; it is the imminent 'prospect of future injury.'") (citing *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 951 (9th Cir. 2011); *Lujan*, 504 U.S. at 564 & n.2).

/////

---

[9] Relying on the unconstitutional conditions doctrine, plaintiffs contend that they suffer a cognizable injury every year they renew their falconry licenses because falconers must agree to unannounced warrantless searches in order to secure their licenses. (*See* Doc. No. 64 ¶¶ 156–57.) However, such an argument goes to the substance of the plaintiffs' Fourth Amendment claim but is irrelevant to the initial determinations of standing or ripeness. *See Lyons*, 461 U.S. at 101–02 (in seeking prospective injunctive relief, "[t]he plaintiff must show that he 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct and the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'") (citations omitted).

Once again, because under the allegations of the SAC Peter, Katherine, Ariyoshi, and Timmons have never been subjected to the unannounced inspections pursuant to the challenged regulations, this court can only speculate as to whether any unannounced inspections will be conducted on them in the future. Accordingly, the court finds that they have not alleged sufficient standing to bring their Fourth Amendment claims and thus, defendants' motions to dismiss Counts I, II, and III as brought by these plaintiffs will be GRANTED. Because these allegations in the SAC are identical to those in the FAC, the court also finds that granting further leave to amend would be futile and therefore, Counts I and II as to Peter, Ariyoshi, and Timmons, and Count III as to Katherine, will be DISMISSED without further leave to amend.

### 3. Counts I and II as to AFC

AFC again argues that by virtue of holding falconry licenses, its members are subject to the warrantless search provisions and have, in fact, been subjected to such searches. (Doc. No. 64 ¶¶ 119–20, 128.) Because AFC does not allege an injury to the organization itself, it must meet the requirements of associational standing. *See Int'l Union, United Auto., Aerospace & Ag. Implement Workers of Am.*, 477 U.S. 274, 281 (1986). In general, an association has standing to bring suit on behalf of their members when three conditions are met: (1) at least one member would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342–43 (1977).

First, "[t]he association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *United Food & Comm. Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 552 (1996) (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)). Here, because the individual plaintiffs lack standing to bring Fourth Amendment claims in their own right, AFC cannot rely upon them to meet this first requirement of associational standing.

/////

18

In addition to the individual plaintiffs, AFC cites two examples of alleged warrantless searches conducted by USFWS agents in Washington State against two of its members, Stephen Layman in 2004 and Lydia Ash in 2009.[10] (*See* Doc. No. 64 ¶¶ 137–42; Layman Decl., Doc. No. 65-6.) AFC has also provided two examples of alleged warrantless searches conducted by DFW agents against two other members, Fred Seaman in 2016 and Leonardo Velazquez in 2017. (*See* Doc. No. 64 ¶¶ 129–36; Peter Stavrianoudakis Supp. Decl., Doc. No. 65-1 ¶¶ 32–46.)

First, as with the alleged searches against Peter and Timmons in 1983 and 1992, the alleged search against Layman in 2004 occurred before the challenged regulations took effect on November 7, 2008. *See* 73 Fed. Reg. 59,448 (Oct. 8, 2008). Second, although the alleged searches against Ash, Seaman, and Velazquez occurred after the challenged regulations took effect, "it is not the presence or 'absence of a past injury' that determines Article III standing to seek injunctive relief; it is the imminent 'prospect of future injury.'" *Ervine*, 753 F.3d at 868 (citing *Chapman*, 631 F.3d at 951; *Lujan*, 504 U.S. at 564 & n.2). AFC alleges that Ash, Seaman, and Velazquez each were subjected to a search in the past, but "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Lyons*, 461 U.S. at 102 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)). The fact that these individuals were once subjected to an alleged search is insufficient to satisfy the "certainly impending" requirement or to demonstrate that they will be subject to searches in the future. *See Clapper*, 568 U.S. at 409. Even if Ash, Seaman, and Velazquez were proceeding as individual plaintiffs, one past search would be insufficient to confer standing on AFC. Because these three individuals and the individual named plaintiffs lack standing in their own right to bring a Fourth Amendment claim, AFC cannot satisfy the first requirement of associational standing. In light of this conclusion, the court need not analyze the remaining two elements of associational standing.

/////

---

[10] Because Layman and Ash hold Washington State falconry licenses, these alleged searches cannot be used to support standing against the State Defendant in this case. (*See* Doc. No. 66-1 at 7 n.4.)

Accordingly, defendants' motions to dismiss with respect to AFC's Fourth Amendment claims will be GRANTED.  Because plaintiffs' allegations set forth in their SAC are substantially similar to those appearing in their FAC, the court finds that granting further leave to amend would be futile and thus, Counts I and II as to AFC will be DISMISSED without further leave to amend.[11]

4.  <u>Counts IV, V, VI, and VII as to Peter and Timmons</u>[12]

In the pending motion to dismiss, the Federal Defendants argue that there is no case or controversy with respect to the First Amendment claims brought by plaintiffs Peter and Timmons because the Federal Defendants do not issue falconry licenses in California and licensing and enforcement authority has been transferred to the state of California.  (Doc. No. 68-1 at 20.)  The Federal Defendants contend that "[a]ny relief this Court might grant against [them] will have no effect on [their] falconry licensing or enforcement operations, because they do not conduct any such operations."  (Doc. No. 77 at 5–6.)

"[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."  *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002).  "Because '[c]onstitutional challenges based on the First Amendment present unique standing considerations,' plaintiffs may establish an injury in fact without first suffering a direct injury from the challenged restriction."  *Lopez*, 630 F.3d at 785 (quoting *Ariz. Right to Life Political Action Committee v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003)).  "When an individual is subject to [a threat of enforcement], an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law."  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citations omitted).  Here, because plaintiffs are not currently subject to an enforcement action, they are raising a pre-enforcement challenge to the regulations

---

[11]  Because all plaintiffs lack standing to bring their Fourth Amendment claims, the court need not consider their substantive Fourth Amendment arguments or notices of supplemental authority. (*See* note 9 above; Doc. Nos. 80, 86.)  Accordingly, defendants' motions to dismiss due to plaintiffs' failure to state a claim as to their Fourth Amendment claims will be DENIED as moot.

[12]  The SAC excludes Katherine and Ariyoshi from these counts.  (*See* Doc. No. 64 ¶¶ 191, 202, 213, 225, 236.)

20

that restrict speech. *Wolfson*, 616 F.3d at 1058.

In a pre-enforcement case, "the plaintiff may meet constitutional standing requirements by 'demonstrat[ing] a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement.'" *Lopez*, 630 F.3d at 785 (quoting *Babbitt*, 442 U.S. at 298). "To show such a 'realistic danger,' a plaintiff must 'allege[] an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and . . . a credible threat of prosecution thereunder.'" *Id.* Although the standard is less stringent, pre-enforcement plaintiffs "must still show an actual or imminent injury to a legally protected interest." *Lopez*, 630 F.3d at 785 (citation omitted).

To determine if pre-enforcement plaintiffs face a credible threat of adverse state action sufficient to establish standing, the Ninth Circuit has identified three appropriate related inquiries.[13] *Id.* at 786.

> First, we have considered whether pre-enforcement plaintiffs have failed to show a reasonable likelihood that the government will enforce the challenged law against them. Second, we have considered whether the plaintiffs have failed to establish, with some degree of concrete detail, that they intend to violate the challenged law. We have also considered a third factor, whether the challenged law is inapplicable to the plaintiffs, either by its terms or as interpreted by the government. Such inapplicability weighs against both the plaintiffs' claims that they intend to violate the law, and also their claims that the government intends to enforce the law against them.

*Id.* "Self-censorship is a constitutionally recognized injury." *Wolfson*, 616 F.3d at 1059 (citing *Va. v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988) (holding self-censorship is "a harm that can be realized even without an actual prosecution")). In pre-enforcement cases, the actual or

/////

/////

/////

---

[13] In their pending motion to dismiss, Federal Defendants cite the factors set forth in *Wolfson*, which are considered in determining when a claimed threat of prosecution is credible. (*See* Doc. No. 68-1 at 13–14 (citing 616 F.3d at 1058)). However, the decision in *Lopez* was published almost four months after *Wolfson*. Nevertheless, because the relevant factors as articulated by the Ninth Circuit in *Wolfson* and *Lopez* are similar, the parties' arguments will be considered below.

imminent injury is often self-censorship.[14]  *Bayless*, 320 F.3d at 1006.

A government's preliminary efforts to enforce a speech restriction or its past enforcement of a restriction is strong, though not dispositive, evidence that the pre-enforcement plaintiffs face a credible threat of adverse state action.  *Lopez*, 630 F.3d at 786.  A history of past prosecution of parties similarly situated to the plaintiffs will also support a credible threat of enforcement.  *Id.* at 786–87.  On the other hand, "general threat[s] by officials to enforce those laws which they are charged to administer" do not create the necessary injury in fact.  *Id.* at 787; *Thomas*, 220 F.3d at 1139 ("We have held that neither the mere existence of a proscriptive statute nor a generalized threat of prosecution satisfies the 'case or controversy' requirement.").  "Mere allegations of subjective chill are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm."  *Lopez*, 630 F.3d at 787 (internal quotation marks omitted).

Here, the allegations of plaintiffs Peter and Timmons in the SAC are identical to those previously considered by this court.  (*See* Doc. Nos. 17-2 ¶¶ 36, 38; 17-4 ¶¶ 13–16.)  For example, Peter alleges that he has repeatedly declined to give presentations because of the content and compensation restrictions, and that if he "had the chance to earn money with Ares and take him out onto a movie set for a shoot, [he] would absolutely do it," but he has declined to pursue such opportunities because of the regulations in effect.  (Doc. No. 17-2 ¶¶ 36, 38.)  Similarly, Timmons alleges that he was told on the phone by DFW staff that he was not allowed to give educational presentations or to speak to the public about his birds; that he previously performed abatement services at a resort, but DFW advised him that he could not answer questions from resort guests about his birds; and that he was told that if he wanted to schedule time for a guest to come out to speak about his birds, that would be in violation of the regulations.  (Doc. No. 17-4 ¶¶ 13–16.)

---

[14]  Plaintiffs do not address the merits of the Federal Defendants' First Amendment standing arguments, but rather argue that this court has already found that Peter, Timmons, and AFC pleaded valid First Amendment claims and thus the Federal Defendants' motion to dismiss is actually an improper motion for reconsideration.  (*See* Doc. Nos. 73 at 11, 77 at 6.)  As explained above, the SAC supersedes the previous complaints, and therefore the court must determine whether plaintiffs have standing to bring their First Amendment claims based on the allegations presented in the SAC.  (*See* note 8 above.)

Because the allegations presented in the SAC are identical to those in the FAC, the court turns to the reasoning outlined in its prior order. (*See* Doc. No. 59 at 20–23.) Instead of concrete examples of past enforcement, Peter has only provided allegations of self-censorship, which on its own does not support a finding of a credible threat of enforcement. On the other hand, the examples alleged by Timmons are that he was specifically warned by DFW that the challenged regulations would be enforced, and such allegations are sufficient to support a credible threat of enforcement. As to whether Peter and Timmons alleged a credible threat of enforcement *based on the federal and/or state regulations*, the court previously stated:

> Nothing in the record suggests similar enforcement threats have been made by any employee of the Federal Defendants. However, the standing inquiry is whether each Plaintiff has standing to bring each claim in the case. Here, there is no question that the state regulation incorporates the federal regulations by reference. 14 C.C.R. § 670(a)(4) ("Applicable regulations adopted by the U.S. Secretary of the Interior pursuant to the [MBTA] and published in Title 50, Code of Federal Regulations, Part 21 (Revised 07/02/2015), hereinafter referred to as 50 CFR 21, are hereby incorporated and made a part of these regulations."). For purposes of this motion, the Court assumes DFW has authority to and does enforce those incorporated regulations. The Court further finds that, for purposes of this motion, a Plaintiff who is able to establish a credible threat of enforcement by DFW may challenge all of the regulations DFW claims authority to enforce.

(Doc. No. 59 at 22 n.14.)

While there may be a credible threat as to the enforcement of the state and federal regulations against Peter and Timmons, the question remains, by which defendants? *See Bronson v. Swenson*, 500 F.3d 1099, 1110 (10th Cir. 2007) ("It is well-established that when a plaintiff brings a pre-enforcement challenge to the constitutionality of a particular statutory provision, the causation element of standing requires the named defendants to possess authority to enforce the complained-of provision."). Here, the Federal Defendants argue that, even though the state regulations may have incorporated the federal regulations, their "authority over federal falconry licensing has been specifically 'terminate[d]' in favor of the state program." (Doc. No. 68-1 at 24 (citing 50 C.F.R. § 21.29(b)(3)); *see also* 78 Fed. Reg. 72,830-01 (Dec. 4, 2013) (delegating falconry permitting authority to California after concluding that California's regulations comply with the federal regulations and "terminat[ing]" the federal falconry permitting program in

23

California).)  The Federal Defendants further contend that in addition to the absence of allegations that "Federal Defendants have ever threatened any plaintiff with adverse actions for violating the challenged regulations," "there are no facts suggesting that the Federal Defendants will, or even could, take action to enforce the challenged regulations against the plaintiffs or anyone else."  (*Id.* at 23; *see* Crum Decl., Doc. No. 27-1 ¶ 5 ("USFWS does not conduct any licensing enforcement with respect to 50 C.F.R. §§ 21.29(f)(8) and (9). . . .  [S]uch matters are monitored by the California state agency pursuant to its own regulations."); Millsap Decl., Doc. No. 68-2 ¶ 9 ("California likewise assumed control of falconry licenses in its jurisdiction on January 1, 2014.  After those dates, USFWS has not issued any falconry licenses to individuals within the jurisdiction of [California] and has not conducted license enforcement operations in [California].").)  Federal Defendants also point out that although "[t]he regulations do provide a regulatory avenue by which the Federal Defendants hypothetically could reacquire control over falconry licensing operations and enforcement[,] . . . that process can only be triggered by complaints from either the public or law enforcement."  (Doc. No. 68-1 at 19, 23 (citing 50 C.F.R. § 21.29(b)(4)–(5)).)  "Even then, the regulatory process would last more than two years, and it may or may not result in a state's falconry licensing authority being transferred back to the Federal Defendants."  (*Id.*)

Plaintiffs counter that "any enforcement of the state regulations is required by the federal regulations."  (Doc. No. 73 at 11; *see also* 50 C.F.R. § 21.29(b)(1)(i) ("A State . . . that wishes to allow falconry must establish laws and regulations . . . that meet the standards established in this section.").)  Additionally, although USFWS "may have delegated some day-to-day enforcement authority to [DFW], . . . it retains authority to enforce all the regulations challenged here, including ensuring that [DFW's] enforcement of the state and federal regulations is in compliance with the federal regulations."  (Doc. No. 73 at 12 (citing 50 C.F.R. §§ 21.29(b)(4)(vi) (stating that USFWS "may review the administration of an approved State's . . . falconry program if complaints from the public or law enforcement investigations indicate the need for a review" and such review may involve "[r]eviewing laws to determine if they meet the requirements of this section"), (b)(8) ("Suspension or revocation of a falconry permit is the responsibility of the

State . . . However, compliance with all provisions of these regulations remains under the purview of [USFWS].").) Finally, plaintiffs argue that "if [DFW] does not follow the federal regulations, [USFWS] will suspend state permits and Plaintiffs would be required to either transfer their birds to other parties, release them into the wild, or euthanize them." (Doc. No. 73 at 12 (citing 50 C.F.R. § 21.29(b)(v)).)

Plaintiffs have not alleged any enforcement threats that have been made by the Federal Defendants specifically, nor have they alleged a history of past enforcement of the speech regulations by the Federal Defendants. Additionally, licensing and enforcement authority has been transferred to DFW and, as a result, USFWS has not conducted any enforcement proceedings in California and seems unlikely to do so. (*See* Millsap Decl., Doc. No. 68-2 ¶ 9.)

Plaintiffs contend that, despite the Federal Defendants' transfer of authority, they still retain authority to enforce all of the challenged speech regulations in California and to ensure that DFW's enforcement of those regulations is in compliance with the federal regulations. (See Doc. No. 73 at 12.) Even accepting plaintiffs' argument as true, however, the process through which the Federal Defendants could regain authority over California's falconry program would take time and requires following a number of regulatory steps. See 50 C.F.R. § 21.29(b)(4)–(5). First, USFWS would need to receive "complaints from the public or law enforcement investigations [that] indicate the need for a review or for revisions to [California's] . . . laws . . ." 50 C.F.R. § 21.29(b)(4). If this occurs, USFWS *may* suspend or propose to suspend approval of California's falconry program if USFWS determines that California's program is deficient. *Id.* § 21.29(b)(5)(i). In any event, should USFWS determine that suspension of the California falconry program is still warranted, USFWS "will honor all falconry permits in [California] for *2 years* from the date of [the] final notification of suspension of certification." *Id.* § 21.29(b)(5)(v) (emphasis added).

Under the doctrine of ripeness, the question is "whether the case involves uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all." *Richardson*, 124 F.3d at 1160 (citation omitted); *see also Davis*, 785 F.3d at 1318 ("Where a dispute hangs on future contingencies that may or may not occur, it may be too impermissibly

speculative to present a justiciable controversy.") (internal quotation marks and citations omitted).

As reviewed above, a number of regulatory steps would need to be taken before falconry permitting and enforcement authority is transferred from DFW back to USFWS. Plaintiffs have not alleged or provided any factual assertions indicating that any of these steps are likely to occur, including whether USFWS will suspend or terminate California's falconry program in the event that the challenged regulations are invalidated. Additionally, "the regulatory process would last more than two years, and it may or may not result in a state's falconry licensing authority being transferred back to the Federal Defendants." (Doc. No. 68-1 at 19.)

Likewise, to satisfy the injury-in-fact requirement of standing, the "threatened injury must be *certainly impending* to constitute injury in fact," and "[a]llegations of *possible* future injury" are insufficient. *Clapper*, 568 U.S. at 409 (citations omitted) (emphasis in original). Even under the less-stringent pre-enforcement standard, "plaintiffs must still show an *actual or imminent injury* to a legally protected interest." *Lopez*, 630 F.3d at 785 (emphasis added). If all of the regulatory steps are completed and USFWS were to decide to suspend California's falconry program, USFWS would still honor the state falconry permits for two years before requiring the transfer or disposition of raptors held under those permits. *See* 50 C.F.R. § 21.29(b)(5)(v). In light of this two-year grace period under the applicable regulations and the time it takes for the regulatory process to be completed, plaintiffs have failed to show an imminent or certainly-impending injury at the hands of the Federal Defendants.

In sum, plaintiffs have failed to sufficiently allege a credible threat of enforcement of the speech regulations by the Federal Defendants. Accordingly, the motion to dismiss Counts IV, V, VI, and VII as to Peter and Timmons brought by the Federal Defendants' will be GRANTED. Because plaintiffs' allegations in the SAC are identical to those made in the FAC, the court finds that granting further leave to amend would be futile and therefore, Counts IV, V, VI, and VII as brought by plaintiffs Peter and Timmons will be DISMISSED without leave to amend as to the Federal Defendants.

/////

/////

26

5.        Counts IV, V, VI, and VII as to AFC

Because AFC again does not allege injury to the organization itself, it must also meet the three requirements to have associational standing.  *See Hunt*, 432 U.S. at 342–43.  AFC alleges that certain of its members have:  (1) declined to create photographs, movies, commercials, and other expressions; (2) modified the content of their educational presentations; or (3) declined to perform educational presentations and engage in other expression due to defendants' active enforcement of the regulations complained of in this action.  (Doc. No. 64 ¶¶ 144–47.)  While the alleged self-censorship by AFC's members can be a cognizable harm for purposes of standing, *see Am. Booksellers Ass'n*, 484 U.S. at 393, as noted above "[t]he self-censorship door to standing does not open for every plaintiff," *Getman*, 328 F.3d at 1095.  The potential plaintiff must have an actual and well-founded fear that the law will be enforced against him or her.  *Id.*

Peter and Timmons are AFC members, but as discussed above, the court has concluded that Peter and Timmons lack standing to challenge the regulations on the grounds raised in Counts IV, V, VI, and VII of the SAC against the Federal Defendants.  Because AFC cannot demonstrate that at least one member would otherwise have standing to sue in their own right, *see Hunt*, 432 U.S. at 342–43, the court finds that the first element of associational standing is not satisfied by AFC here.  The court therefore need not analyze the remaining two elements of associational standing.

Accordingly, the motion to dismiss with respect to AFC's First Amendment claims against the Federal Defendants will be GRANTED.  Because the allegations in the SAC are substantially similar with respect to this claim to those appearing in the FAC, the court finds that granting further leave to amend would be futile.  Therefore, Counts IV, V, VI, and VII as brought by plaintiff AFC will also be DISMISSED without leave to amend as to the Federal Defendants.[15]

/////

/////

---

[15] Because all plaintiffs lack standing to bring their First Amendment claims against the Federal Defendants, the court need not consider the substantive First Amendment arguments raised in the Federal Defendants' motion.  Accordingly, the Federal Defendants' motion to dismiss for failure to state a claim as to the First Amendment claims will be DENIED as moot.

6. Count IX

The APA allows persons "adversely affected or aggrieved by agency action" to file suit on that basis. 5 U.S.C. § 702. For purposes of the APA, "agency" means "each authority of the Government of the United States . . . ." *Id.* § 701(b)(1). Therefore, "[b]y its own terms the APA does not apply to state agencies." *Sw. Williamson Cnty. Ass'n, Inc. v. Slater*, 173 F.3d 1033, 1035 (6th Cir. 1999); *see also Gilliam v. Miller*, 973 F.2d 760, 764 (9th Cir. 1992) (declining review under the APA because the defendant was acting in a state, not a federal, capacity). Thus, the State Defendant seeks dismissal of Count XI on grounds that "California regulations are not subject to challenge under the federal APA." (Doc. No. 66-1 at 28 (citing Doc. No. 59 at 47 n.17).) Plaintiffs do not address State Defendant's contention, but their opposition to the pending motion indicates that they only "allege that the federal regulations violate the [APA]." (Doc. No. 74 at 8 (citing Doc. No. 64 ¶¶ 242–47).) Accordingly, Count IX will be DISMISSED both with respect to the California regulations and to the extent the claim is brought against the State Defendant.

Regarding the federal regulations, because plaintiffs lack standing to bring their substantive Fourth Amendment claims, they therefore also lack standing to bring any APA based challenge to the unannounced inspection provisions of those regulations. (*See supra* Parts B.2–3.) Therefore, Count IX will be DISMISSED as to the Federal Defendants with respect to plaintiffs' Fourth Amendment claims based on 50 C.F.R. § 21.29(d)(2)(ii).

However, the court previously denied Federal Defendants' motion to dismiss plaintiffs' APA challenge with respect to Peter, Timmons, and AFC's First Amendment claims, finding that the Federal Defendants had failed to satisfy their burden of demonstrating "whether it is reasonable for [USFWS] to interpret its statutory authority to regulate 'possession' of migratory birds so as to permit the promulgation of the challenged regulations." (Doc. No. 59 at 48.) In their pending motion to dismiss the SAC, Federal Defendants state that they will "address Count IX in a motion for summary judgment based on the administrative record at the appropriate time." (Doc. No. 68-1 at 13 n.4.) Accordingly, Count IX with respect to the First Amendment claims

/////

brought by plaintiffs Peter, Timmons, and AFC based on 50 C.F.R. §§ 21.29(f)(8)(iv)–(v) and (f)(9)(i)–(ii) will be allowed to proceed at this time against Federal Defendants.

## C.    Plaintiffs' Motions for Preliminary Injunction[16]

### 1.    Fourth Amendment

Following the court's prior order, plaintiffs filed a second motion for preliminary injunction, seeking to "enjoin[] California and federal regulations that violate their Fourth Amendment rights." (Doc. No. 65-1 at 9.)  However, for the reasons explained above plaintiffs lack standing to bring their Fourth Amendment claims and thus they are unlikely to succeed on those claims. (*See supra* Parts B.2–3.)  Because the first prong of the *Winter* preliminary injunction test (i.e., likelihood of success) fails as to the Fourth Amendment claims, the court need not address the remaining three prongs of the applicable standard.  Accordingly, plaintiffs' motion for preliminary injunction with respect to Counts I, II, and III will be DENIED.

### 2.    First Amendment

In its prior order, the court directed defendants to submit supplemental briefing on "the nature of the government interest involved and how the three categories of speech restrictions (falconers' presentations and media, [17] compensation, and commercial speech) are drawn to meet such interest." (Doc. No. 59 at 53.)  The court also directed defendants to address the balance of equities and public interest prongs of the *Winter* test.  (*Id.*)  Defendants have filed supplemental briefing, and plaintiffs have filed a response thereto.[18]  (Doc. Nos. 67, 69, 78.)  The court will now re-examine plaintiffs' motion for preliminary injunction as to their First Amendment claims in light of the additional briefing.

/////

---

[16]  Plaintiffs do not premise either of their preliminary injunction motions on their APA claim. (*See generally* Doc. Nos. 17, 65.)

[17]  "Media" refers to movies, advertisements, entertainment, or other commercial ventures. *See* 50 C.F.R. § 21.29(f)(9)(i)–(ii).

[18]  In his supplemental brief, the State Defendant defers to the Federal Defendants on this point, stating that they are "in a better position to explain the interests behind the restrictions . . ." (Doc. No. 67 at 3.)

a. *Likelihood of Success on the Merits*

Defendants were first directed to address whether the restrictions on falconers' presentations and media and the compensation restrictions meet strict scrutiny, specifically whether the restrictions are narrowly tailored to achieve the government's interest in protecting the native raptor species. (Doc. No. 59 at 50–51.) The court also identified a similar issue regarding the commercial speech restrictions and directed defendants to explain how those restrictions are not more extensive than necessary to serve the government interest involved. (*Id.* at 53.)

In response, the Federal Defendants have repeated their argument that because they "have no role in issuing or enforcing the terms of falconry licenses in" California or other relevant states, the issuance of a preliminary injunction "would have no effect on the day-to-day operations of the Federal Defendants . . ." (Doc. No. 69 at 6.) However, if the court reaches the merits of plaintiffs' First Amendment claims, then the Federal Defendants state they do "not take the position that the challenged regulations satisfy strict scrutiny insofar as they apply to non-commercial speech."[19] (*Id.* (referring to the restrictions on falconers' presentation and media and the compensation restrictions of 50 C.F.R. § 21.29(f)(8)(iv)–(v)).) On the other hand, Federal Defendants do argue that the commercial speech regulations of 50 C.F.R. § 21.29(f)(9)(i)–(ii) satisfy the four-step *Central Hudson* test. (*See id.* at 3–6.) Because the Federal Defendants have addressed only the commercial speech regulations, the court limits its analysis to the commercial speech inquiry.

Commercial speech is "expression related solely to the economic interests of the speaker and its audience." *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980). Such speech is protected by the First Amendment, but to a lesser degree than other types of speech. *Id.* Courts determine if a law regulates commercial speech by inquiring

---

[19] Because the Federal Defendants chose not to defend or address the non-commercial speech regulations, plaintiffs state that they are "entitled to immediate entry of a permanent injunction and entry of a final judgment with respect to those claims." (Doc. No. 78 at 8–9.) The court is unaware, however, of any authority that would permit such an action in the absence of a properly noticed motion. Accordingly, neither a permanent injunction nor an entry of judgment as to the non-commercial speech regulations will be issued by the court at this time.

whether the speech does no more than propose a commercial transaction.  *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 473–74 (1989) (citing *Va. Pharmacy Bd. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976)); *see also Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 818–19 (9th Cir. 2013).  Where commercial speech is "inextricably intertwined" with otherwise fully protected speech, the commercial speech may lose its commercial character.  *See Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988).  The court evaluates restrictions on commercial speech applying the four-part test set forth in *Central Hudson*:

> (1) if the communication is neither misleading nor related to unlawful activity, then it merits First Amendment scrutiny as a threshold matter; in order for the restriction to withstand such scrutiny, (2) [t]he State must assert a substantial interest to be achieved by restrictions on commercial speech; (3) the restriction must directly advance the state interest involved; and (4) it must not be more extensive than necessary to serve that interest.

*Valle Del Sol*, 709 F.3d at 820–21 (citations omitted).[20]

Here, the parties do not dispute that the government has an interest in "conserv[ing] wild native raptor populations, consistent with the United States' treaty obligations and implementing legislation, including by regulating commercialization of native raptors."  (Doc. Nos. 69 at 4, 78 at 11; *see also* Doc. No. 59 at 43 ("The Court acknowledges Defendants have a substantial interest in protecting native raptors.").)  Instead, the parties' dispute whether the commercial speech regulations directly advance that interest and whether those regulations are more extensive than necessary to achieve that interest, i.e., the third and fourth prongs of the *Central Hudson* test.

/////

/////

---

[20]  The Federal Defendants argue that portions of 50 C.F.R. § 21.29(f)(9)(i)–(ii) "encompass some non-speech activity in addition to commercial speech, [and thus] those portions of the regulations do not implicate the First Amendment."  (Doc. No. 69 at 3–4 (stating that "commercial ventures that are not related to falconry" and "commercial entertainment" are "not necessarily entitled to First Amendment protection").)  Additionally, the Federal Defendants contend that "some of the activities plaintiffs seek to undertake, in fact, are not speech[,]" such as Timmons' indication that he wants "to take paying clients out with [him] on falconry hunting expeditions with [his] birds."  (*Id.* at 3 (citing Doc. No. 17-4 ¶ 24).)  While the Federal Defendants are correct in suggesting that the challenged regulations may encompass some non-speech activities, because plaintiffs' request for injunctive relief will be denied, the court finds it unnecessary to parse out those portions of the regulations at this time.

31

"The third part of the *Central Hudson* test asks whether the speech restriction directly and materially advances the asserted governmental interest." *Greater New Orleans Broadcasting Ass'n, Inc. v. United States*, 527 U.S. 173, 188 (1999). "This burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Id.* (quoting *Edenfield v. Fane*, 507 U.S. 761, 770–71 (1993)). "The fourth part of the test complements the direct-advancement inquiry of the third, asking whether a speech restriction is not more extensive than necessary to serve the interests that support it." *Id.* "The [Supreme] Court has also clarified *Central Hudson*'s fourth factor by making clear that it does not require satisfaction of a 'least-restrictive-means standard,' but rather requires 'a fit between the legislature's ends and the means chosen to accomplish those ends, []a fit that is not necessarily perfect, but reasonable[,] . . . a means narrowly tailored to achieve the desired objective.'" *Retail Digital Network, LLC v. Prieto*, 861 F.3d 839, 846, 848 n.10 (9th Cir. 2017) (quoting *Fox*, 492 U.S. at 477, 480) (alterations in original).

As to whether the commercial speech regulations at issue here directly advance the government's interest in protecting wild native raptor populations, the Federal Defendants assert as follows:

> The commercial regulations challenged by plaintiffs directly advance that interest by limiting the demand for taking wild raptors to use in commercial endeavors. Allowing commercial use of native falconry raptors would increase take of those raptors in two ways. First, additional raptors would be taken pursuant to valid permits. And second, the availability of commercial opportunities for raptor use would increase unlicensed take by individuals without permits. The challenged regulations directly prevent those sources of pressure on wild raptor populations from developing.

(Doc. No. 69 at 4 (internal citations omitted) (citing Millsap Decl., Doc. No. 68-2 ¶¶ 11, 17).) In support of their argument, the Federal Defendants provide a declaration from Brian Millsap, the National Raptor Coordinator in USFWS's Migratory Bird Management, Migratory Bird Program. (*See generally* Millsap Decl., Doc. No. 68-2.) Mr. Millsap generally concludes that creating additional commercial opportunities related to falconry will increase threats to wild, native raptors. (*Id.*) But, because plaintiffs peck away at the details of Mr. Millsap's reasoning, the

court will reproduce the most pertinent parts of his declaration here:

> Included in the federal falconry regulations are prohibitions against the use of falconry raptors in commercial activities, including in commercials, commercial ventures, commercial entertainment, advertisements, as a representation of businesses or other entities, and for promotion or endorsement of any products, merchandise, goods, services, meetings, or fairs. *See* 50 C.F.R. § 21.29(f)(9)(i), (ii). An exception is made for such activities to the extent they relate to falconry products or nonprofit falconry organizations. *See id.*

> As noted, one of the guiding principles of the MBTA has been to prevent commercialization of protected bird species, including falconry raptors. The restrictions on commercial speech set out in § 21.29(f)(9) are intended to prevent a commercial market for falconry raptors from developing. If falconry raptors were permitted to be used in those ways, the demand for falconry raptors would increase, potentially quite substantially. An increase in that demand would result in additional protected raptors being captured from the wild, which could place downward pressure on the native bird populations that the MBTA is designed to protect.

> It is difficult to estimate precisely how much of an effect commercialization might have on protected wild raptor populations. Wild raptor population estimates are difficult to obtain; many of the species used in falconry are relatively shy and reclusive, and populations of different species tend to change over time, such that they cannot be easily counted with regularity. Moreover, any effect of commercialization would likely have different effects on different species. The difficulty associated with predicting the negative effects on bird species is a major reason the USFWS conservatively manages such species.

> . . .

> If the Court were to issue an injunction prohibiting state officials from enforcing the regulatory framework challenged in this law suit [sic], the consequences to native raptor populations would be impossible to predict but would certainly be greater than under the current regulatory paradigm. I conducted the scientific analyses that underlie the 2008 falconry regulations, and these analyses concluded that falconry, as currently practiced, was extremely unlikely to result in levels of take that would be harmful to wild populations of any species of raptor.[21] *See* [Millsap & Allen, *supra* note 21, at 1392–1400]. . . . Expanding the scope of falconry to include for-profit commercial activities unrelated to falconry would increase the demand for falconry permits and raptors, potentially significantly. This would occur because individuals not interested in practicing the

---

[21] Millsap's research "used data for 2003 and 2004 from [the USFWS's permit-tracking database] to assess the number of raptors removed from the wild by species for the purposes of [these] analyses." B.A. Millsap & G.T. Allen, *Effects of Falconry Harvest on Wild Raptor Populations in the United States: Theoretical Considerations and Management Recommendations*, 34 WILDLIFE SOC'Y BULLETIN 1392, 1398 (2006) ("Millsap & Allen").

33

sport of falconry, but rather in acquiring and using raptors in for-profit commercial ventures, would seek permits. Predicting and managing take of raptors for falconry under this new paradigm would be entirely different, and the USFWS currently lacks the rigorous data on raptor populations that would be required to manage take at that increased scale. The USFWS would necessarily have to undertake a new set of analyses to assess that risk to the degree possible, and then to revise the regulations to address that new, higher level of risk. This would also have significant consequences to how the USFWS viewed and managed raptor propagation, because the new and greater commercial demand for raptors would expand the potential negative consequences on raptor populations from this activity as well. This would all have significant negative consequences on the practice of the sport of falconry because much of the flexibility added in the 2008 regulations would need to be removed, and additional safeguards not needed previously would have to be enacted. . . . States and the USFWS would have to carefully consider the cost-benefit of the added administrative burden necessary to implement such a system. In addition to an increase in legal take, the USFWS would have to consider the increased incentive for unlicensed take of wild raptors for both falconry and raptor propagation. Illegal take of raptors for sale of feathers on the black market is already a problem that USFWS works to control; creating additional commercial opportunities for using wild raptors would only increase that threat.

(*Id.* ¶¶ 10–12, 17 (emphasis added).)

Plaintiffs argue that the Federal Defendants are merely speculating as to whether lifting the commercial speech regulations would lead to increased legal and illegal wild take, and that the Federal Defendants' evidence, specifically Millsap's declaration, contradicts their own arguments in at least three ways. (*See* Doc. No. 78 at 12, 14–16.) The court will first attempt to articulate plaintiffs' three arguments before addressing them on their merits.

First, the Federal Defendants express their concern that "[a]llowing commercial use of native falconry raptors would increase take of those raptors" either by persons with valid permits or unlicensed take by persons without permits. (Doc. No. 69 at 4.) In support of this concern, Millsap declares that his own analysis published in 2006 concluded that "falconry, as currently practiced, was extremely unlikely to result in" harmful levels of wild take. (Millsap Decl., Doc. No. 68-2 ¶ 17.) Plaintiffs point out that the falconry regulations in place when Millsap wrote his 2006 paper did not contain any of the challenged speech restrictions. (Doc. No. 78 at 14–15); *compare* 50 C.F.R. § 21.29 (effective June 15, 2005 to Nov. 6, 2008), *with id.* (effective Jan. 1, 2016 (current)). Plaintiffs in making this observation appear to be suggesting that commercial

34

speech regulations are not needed because: (1) none were in place when Millsap conducted his research in 2006; and (2) Millsap concluded that falconry as practiced in 2006 was "extremely unlikely to result in levels of take that would be harmful to wild populations of any species of raptor."

Second, the Federal Defendants assert that "the availability of commercial opportunities for raptor use would increase unlicensed take by *individuals without permits*." (Doc. No. 69 at 4 (citing Millsap Decl., Doc. No. 68-2 ¶¶ 11, 17) (emphasis added).) Plaintiffs, however, point to Millsap's research which found that, under the pre-2008 regulations that did not include any express speech restrictions, "[s]ome wild take may go unreported each year, but we believe such actions are infrequent enough to be considered inconsequential in the context of this analysis." (Doc. No. 78 at 14–15); Millsap & Allen, *supra* note 21, at 1393.

Thirdly, and relatedly, the Federal Defendants express concern over a potential increase in *valid permits*; they contend that "[a]lthough the precise impact on individual species is difficult to predict, even a moderate increase in the number of permitted falconers could have potentially significant consequences." (Doc. No. 69 at 7.) Once again, plaintiffs point to Millsap's own research, which included the following statement:

> [E]stimated harvest rates in 2003 and 2004 for all raptor species in the United States were well below the recommended thresholds. The primary harvest regulation mechanism in effect in these years was a 2-bird-per-falconer limit on the number of raptors that could be removed from the wild each year, in conjunction with an overall maximum possession limit of 3 birds.[22] Thus, even with some 4,250 licensed falconers in the United States (USFWS files) and a potential harvest of up to 8,500 raptors, harvest rates were extremely conservative under this regulatory framework; only 11.7% of the recommended allowable take occurred.

(Doc. No. 78 at 14–15); Millsap & Allen, *supra* note 21, at 1398–99 ("Only if the potential for impacts increase, either through substantial growth in the number of licensed falconers or an

---

[22] Under the current regulation, a General Falconer "may possess no more than 3 raptors[,]" 50 C.F.R. § 21.29(c)(2)(ii)(F), and a Master Falconer "may possess no more than 5 wild raptors, including golden eagles[,]" *id.* § 21.29(c)(2)(iii)(D). However, a Master Falconer "may possess any number of captive-bred raptors[,]" but only to "train them in the pursuit of wild game and use them in hunting." *Id.* § 21.29(c)(2)(iii)(E).

increase in harvest rates for a particular species, would additional safeguards be necessary."). It appears that Millsap attributes the low harvest rates among licensed falconers to the limitations on the number of birds each falconer may possess, limitations that are still in place under the current regulation albeit with those numbers having increased since 2006. (*See* Doc. No. 78 at 15.)

In sum, plaintiffs suggest by way of the three arguments articulated above that Millsap's declaration demonstrates that restrictions on the commercial use of falcons are <u>unnecessary</u> because the practice of falconry in the years pre-dating the 2008 commercial speech restrictions at issue in this case posed no threat to wild raptors. The Federal Defendants attempted to address this contention at the hearing on these motions, clarifying that Millsap's declaration and his 2006 research article were focused on falconry practices undertaken pursuant to the limited federal regulatory definition of falconry, <u>which did not encompass any commercial activity</u>. (*See* Millsap Decl., Doc. No. 68-2 ¶ 7); Millsap & Allen, *supra* note 21, at 1393 ("'Harvest' and 'take' in this paper refer to the capture and removal from the wild of raptors for *use in falconry*.") (emphasis added). Specifically, federal regulations define falconry as the "caring for and training raptors for pursuit of wild game," "hunting wild game with raptors," "taking [] raptors from the wild to use in the sport," and "caring for, training, and transporting raptors held for falconry." (*Id.* ¶¶ 2, 7 ("Any activity outside of this definition using a protected raptor does not qualify as falconry and is not authorized by a falconry permit.") (citing 50 C.F.R. § 21.3).) Accordingly, Millsap's statements that "only 11.7% of the recommended allowable take occurred" among licensed falconers, and that "falconry, as currently practiced, was extremely unlikely to result in levels of take that would be harmful to wild populations of any species of raptor," refer to the take of wild raptors only for non-commercial purposes related to the sport of hunting wild game with raptors. Millsap's work does not therefore directly support plaintiffs' contention that a scenario in which falconers are permitted to use their birds for commercial purposes would pose no more risk of harm to wild populations of any species of raptor as the circumstances examined by Millsap in 2006.

However, Millsap's declaration nonetheless does reflect largely speculative assertions regarding the importance of the commercial speech regulations. Millsap states that "the

consequences to native raptor populations would be *impossible to predict* but would certainly be

greater than under the current regulatory paradigm." (Millsap Decl., Doc. No. 68-2 ¶ 17

(emphasis added).) Additionally, Millsap declares that "[i]f falconry raptors were permitted to be

used in [commercial] ways, the demand for falconry raptors would increase, *potentially quite*

*substantially.*" (*Id.* ¶ 11 (emphasis added).) Finally, the Federal Defendants concede that no

specific studies have been performed on the commercialization of falconry and what effect such

commercialization would have on the wild raptor population. (*See id.* ¶ 17 (stating that USFWS

"would necessarily have to undertake a new set of analyses to assess that risk to the degree

possible, and then to revise the regulations to address that new, higher level of risk").) Thus, it

remains at least somewhat unclear how the commercial speech restrictions challenged here

advance the government's interest in protecting those populations.

     Even if Millsap's declaration could be interpreted to draw a connection between

commercialization and increased take, he does not (either qualitatively or quantitatively) provide

explanations or information that could allow the court to rationally address how well the

commercial speech restrictions fit the asserted government interest involved here. In arguing that

the commercial speech restrictions are not more extensive than necessary to achieve the

government interest, the Federal Defendants state that the speech regulations "do not prohibit

falconers from giving presentations or speeches on any topic they may wish to address; the

regulations only prohibit the use of the MBTA-protected (i.e., native to the United States) raptors

in such presentations." (Millsap Decl., Doc. No. 68-2 ¶ 15.) Furthermore, the Federal

Defendants assert that the commercial speech restrictions "provide a limited carve-out for

commercial speech related to falconry or non-profit falconry associations[,]" as well as "a limited

exception to the prohibition on commercial use of raptors that allows falconers to use raptors in

certain circumstances to propagate captive-bred raptors and sell them to licensed falconers."

(Doc. No. 69 at 5 (citing Millsap Decl., Doc. No. 68-2, ¶¶ 13, 14).) The Federal Defendants also

point to the fact that the regulations "apply only to native raptor species listed in the treaties

underlying the MBTA[,]" which means falconers "can engage in commercial speech using any

number of widely available non-native raptor species." (*Id.* (citing Millsap Decl., Doc. No. 68-2

¶ 15).)  But the existence of various carve-outs is not affirmative evidence of a good fit.

The court ultimately finds that Federal Defendants have not shown a sufficient fit between the commercial speech restrictions at 50 C.F.R. § 21.29(f)(9)(i)–(ii) and the asserted government interest, nor have they provided any evidence that rises above the level of speculation illustrating how the commercial speech restrictions play a role in managing the wild take of raptors. Accordingly, the undersigned concludes that plaintiffs have demonstrated that they are likely to succeed on the merits of their First Amendment commercial speech claims.[23]

Furthermore, the Federal Defendants did not attempt to defend the non-commercial speech restrictions at 50 C.F.R. § 21.29(f)(8)(iv)–(v) nor did they discuss whether those restrictions satisfy strict scrutiny.  (*See* Doc. No. 69 at 6.)  Given that election, at this stage of the proceedings, the Federal Defendants have not satisfied the lower level of scrutiny applicable under *Central Hudson*, and it follows that the Federal Defendants would also unlikely overcome the burden imposed on them under the strict scrutiny standard.  *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571 (2011) (holding that, regardless of the commercial or non-commercial nature of the speech being restricted, "the outcome is the same whether a special commercial speech inquiry or a stricter form of judicial scrutiny is applied.").

> b.  *Irreparable Harm*

Having found that plaintiffs have shown a likelihood of success on the merits on their First Amendment claims, the court now turns to whether plaintiffs have also shown a likelihood that they will suffer irreparable harm in the absence of the court granting preliminary injunctive relief.  The Ninth Circuit has repeatedly held that the "loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury."  *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).  "[A] party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury . . . by demonstrating the existence of a colorable First Amendment claim."  *Sammartano v. First Judicial Dist. Ct.*, 303 F.3d 959, 973 (9th Cir. 2002), *abrogated on other grounds by Winter*,

---

[23]  This finding is without prejudice to the making of a more developed showing based upon a more complete record.

555 U.S. at 22; *see also CTIA – The Wireless Ass'n v. City of Berkeley, Cal.*, 928 F.3d 832, 851

(9th Cir. 2019) ("Irreparable harm is relatively easy to establish in a First Amendment case.").

For the reasons outlined above, plaintiffs have demonstrated that they are likely to succeed on the

merits of their First Amendment claims. Accordingly, the court concludes that consideration of

the *Winter* factor of irreparable harm weighs in favor of granting the requested injunctive relief.

### c.  Balance of Equities and Public Interest

Courts "must balance the competing claims of injury and must consider the effect on each

party of the granting or withholding of the requested relief," and "should pay particular regard for

the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S.

at 24. "In assessing whether the plaintiffs have met this burden, the district court has a duty to

balance the interests of all parties and weigh the damage to each." *Stormans, Inc. v. Selecky*, 586

F.3d 1109, 1138 (9th Cir. 2009) (internal quotation marks and alteration omitted). "Where the

government is a party to a case in which a preliminary injunction is sought, the balance of the

equities and public interest factors merge." *Padilla v. Immigration & Customs Enf't*, 953 F.3d

1134, 1141 (9th Cir. 2020), *vacated and remanded on other grounds*, __U.S.__, 141 S. Ct. 1041

(2021) (citing *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014)).

Here, the Federal Defendants reassert that "the potentially permanent negative ecological

and environmental consequences that could arise from enjoining the challenged regulations

outweigh plaintiffs' interests in obtaining preliminary relief." (Doc. No. 69 at 8.) Specifically,

Federal Defendants express the following concerns:

> As explained in the Millsap Declaration, prohibiting government
> officials from enforcing the challenged restrictions would increase
> the demand for falconry permits and raptors in a potentially
> significant way. *See* Millsap Decl. (ECF 68-2) ¶¶ 11, 17. This would
> be driven both by individuals interested in acquiring raptors to use in
> for-profit commercial ventures as well as an increase in the incentive
> for unlicensed take of wild raptors. *See id.* Although the precise
> impact on individual species is difficult to predict, even a moderate
> increase in the number of permitted falconers could have potentially
> significant consequences. *See id.* USFWS likely would take
> regulatory action to mitigate any negative effects on wild raptor
> populations, but the regulatory process takes time, and the potential
> for negative effects on local raptor populations would still exist. *See
> id.* ¶¶ 17–18. Given the important ecological role native wild raptors
> play in ecosystems throughout the country as apex predators, a

decrease in native raptor populations at any scale could negatively affect those ecosystems in unpredictable ways. *See id.* ¶ 18. Moreover, reversing wild raptor population decreases would take years and would be expensive. *See id.* ¶ 19. These important and potentially significant ecological and conservation consequences weigh heavily against issuing preliminary relief.

(Doc. No. 69 at 6–7.) Plaintiffs respond by arguing that the harms posited by defendants are entirely speculative and that "[e]njoining the speech restrictions will simply allow Plaintiffs to speak—no other change in the way they care for, protect, fly, or capture wild birds will result from an injunction." (Doc. No. 78 at 20 (noting Federal Defendants' admission "that the harms it imagines are 'difficult to predict' and [Millsap's] published research contradicts the notion that 'even a moderate increase in the number of permitted falconers' would have any effect on wild take.") (quoting Doc. No. 69 at 7).)

As discussed above, Federal Defendants have only speculated as to the actual effect of enjoining or removing the commercial speech regulations on wild native raptor populations. However, it is that same uncertainty that cautions this court to deny injunctive relief. On the other side of the balance, the court agrees with defendants that the protection of native raptor species is a very important government interest. *See Missouri v. Holland*, 252 U.S. 416, 435 (1920) (recognizing that protecting species under the MBTA was a national interest "of very nearly the first magnitude"); *United States v. Vasquez-Ramos*, 531 F.3d 987, 991 (9th Cir. 2008) (finding the United States has a compelling interest in protecting bald eagles under both the Bald Eagle Protection Act and the MBTA). In addition, more generally, courts must be cognizant of the fact that "environmental injury, by its nature, can seldom be adequately remedied by money damages." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011); *see also Native Songbird Care & Conservation v. LaHood*, No. 13-CV-02265-JST, 2013 WL 3355657, at *8 (N.D. Cal. July 2, 2013) (applying *Cottrell* in a MBTA case).

In contrast to the potential ecological and conservation consequences highlighted by Millsap and Federal Defendants, apart from the *inherent* harms recognized in the First Amendment context (which are present in every First Amendment lawsuit), plaintiffs seemingly will suffer relatively lesser harm if the commercial speech regulations remain in force during the

40

pendency of this action.  Indeed, plaintiffs themselves concede that there will be no change in how their falcons are protected and cared for (Doc. No. 78 at 20), and both parties maintain that the commercial speech restrictions simply prohibit the use of native raptors in certain presentations and via media and limit what falconers can say while holding or flying their birds (Millsap Decl., Doc. No. 68-2 ¶ 15; *see* Doc. No. 78 at 17).  Furthermore, while plaintiffs reiterate that Millsap's research shows that wild take is rare (Doc. No. 78 at 20), as the Federal Defendants point out, such analysis was based on the take of native raptors only for sporting purposes and not on the taking of native raptors for commercial purposes  (*see* Millsap Decl., Doc. No. 68-2 ¶ 7); Millsap & Allen, *supra* note 21, at 1393 ("'Harvest' and 'take' in this paper refer to the capture and removal from the wild of raptors for *use in falconry*.") (emphasis added).

"With due consideration to the free speech considerations raised by Plaintiffs, which are also of public interest, a cautionary approach that favors denial greater serves the public interest than granting the injunction." *Tracy Rifle and Pistol LLC v. Harris*, 118 F. Supp. 3d 1182, 1195 (E.D. Cal. 2015).  Accordingly, the court concludes that consideration of the balance of equities and public interest prongs of the applicable standard weigh in favor of defendants.  After fully considering all four prongs of the *Winter* test, plaintiffs' motion for preliminary injunction as to their First Amendment claims will be DENIED.

### CONCLUSION

For all of the reasons explained above:

1.  Defendants' motions to dismiss for lack of standing as to Counts I, II, and III (Doc. Nos. 66, 68) are GRANTED and Counts I, II and III are hereby DISMISSED without leave to amend.

2.  The Federal Defendants' motion to dismiss for lack of standing as to Counts IV, V, VI, and VII (Doc. No. 68) is GRANTED and Counts IV, V, VI, and VII are hereby DISMISSED without leave to amend as to the Federal Defendants;

3.  The State Defendant's motion to dismiss Count IX (Doc. No. 66) is GRANTED and Count IX is hereby DISMISSED without leave to amend as to the State Defendant.  As to the Federal Defendants, Count IX (Doc. No. 68) is DISMISSED without leave to amend with respect

1     to the unannounced inspection provisions of the challenged regulations, but shall proceed with

2     respect to the remaining challenged speech regulations;

3        4. Plaintiffs' motion for preliminary injunction based on their Fourth Amendment claims

4     (Doc. No. 65) is DENIED;

5        5. Plaintiffs' motion for preliminary injunction based on their First Amendment claims

6     (Doc. No. 17) is DENIED; and

7        6. The Clerk of the Court is directed to now reassign this case to U.S. District Judge

8     Jennifer L. Thurston and to remove the "NONE" designation.

9     IT IS SO ORDERED.

10       Dated: **January 13, 2022**

11                           UNITED STATES DISTRICT JUDGE

42